**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| FOREVER 21, INC., *et al.*,[1] | ) | Case No. 19-12122 (___) |
| Debtors. | ) | (Joint Administration Requested) |

**DEBTORS' MOTION SEEKING ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION EMPLOYEE WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EMPLOYEE EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[2] respectfully state as follows in support of this motion (this "Motion"):

**Relief Requested**

1. The Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and "Final Order"): (a) authorizing the Debtors to (i) pay prepetition wages, salaries, other compensation, reimbursable employee expenses, and non-insider severance obligations, and (ii) continue employee benefits

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Forever 21, Inc. (4795); Alameda Holdings, LLC (2379); Forever 21 International Holdings, Inc. (4904); Forever 21 Logistics, LLC (1956); Forever 21 Real Estate Holdings, LLC (4224); Forever 21 Retail, Inc. (7150); Innovative Brand Partners, LLC (7248); and Riley Rose, LLC (6928). The location of the Debtors' service address is: 3880 N. Mission Road, Los Angeles, California 90031.

[2] A detailed description of the Debtors and their business, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Jonathan Goulding, Chief Restructuring Officer of Forever 21, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), on September 29, 2019 (the "Petition Date"). Capitalized terms used but not otherwise defined in this Motion shall have the meanings given to them in the First Day Declaration.

programs in the ordinary course, including payment of certain prepetition obligations related thereto, in an aggregate amount not to exceed $25 million pursuant to the Interim Order and $37.1 million pursuant to the Final Order; and (b) granting related relief. In addition, the Debtors request that the Court schedule a final hearing within approximately 30 days after the commencement of these chapter 11 cases to consider entry of the Final Order.

## Jurisdiction and Venue

2. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The bases for the relief requested herein are sections 105(a), 362(d), 363(b), 507(a), and 541(b)(1) of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Local Rule 9013-1(m).

## Background

5. The Debtors are a specialty fashion retailer of women's and men's apparel and accessories. As of the Petition Date, the Debtors operate 549 stores across the United States,

and 251 stores are operated internationally by non-Debtor affiliates. Of the 251 international stores, 181 are owned and operated exclusively by the non-Debtor affiliates, 54 are franchises, and 16 are operated as joint ventures. The Debtors also maintain a substantial online presence, with their e-commerce platform accounting for approximately 16 percent of all sales. In addition to the 534 stores operated under the Forever 21 brand, the Debtors formed a beauty and wellness brand, Riley Rose, in 2017, which operates 15 stores in the United States.

6. On the date hereof, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors have also filed a motion requesting joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

## The Debtors' Workforce

7. As of the Petition Date, the Debtors employ approximately 28,500 employees (the "Employees"), including approximately 5,000 full-time employees and approximately 23,500 part-time and seasonal employees. In addition to the Employees, the Debtors also periodically retain independent contractors and temporary workers (collectively, the "Temporary Staff") sourced regularly from various staffing agencies (the "Staffing Agencies") to fulfill certain duties on a short- and long-term basis. Typically, at any given time the Debtors retain approximately 500 Temporary Staff. In addition, over the next four to six months, in preparation for and during the retail holiday season, as well as relocation of the domestic distribution center, the Debtors

anticipate that the number of Employees and Temporary Staff will increase by approximately 4,000 and 700 respectively.

8. The Employees and Temporary Staff perform a wide variety of functions, which are mission-critical to the preservation of value and the administration of the Debtors' estates. In many instances, the Employees and Temporary Staff include personnel who are intimately familiar with the Debtors' business, processes, and systems, and who cannot be easily replaced. Without the continued, uninterrupted services of the Employees and the Temporary Staff, the Debtors' business operations will be halted immediately and the administration of the estates materially impaired.

9. Further, the vast majority of the Employees and Temporary Staff rely on their compensation and benefits to pay their daily living expenses. These workers will be unfairly harmed if the Debtors are not permitted to continue paying compensation and providing health and other benefits during these chapter 11 cases. Consequently, the Debtors respectfully submit that the relief requested herein is necessary and appropriate under the facts and circumstances of these chapter 11 cases.

## Employee Compensation and Benefits

10. To minimize the personal hardship the Employees and Temporary Staff could suffer if prepetition Employee-related obligations remain unpaid during the administration of these chapter 11 cases, the Debtors, by this Motion, seek authority, but not direction, to: (a) pay and honor certain prepetition claims relating to, among other things, wages, salaries, other compensation, payroll services, federal and state withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, and taxes), reimbursable expenses, the non-insider deferred compensation plan, health insurance, retirement health and

related benefits, workers' compensation benefits, life insurance, short- and long-term disability coverage, non-insider severance, and certain other benefits that the Debtors have historically provided in the ordinary course (collectively, the "Employee Compensation and Benefits"); and (b) pay all costs incident to the Employee Compensation and Benefits, collectively in an aggregate amount not to exceed $25 million pursuant to the Interim Order and $37.1 million pursuant to the Final Order.

11. Subject to the Court's approval, the Debtors intend to honor the applicable prepetition Employee Compensation and Benefits programs in the ordinary course on a postpetition basis. Out of an abundance of caution, the Debtors further request authority to modify, change, or discontinue any of their Employee Compensation and Benefits and to implement new programs, policies, and benefits in the ordinary course during these chapter 11 cases in the Debtors' sole discretion without the need for further Court approval, subject to applicable law.

12. By this Motion, the Debtors seek authority, but not direction, to make the following payments related to prepetition amounts owed on account of the Employee Compensation and Benefits:

| **Employee Obligation** | **Interim Amount** | **Final Amount** |
|---|---|---|
| **Employee Compensation** | **$21,731,000** | **$23,531,000** |
| Unpaid Compensation | $14,800,000 | $14,800,000 |
| Unpaid Temporary Staff Compensation | $1,800,000 | $3,600,000 |
| Unpaid Withholding Obligations | $4,500,000 | $4,500,000 |
| Unpaid Payroll Processing Fees | $140,000 | $140,000 |
| Unpaid Reimbursable Expenses | $219,000 | $219,000 |
| Unpaid Corporate Credit Card Expenses | $272,000 | $272,000 |
| **Non-Insider Deferred Compensation Plan** | **$0** | **$405,000** |
| **Non-Insider Employee Incentive Programs** | **$0** | **$21,000** |
| Unpaid Referral Bonus Payments | $0 | $7,000 |
| Unpaid Non-Insider Retention Bonus Payments | $0 | $14,000 |

| Employee Obligation | Interim Amount | Final Amount |
|---|---|---|
| **Employee Benefits Programs** | **$3,304,000** | **$13,154,000** |
| Unpaid Health Benefit Plan Amounts | $1,305,000 | $2,255,000 |
| Unpaid FSA Costs | $27,000 | $27,000 |
| Unpaid HSA Costs | $9,000 | $9,000 |
| Unpaid Basic Life Amounts | $7,000 | $7,000 |
| Unpaid Disability Benefits | $54,000 | $54,000 |
| Unpaid 401(k) Expenses | $302,000 | $302,000 |
| Unpaid Paid Time Off | $1,600,000 | $10,500,000 |
| **Non-Insider Severance Benefits** | **$0** | **$13,000** |
| **Total** | **$25,035,000** | **$37,124,000** |

## I. Compensation and Withholding Obligations.

### A. Unpaid Compensation.

13. The Debtors incur obligations to their Employees for, among other things, wages, salaries, overtime, and other obligations described herein (collectively, the "Employee Compensation"). The Debtors' historical average monthly gross Employee Compensation, including wages, salaries, and related compensation, has been approximately $36.8 million. The Debtors anticipate that their monthly gross Employee Compensation, including wages, salaries, and related compensation, will range from approximately $30.1 million to approximately $50.4 million during the pendency of these chapter 11 cases.[3] As of the Petition Date, the Debtors estimate that they owe approximately $14.8 million on account of unpaid Employee Compensation earned by Employees prior to the Petition Date (the "Unpaid Compensation"), all of which will come due within the first 30 days of these chapter 11 cases. The majority of the Debtors' payroll

[3] Employee Compensation will decrease throughout these chapter 11 cases as a result of store closings. The Debtors planned store closings are discussed in more detail in *Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Enter Into the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief*, filed contemporaneously herewith.

is made by direct deposit through electronic transfer of funds to the Employees' bank accounts or other electronic means. Failure to pay the Unpaid Compensation will result in financial hardship for the Employees and lead to widespread departures at all levels of the Debtors' corporate structure. In light of the substantial benefit the Employees will continue to provide to the Debtors' estates and the costs attendant to filling sudden vacancies, the Debtors hope to avoid imposing such a hardship.

14. Additionally, the Debtors maintain a natural disaster pay policy (the "Natural Disaster Pay Policy"). The Natural Disaster Pay Policy pays employees for the hours they were scheduled to work but were unable to do so because of a natural disaster. The most recent payment made on account of the Natural Disaster Pay Policy was made on September 13, 2019, in the aggregate amount of $17,000 to 87 Employees who were unable to work because of Hurricane Dorian. As of the Petition Date, the Debtors do not have any accrued but unpaid fees on account of the Natural Disaster Pay Policy. The Debtors believe they are authorized to continue the Natural Disaster Pay Policy in the ordinary course; however, out of an abundance of caution the Debtors seek authority to continue the Natural Disaster Pay Policy on a postpetition basis in the ordinary course of business (including any prepetition amounts that may be outstanding) and consistent with their prepetition practices pursuant to the Final Order only. For the avoidance of doubt, the Debtors do not seek authority to pay any amounts on account of the Natural Disaster Pay Policy on an interim basis.

15. Accordingly, by this Motion, the Debtors request authority, but not direction, to pay any Unpaid Compensation and Natural Disaster Pay in the ordinary course and consistent with past practice and to continue paying the Employee Compensation in the ordinary course subject to the caps set forth in the Interim Order and Final Order. For the avoidance of doubt, should the

Debtors seek to pay Unpaid Compensation and Natural Disaster Pay to any Employee in excess of the $13,650 priority wage cap imposed by section 507(a)(4) of the Bankruptcy Code, the Debtors shall only seek such relief pursuant to the Final Order.

**B. Temporary Staff Compensation.**

16. The Debtors make payments to Staffing Agencies and the Temporary Staff (the "Temporary Staff Compensation") for the performance of certain services important to the Debtors' operations. The Employees rely on the support of Temporary Staff to complete discrete projects in furtherance of the Debtors' business and to fill short-term positions. Historically, the Debtors have paid approximately $1.8 million in Temporary Staff Compensation on a monthly basis, which includes fees that the Debtors remit to Staffing Agencies in exchange for the services they provide with respect to the Temporary Staff. The Debtors believe the authority to continue paying the Temporary Staff Compensation is critical to minimizing disruption of the Debtors' business operations, particularly as the holiday approaches.

17. As of the Petition Date, the Debtors estimate that Temporary Staff and Staffing Agencies are owed an aggregate of approximately $3.6 million on account of accrued services rendered prior to the Petition Date and anticipate that $1.8 million will come due within the first 30 days of these chapter 11 cases (collectively, the "Unpaid Temporary Staff Compensation").

18. Accordingly, by this Motion, the Debtors request authority to pay any Unpaid Temporary Staff Compensation in the ordinary course and consistent with past practice and to continue paying the Temporary Staff Compensation in the ordinary course subject to the caps set forth in the Interim Order and Final Order. For the avoidance of doubt, should the Debtors seek to pay Unpaid Temporary Compensation to any Temporary Staff in excess of the $13,650 priority

wage cap imposed by section 507(a)(4) of the Bankruptcy Code, the Debtors shall only seek such relief pursuant to the Final Order.

**C. Withholding Obligations and Payroll Taxes.**

19. During each applicable payroll period, the Debtors routinely deduct certain amounts from Employees' paychecks, including garnishments, child support, and similar deductions, as well as other pre-tax and after-tax deductions payable pursuant to certain employee benefit plans discussed herein, such as an Employee's share of health care benefits and insurance premiums, 401(k) contributions, legally ordered deductions, and miscellaneous deductions (collectively, the "Deductions"), and forward such amounts to various third-party recipients.

20. In addition to the Deductions, certain federal and state laws require that the Debtors withhold certain amounts from Employees' gross pay related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, or local taxing authorities. The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for federal and state unemployment insurance and Social Security and Medicare taxes (together with the Employee Payroll Taxes, the "Payroll Taxes," and, the Payroll Taxes, together with the Deductions, the "Withholding Obligations"). The Payroll Taxes are generally processed and forwarded to the appropriate federal, state, and local taxing authorities at the same time the Employees' payroll checks are disbursed.

21. In the 12 months before the Petition Date, the Debtors remitted approximately $132.5 million on Withholding Obligations in the aggregate. As of the Petition Date, the Debtors estimate that they owe $4.5 million on account of Withholding Obligations, substantially all of which will come due within the first 30 days of these chapter 11 cases (the "Unpaid Withholding

Obligations"). Accordingly, by this Motion, the Debtors request authority to pay the Unpaid Withholding Obligations in the ordinary course and consistent with past practice and to continue paying the Withholding Obligations in the ordinary course on a postpetition basis.

**D. Payroll Processing.**

22. The Debtors use third-party providers to support payroll processing, payroll tax calculations and filings, and other payroll-related services (collectively, the "Payroll Processing Fees"), including Automatic Data Processing ("ADP") for payroll fulfillment, Kronos, Inc. for employee timekeeping, and Infor, Inc. for master employee data and payroll calculations. The majority of the Employee Compensation obligations are satisfied by direct deposit through the electronic transfer of funds from the Debtors' payroll department directly to each Employee's bank account, with the balance of Employees receiving checks. The Debtors outsource this operation to ADP. In particular, ADP is responsible for serving as the Debtors' payroll and federal W-2 tax form processing vendor, as well as completing the Debtors' payroll tax filings, including federal, state, and local tax filings. In addition, for each payroll period, ADP processes direct deposit transfers or administers payroll checks to Employees from certain disbursement accounts funded by the Debtors with the amounts necessary to satisfy the Debtors' payroll obligations. The Debtors pay ADP approximately $70,000 per month for this service.

23. In the 12 months before the Petition Date, the Debtors spent approximately $1.3 million on Payroll Processing Fees in the aggregate. As of the Petition Date, the Debtors estimate that Unpaid Payroll Processing Fees are owed an aggregate of approximately $140,000 on account of accrued services rendered prior to the Petition Date, substantially all of which will come due within the first 30 days of these chapter 11 cases (the "Unpaid Payroll Processing Fees"). Accordingly, by this Motion, the Debtors request authority to pay the Unpaid Payroll Processing

Fees in the ordinary course and consistent with past practice and to continue paying the Payroll Processing Fees in the ordinary course on a postpetition basis.

**E. Reimbursable Expenses.**

24. Prior to the Petition Date and in the ordinary course, the Debtors reimburse Employees or pay credit card invoices of certain Employees for approved expenses incurred in connection with the performance of their assigned duties (the "Reimbursable Expenses"). The Reimbursable Expenses are largely on account of costs incurred related to (a) Employee travel for reasonable business related purposes, (b) purchases of merchandise, or (c) payments to vendors for services. Employees who pay up front for Reimbursable Expenses apply for reimbursement of Reimbursable Expenses through one of two ways. Through August 15, 2019, Employees requesting reimbursement were required to fill out a form for manual submission to a department head. Following the department head's initial review, the form was submitted for executive review and, if approved, submitted to accounts payable and disbursed during the subsequent payroll period. On August 15, 2019, the Company implemented an automated expense reimbursement program. Now, Employees also may be reimbursed by submitting an expense report through SAP Concur. Disbursements will still be made with the Employee's paycheck during the subsequent payroll period. The Debtors pay SAP Concur approximately $42,000 annually for this service (the "Expense Processing Fees").[4] Once the Debtors determine that the charges are for legitimate reimbursable business expenses pursuant to their Reimbursable Expenses policies, the Debtors reimburse Employees within 14 days.

---

[4] The Debtors are allotted 5,520 reports annually; should the Debtors exceed that number, the incremental transaction charge is $9.46 per report.

25. Although the Debtors ask that reimbursement requests be submitted promptly, submission delays occasionally occur, and Employees may submit reimbursement requests for prepetition expenses after the Petition Date. Employees incurred the Reimbursable Expenses as business expenses on the Debtors' behalf and with the understanding that such expenses would be reimbursed fully. In the 12 months before the Petition Date, the Debtors spent approximately $980,000 on Reimbursable Expenses and Expense Processing Fees in the aggregate. As of the Petition Date, the Debtors estimate that Reimbursable Expenses are owed an aggregate of approximately $219,000 on account of accrued services rendered prior to the Petition Date, substantially all of which will come due within the first 30 days of these chapter 11 cases (the "Unpaid Reimbursable Expenses"). Accordingly, by this Motion, the Debtors request authority to pay the Unpaid Reimbursable Expenses in the ordinary course and consistent with past practice and to continue paying the Reimbursable Expenses in the ordinary course on a postpetition basis.

26. The Debtors provide certain Employees with corporate credit cards (the "Corporate Credit Cards"). Currently, approximately 185 Corporate Credit Cards are used by Employees. The Corporate Credit Cards, with the exception of the prepaid travel Corporate Credit Card issued by U.S. Bank, are issued to Employees in each Employee's own name and monthly invoices are sent to the Company. U.S. Bank, Wells Fargo, American Express, Shell, and Bank of America issue the Corporate Credit Cards. The Debtors are liable on account of the Corporate Credit Card and must make payments in a timely manner. In the 12 months before the Petition Date, the average monthly amount paid on account of the Corporate Credit Cards was approximately $582,000 (the "Corporate Credit Card Expenses"). As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid amounts owed on account of the Corporate Credit

Cards is approximately $272,000, all of which will come due within the first 30 days of these chapter 11 cases (the "Unpaid Corporate Credit Card Expenses"). Accordingly, by this Motion the Debtors request authority to pay the Unpaid Corporate Credit Card Expenses in the ordinary course and consistent with past practice and to continue paying the Corporate Credit Card Expenses in the ordinary course on a postpetition basis subject to the caps set forth in the Interim Order and the Final Order.

**II. Non-Insider Deferred Compensation Plan.**

27. The Debtors historically maintained a non-qualified deferred compensation plan (the "Deferred Compensation Plan") for the benefit of certain current and former non-insider Employees. Five individuals are owed payment under the Deferred Compensation Plan, including four current Employees. As of the Petition Date, all deferrals to the Deferred Compensation Plan have ceased as the Deferred Compensation Plan was terminated effective November 1, 2018. However, amounts due and owing according to the Deferred Compensation Plan remain.

28. By this Motion, the Debtors request to make lump sum payments under the Deferred Compensation Plan to Employees who remain employed by the Debtors as of the date of entry of the Final Order. The Deferred Compensation Plan was terminated in 2018 and final payments are due to be made in January 2020. The current employees fill key roles for the Debtors across a number of core groups.

29. The Debtors maintain a trust account with Broadridge Financial Solutions, Inc. (the "Broadridge Account") in connection with the Deferred Compensation Plan, the balance of which, as of September 16, 2019, is approximately $405,000. Pursuant to its terms, amounts owed under the Deferred Compensation Plan are scheduled to be paid to the Employees who remain employed by the Debtors as of the date of entry of the Final Order in a lump sum in January 2020

(the "2020 Payment"). For the avoidance of doubt, no additional funds will be deposited in the Broadridge Account during the pendency of these chapter 11 cases. By this Motion, the Debtors seek to honor the 2020 Payment as described above solely pursuant to the Final Order.

**III. Non-Insider Employee Incentive Programs.**

30. The Debtors maintain a number of incentive programs to drive performance among their Employees, including store and corporate bonus programs. The Debtors offer bonuses to retail Employees based on myriad factors including the particular Employee's performance, store "shrinkage reduction," sales targets, and payroll hour targets (the "Store Employee Bonus Program"). The Store Employee Bonuses are paid quarterly (the "Store Employee Bonus Payments"), with the most recent Store Employee Bonus Payment made on September 27, 2019, in the amount of $37,000 in the aggregate to 89 Employees. The Debtors currently have no outstanding obligations to Employees on account of the Store Employee Bonus Program. Accordingly, the Debtors seek authority to continue the Store Employee Bonus Program in the ordinary course during the administration of these chapter 11 cases.

31. The Debtors offer discretionary bonuses to corporate, non-insider Employees (all full-time, non-management Employees) based on their performance reviews (the "Corporate Non-Management Bonus Program"). The performance review factors include length of service, team and individual key performance indicators, goal achievement, difficulty or complexity of projects, major achievements, stretch assignments, time, and attendance, all of which are used to calculate an Employee's overall performance review score.[5] The Corporate Non-Management

---

[5] Managers are allotted $300 per Employee to be allocated amongst their Employees as the manager deems fit using the following guidelines: (a) the employee's performance review rating should be the driving factor when determining individual bonus amounts; (b) there should be a larger percentage of the manager's overall budget allocated to employees rated as "exceeds expectations" and "outstanding;" and (c) managers are instructed to strive to minimize large discrepancies between amounts for employees in different rating groups (e.g., an employee with a "meets expectations" rating should not receive more than an employee with an "exceeds

Bonus Program is paid biannually (the "Corporate Non-Management Bonus Payments"), with the most recent Corporate Non-Management Bonus Payment made on September 13, 2019, totaling $98,000 across 325 Employees. As of the Petition Date, the Debtors do not believe they owe any amounts under the Corporate Non-Management Bonus Program. Accordingly, the Debtors seek authority to continue the Corporate Non-Management Bonus Program in the ordinary course during the administration of these chapter 11 cases.

32. The Debtors also offer bonuses to corporate, non-insider Employees (all full-time management Employees) based on discretionary and non-discretionary components (the "Corporate Management Bonus Program").[6] The non-discretionary component is comprised of a formula calculated according to an Employee's core competencies including job knowledge, self-development, communication, staff development, team building, commitment to Forever 21's core values, and overall performance rating. The discretionary component is composed of the Debtors' earnings before interest, tax, depreciation, and amortization, and whether sales are greater than the established monthly plan. The Corporate Management Bonus Program is paid biannually, with sixty percent of the Corporate Management Bonus Program coming due in the spring and forty percent coming due in the fall (the "Corporate Management Bonus Payments"). The most recently paid Corporate Management Bonus Payment was made on September 13, 2019, totaling $1.5 million across 342 Employees. As of the Petition Date, the Debtors do not believe they owe any amounts under the Corporate Management Bonus Program. Accordingly, the Debtors seek

---

expectations" or "outstanding" rating).

[6] The Corporate Management Bonus Program has included members of the leadership team. To the extent any such member is deemed to be an Insider as defined in the Bankruptcy Code, the Debtors are not seeking authority to pay such members under the Corporate Management Bonus Program.

authority to continue the Corporate Management Bonus Program in the ordinary course during the administration of these chapter 11 cases.

33. Additionally, the Debtors maintain a bonus program for employee referrals (the "Referral Bonus Program"). All Employees are eligible to participate in the Referral Bonus Program. Payments for the Referral Bonus Program are partially paid 90 days following the hiring, with the remaining balance paid after one year (the "Referral Bonus Payments"). The referral amount in the aggregate is $500 to $2,500 per referral, depending on the the Employees' department and position, for Employees at the corporate headquarters and distribution center. Further, in order to qualify for the Referral Bonus Program, both the Employee and the referral must remain employed by the Debtors at the time the award is earned. The Debtors anticipate $7,000 in outstanding obligations to Employees on account of the Referral Bonus Program (the "Unpaid Referral Bonus Payments"). Currently, there are approximately 12 Employees that have pending Unpaid Referral Bonus Payments. For the avoidance of doubt, the Debtors are seeking authority to pay the Unpaid Referral Bonus Payments solely pursuant to the Final Order. Accordingly, the Debtors seek authority to pay the Unpaid Referral Bonus Payments and to continue the Referral Bonus Program in the ordinary course during the administration of these chapter 11 cases.

34. Finally, the Debtors maintain a retention bonus program for non-insider Employees (the "Non-Insider Retention Bonus Program"). The Non-Insider Retention Bonus Program has been implemented to retain specific key personnel. The Debtors currently have no outstanding obligations to Employees on account of the Non-Insider Retention Bonus Program. The Non-Insider Retention Bonus Program has been offered to six Employees. Four of those Employees are in Human Resources and are important to the relocation of the Debtors' domestic distribution

center. These Employees are also crucial to staffing for the peak holiday season. One of the six Employees participating in the Non-Insider Retention Bonus Program works in global marketing and plays a key role in the Company's holiday marketing efforts. The final Employee who is participating in the Non-Insider Retention Bonus Program is a senior manager in financial planning and the Debtors sought to extend his termination date to assist with lender diligence and transition his workstreams. The Debtors expect that the total amount payable to Employees under the Non-Insider Retention Bonus Program (the "Unpaid Non-Insider Retention Bonus Payments") coming due during the pendency of these chapter 11 cases will be approximately $14,000, with no amounts coming due within the first 30 days following the Petition Date. Accordingly, the Debtors seek authority to continue the Non-Insider Retention Bonus Program in the ordinary course during the administration of these chapter 11 cases subject to the caps set forth in the Final Order.

**IV. Employee Benefits Programs.**

35. The Debtors offer all of their Employees, except for the Temporary Staff, the ability to participate in a number of insurance and benefits programs, including, among other programs, medical and dental plans, life insurance, accidental death and dismemberment insurance, disability benefits, workers' compensation, retirement plans, paid time off, and other employee benefit plans (collectively, the "Employee Benefits Programs").

36. As described below, failure to continue the Employee Benefits Programs could cause Employees to experience severe hardship. In light of the substantial benefits the Employees have provided and will continue to provide to the Debtors' estates, the Debtors wish to avoid imposing such a hardship. Accordingly, by this Motion, the Debtors seek authority, but not direction, to: (a) pay any unpaid amounts due with respect to the Employee Benefits Programs subject to the aggregate caps set forth in the Interim Order and the Final Order; and (b) continue

to provide Employee Benefits Programs in the ordinary course during the administration of these chapter 11 cases. As of the Petition Date, the Debtors estimate that they owe approximately $13.2 million on account of the Employee Benefits Programs, of which $3.3 million will come due within the first 30 days of these chapter 11 cases. The Employee Benefits Programs are described in greater detail below.

**A. Health Benefit Plans.**

37. The Debtors offer their Employees the opportunity to participate in a number of health benefit plans, including medical and dental plans (collectively, the "Health Benefit Plans"). Specifically, the Debtors provide the following:

- Healthcare Plan: The Debtors' healthcare plans (the "Healthcare Plans") are administered by United Health Care ("UHC"), Kaiser Permanente available in California, TakeCare Insurance available in Guam, and Triple-S Salud available in Puerto Rico. The Debtors estimate that the ongoing monthly administrative cost of these Healthcare Plans will be approximately $145,000. As of the Petition Date, the Debtors estimate that the amount of incurred but not reported medical and prescription drug expenses and insurance claims is approximately $1.9 million. The Debtors maintain stop loss insurance coverage to cover all amounts due in excess of $350,000 under any individual claim (the "Stop Loss Insurance"). The Debtors pay the excess amounts and are subsequently reimbursed under the Stop Loss Insurance. The monthly premium for the Stop Loss Insurance is $34,000. As of the Petition Date, the Debtors owe $34,000, substantially all of which will come due during the first 30 days of these chapter 11 cases. The Debtors also offer continued health care coverage under COBRA to eligible Employees.

- Dental Plan: Additionally, the Debtors offer their Employees the option of participating in a dental plan (the "Dental Plan") administered by Aetna. As of the Petition Date, the Debtors estimate that they owe approximately $147,000 under the Dental Plan.

- Vision Plan: The Debtors offer their Employees the option of participating in a vision plan (the "Vision Plan") administered by Vision Services Plan, which is covered by Employee pay period deductions. As of the Petition Date, the Debtors estimate that they

owe approximately $24,000 on account of the Vision Plan. The Debtors estimate that the ongoing monthly administrative cost of the Vision Plan is approximately $5,000. The Debtors are also self-insured under the Vision Plan.

In total, the Debtors estimate that they owe $2,255,000 on account of the Health Benefit Plans (the "Unpaid Health Benefit Plan Amounts"), $1,305,000 of which will come due within the first 30 days of these chapter 11 cases. By this Motion, the Debtors seek authority to honor prepetition obligations on account of the Unpaid Health Benefit Plan Amounts and continue the Health Benefit Plans on a postpetition basis in the ordinary course of business.

38. The Debtors also provide Employees with access to four types of flexible spending accounts: Healthcare, the Limited Purpose Health FSA (for those who enroll in the HSA medical plan), the Dependent Care FSA, and the Adoption Assistance FSA (each, an "FSA") administered by P&A Group, Inc. ("P&A"). The FSAs allow such Employees to contribute pre-tax dollars for eligible out-of-pocket expenses. In addition, Debtors offer parking and transit FSAs that allow employees to use tax-free dollars to pay for their commute to and from work. The Debtors do not make any contributions to the FSAs.

39. Because the Debtors do not contribute to Employees' FSAs, the Debtors believe the FSA amounts are generally held in trust by the Debtors and are not property of their estates. When an Employee seeks to use their elected FSA amounts, the Debtors' remit such amount to the requested healthcare provider through P&A. As of the Petition Date, the Debtors estimate that there are approximately $24,000 in accrued amounts to be remitted on account of the FSA (the "Unremitted FSA Amounts"), of which $24,000 will be required to be remitted during the first 30 days of these chapter 11 cases.

40. Further, the Debtors pay a quarterly administration fee of approximately $3,000 to P&A on account of the FSA program. As of the Petition Date, the Debtors owe $27,000 on account

of accrued but unpaid FSA Fees (the "Unpaid FSA Fees," and, together with the Unremitted FSA Amounts, the "Unpaid FSA Costs"). As a result, the Debtors seek authority pursuant to the Interim Order and the Final Order to pay and/or remit the Unpaid FSA Costs and continue the FSA in the ordinary course of business on a postpetition basis.

41. For certain Employees who participate in the high deductible Healthcare Plan, the Debtors offer access to a health savings account (the "HSA") through Optum Bank. Participating Employees can opt to make pre-tax contributions to their individual HSA through payroll deductions to cover reimbursements under the program up to the maximum amount permitted by the Internal Revenue Service. In the 12 months preceding the Petition Date, the Debtors' employees contributed approximately $59,000 to the HSA, and the Debtors incurred costs of approximately $18,000 over that same span (together, the "HSA Costs"). As of the Petition Date, the Debtors believe they owe approximately $9,000 in accrued but unpaid HSA Costs (the "Unpaid HSA Costs"), $9,000 of which will become due and owing during the first 30 days of these chapter 11 cases. Pursuant to the Interim Order and the Final Order, the Debtors seek authority, but not direction, to pay and/or remit the Unpaid HSA Costs and to continue the HSA in the ordinary course of business on a postpetition basis, subject to the caps set forth in the Interim Order and the Final Order.

**B. Other Insurance, Disability Benefits, and Employee Assistance Programs.**

42. The Debtors offer their employees certain life insurance, disability benefits, and other auxiliary benefits described further below. Pursuant to the Interim Order and the Final Order, the Debtors seek authority to pay and/or remit the Unpaid Insurance Amounts (as described herein) in the ordinary course of business on a postpetition basis, subject to the caps set forth in the Interim Order and the Final Order.

**1. Life Insurance Program.**

43. The Debtors provide life and accidental death and dismemberment insurance (the "Basic Life Insurance") to Employees through Voya.[7] The Debtor-funded life insurance benefit is in the amount of the Employee's annual base salary (rounded to the next higher $1,000) and capped at $350,000 per Employee (the "Basic Life Payments"). As of the Petition Date, the Debtors estimate that they owe approximately $7,000 on account of the Basic Life Insurance (the "Unpaid Basic Life Amounts").

44. Employees also may purchase voluntary life insurance and accidental death and dismemberment insurance (the "Voluntary Life and AD&D Insurance") through Voya. The Voluntary Life and AD&D Insurance premiums are paid by the Debtors' Employees and the Debtors do not have any other obligations under the Voluntary Life and AD&D Insurance.

**2. Disability Benefits.**

45. The Debtors provide certain disability benefits through Voya (the "Disability Benefits"). The Debtors provide a short-term disability insurance benefit to corporate Employees, which replaces a portion of the Employee's income if the Employee is unable to work due to a non-work related injury, illness, or medical condition. The benefit amount is 70 percent of an employee's weekly earnings, to a maximum of $2,500 per week, and will pay for up to 12 weeks. The Debtors also provide a long-term disability insurance benefit to corporate Employees, which replaces a portion of the Employee's income if such Employee is disabled for 90 days or longer due to a non-work-related injury or illness for an extended period of time. The benefit amount is 40 percent of the monthly pre-disability earnings, to a maximum benefit of $4,000 per month.

[7] The Debtors have arranged for Unum Group to replace Voya as their voluntary benefits provider beginning on October 1, 2019.

Corporate Employees have the option to buy additional long-term disability coverage to increase their benefit to 60 percent of the monthly pre-disability earnings, to a maximum of $10,000 per month, for an additional cost.

46. The Debtors offer a voluntary short-term disability insurance benefit to all retail and distribution center employees. This benefit is 100 percent paid for by the employee, and replaces a portion of the employee's income if the employee is unable to work due to a non-work related injury, illness, or medical condition (depending on your place of residence) between 60 and 70 percent of their weekly earnings, to a maximum of $1,250 per week. There is no long-term disability insurance benefit offering to retail and distribution center employees.

47. As of the Petition Date, the Debtors estimated that they owe approximately $54,000 on account of the Disability Benefits (the "Unpaid Disability Benefits Amounts").

**3. Other Insurance and Assistance Programs.**

48. The Debtors also offer certain supplemental benefits, critical illness insurance, hospital confinement insurance, accident insurance, term life insurance, and whole life insurance through Voya (collectively, the "Supplement Benefit Plan").[8] The Debtors are not obligated to make any payments under the Supplemental Benefit Plan, and all premiums are covered by the Employees.

49. Additionally, the Debtors offer their eligible employees the option to participate in various wellness programs (the "Wellness Programs"). These programs include: access to ComPsych, travel assistance, maternity support, Fitbit, and massages. The Debtors engage the services of UHC in order to implement the Wellness Programs. UHC covers the costs of the

---

[8] The Debtors have arranged for Unum Group to replace Voya as their Supplemental Benefit Plan provider beginning on October 1, 2019.

Wellness Programs up to $150,000 annually in exchange for the Healthcare Plans purchased by the Debtors through UHC. The Debtors pay for Employee ComPsych separately, where the Debtors pay counselors' fees of $225 per counselor per hour when sent to a Forever 21 location. In the 12 months prior to the Petition Date, the Debtors spent approximately $15,000 on ComPsych counselors' fees. As of the Petition Date, the Debtors do not believe they owe any amounts pursuant to the Wellness Programs and request authority to continue the Wellness Programs in the ordinary course of business on a postpetition basis.

**C. Workers' Compensation Program.**

50. The Debtors maintain workers' compensation insurance for their Employees at the statutorily required level for each jurisdiction in which the Debtors have Employees (collectively, the "Workers' Compensation Program"). In certain jurisdictions, the Debtors pay premiums based on payroll in accordance with statutory requirements. The Debtors also maintain a master policy for all states that do not have statutory requirements that is subject to a $500,000 deductible. The Debtors maintain insurance coverage for the Workers' Compensation Program through Chubb and is administered by Broadspire.

51. Broadspire opens new claims and pays benefits on behalf of the Debtors. The average cost per month for this service is $589,000 drawn weekly at $127,500 and trued up at the end of the month. The Debtors pay approximately $845,000 in premiums and fees annually to maintain the Workers' Compensation Program (the "Workers' Compensation Coverage Fees") through a down payment and 9 installment payments. As of the Petition Date, the Debtors estimate that they owe 2 installment payments of approximately $141,000 on account of accrued but unpaid Workers' Compensation Coverage Fees (the "Unpaid Workers' Compensation Coverage Fees").[9]

[9] Certain states have unique workers' compensation requirements: Ohio requires biannual installments of

52. The Debtors also attempt to negotiate general releases in exchange for the settlement of some Employee claims under the Workers' Compensation Program (the "Employment Claims Settlements"). As of the Petition Date, the Debtors do not believe they have any accrued but unpaid fees on account of the Employment Claims Settlements.

53. The Debtors must continue the claim assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements. There are approximately 375 open claims in the amount of $6.5 million under the Workers' Compensation Program.

54. The Debtors must continue the claim assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements. Because the Debtors are statutorily and/or contractually obligated to maintain the Workers' Compensation Program, their inability to do so may result in adverse legal consequences that disrupt the reorganization process. Pursuant to the Interim Order and Final Order, the Debtors seek authority, but not direction, to: (a) continue the Workers' Compensation Program in the ordinary course of business on a postpetition basis;[10]

---

approximately $29,000 totaling $58,000; Washington requires quarterly installments of approximately $32,000 totaling $128,000; North Dakota requires an annual payment of approximately $3,000; and Puerto Rico requires biannual payments of approximately $50,000 totaling $100,000 annually. The Debtors are seeking authority to pay Unpaid Workers' Compensation Coverage Fees, if any, pursuant to the *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Their Obligations Under Insurance Policies Entered into Prepetition, (B) Continue to Pay Brokerage Fees, (C) Renew, Supplement, Modify, or Purchase Insurance Coverage, (D) Maintain the Customs Surety Bonds, and (E) Honor the Terms of The Financing Agreement and Pay Premiums Thereunder, and (II) Granting Related Relief*, filed contemporaneously herewith (the "Insurance Motion").

[10] The Workers' Compensation Program may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder. By this Motion, the Debtors request authority to continue the Workers' Compensation Program postpetition, including making any

and (b) modify the automatic stay solely to allow Employees to assert claims under the Workers' Compensation Program, which will be covered 100 percent by the Debtors' insurer beyond an initial $500,000 deductible.

**D. Retirement Plans.**

55. The Debtors offer eligible Employees the opportunity to participate in a 401(k) plan (the "401(k) Plan"). The 401(k) Plan generally provides for pre-tax salary deductions of compensation up to limits set by the Internal Revenue Code. The Debtors provide a SafeHarbor matching contribution, which is 100 percent of the first 3 percent they contribute and 50 percent of the next 2 percent they contribute. The match is immediately vested. The 401(k) Plan is administered by Fidelity Investments ("Fidelity") and allows for automatic pre-tax wage deductions of eligible compensation up to the limits set forth by the Internal Revenue Code.

56. Each pay period, the Debtors deduct the Employees' 401(k) Contributions from the Employees' paychecks (the "401(k) Deductions") and hold such amounts in trust until they are forwarded to Fidelity. The Debtors deduct approximately $403,000 in the aggregate each month from Employee's paychecks on account of the 401(k) Deductions. As of the Petition Date, the Debtors estimate that they are current on account of the 401(k) Deductions (the "Unremitted 401(k) Deductions") but include this description out of an abundance of caution and seek authority to remit Unremitted 401(k) Deductions if any become due.

57. In the 12 months before the Petition Date, the Debtors' monthly payments and disbursements on account of 401(k) Contributions averaged approximately $182,000. As of the Petition Date, the Debtors estimate that they owe approximately $85,000 on account of 401(k) Contributions (the "Unpaid 401(k) Contributions"), all of which will become due and owing

---

changes to current policy and practices that become necessary, subject to applicable law.

within the 30 days of these chapter 11 cases. The Debtors also pay Fidelity administrative fees in the amount of $32,000 per year. As of the Petition Date, the Debtors owe the 401(k) Advisor approximately $16,000. The Debtors seek authority to honor their commitment to 401(k) Contributions (whether due prepetition or arising postpetition), as well as payments to the 401(k) Advisor, in the ordinary course of business on a postpetition basis.

58. Many Employees' retirement savings solely consist of the 401(k) Plan, and many Employees choose to participate in the 401(k) Plan because of the 401(k) Contribution provision. Thus, the Debtors believe that continuing the 401(k) Plan and the 401(k) Contributions are essential to maintaining Employee morale and protecting Employee expectations. In addition, the Debtors believe that the 401(k) Deductions are generally held in trust by the Debtors and are not property of their estates.

59. Accordingly, pursuant to the Interim Order and the Final Order, the Debtors seek the authority, but not direction, to (a) continue the 401(k) Plan in the ordinary course of business on a postpetition basis, (b) remit all Unremitted 401(k) Deductions collected in the ordinary course of business, and (c) pay any Unpaid 401(k) Contributions in the ordinary course of business (together, the "Unpaid 401(k) Expenses"), subject to the caps set forth in the Interim Order and the Final Order (approximately $302,000 in the aggregate).

**E. Paid Time Off.**

60. In the ordinary course of business, the Debtors provide paid time off to their Employees, including sick pay ("Paid Time Off"). Paid Time Off generally accrues at specified rates up to a maximum amount based on the applicable state limit, if any. Accruals of Paid Time Off, however, are not a current cash payment obligation. Over the past 12 months, the Debtors paid approximately $12.1 million in Paid Time Off and sick days. As of the Petition Date, the

Debtors estimate that approximately $10.5 million in Paid Time Off and sick days have accrued, with approximately $1.6 million coming due in the first 30 days of these chapter 11 cases. By this Motion, the Debtors seek authority, but not direction, to pay $10.5 million in "cash out" amounts required under applicable law with respect to earned but unused Paid Time Off and to continue the Paid Time Off policy in the ordinary course on a postpetition basis. For the avoidance of doubt, the Debtors seek to pay Paid Time Off to any Employee in excess of the $13,650 priority cap imposed by section 507(a)(4) of the Bankruptcy Code pursuant to the Final Order only.

61. In addition, the Debtors provide certain other forms of paid and unpaid leave, including, for example, (a) paid holidays, (b) leave under the Family and Medical Leave Act, and (c) other paid and unpaid leaves of absence for personal reasons, including those required by law. Importantly, these other forms of paid and unpaid leave do not involve incremental cash outlays beyond standard payroll obligations.

62. The Debtors believe that the continuation of Paid Time Off is essential to maintaining Employee morale during these chapter 11 cases. Further, the policies are broad-based programs upon which all Employees have come to depend. The Debtors anticipate that their Employees will utilize any accrued Paid Time Off in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' regular payroll obligations.

**V. Non-Insider Employee Severance Obligations.**

63. In the ordinary course of business, the Debtors maintain a severance program for the benefit of certain non-Insider Employees (the "Non-Insider Severance Program"). Pursuant to the Non-Insider Severance Program, eligible Employees, upon termination and on a discretionary basis, are entitled to receive payments at base compensation levels (based on years of service or if the Employee is a senior executive) in accordance with standard company practice pursuant to

which Employees receive one week of severance for each year of service (the "Non-Insider Severance Benefits"). The Debtors also offer COBRA coverage as part of the Non-Insider Severance Program for the same duration as the Employee qualifies for severance.

64. The Debtors' ability to pay and provide severance amounts and other benefits has been critical to maintaining Employee morale and loyalty, particularly during the current store optimization. Increased instability in the Debtors' workforce will undermine the Debtors' ability to complete the store closing sales that are critical to generating immediate liquidity and to strengthen their financial and operational foundation, to generate growth, and to be positioned for long-term success. As a condition to receiving Non-Insider Severance Benefits as part of the Non-Insider Severance Program, the Debtors require that each Employee not have been fired for cause. The Debtors believe that the Non-Insider Severance Program and the Non-Insider Severance Benefits reduce the time and expense that would be spent defending against the assertion of claims by any severed Employees.

65. In the last 12 months, the Debtors have paid approximately $2.8 million to former Employees on account of Non-Insider Severance Benefits. As of the Petition Date, the Debtors believe that approximately 2 former Employees are or will become entitled to Non-Insider Severance Benefits in the aggregate amount of approximately $13,000 during the pendency of these chapter 11 cases. By this Motion, the Debtors seek authority to honor prepetition obligations on account of the Non-Insider Severance Benefits and continue the Non-Insider Severance Program on a postpetition basis pursuant to the Final Order only.

## VI. Postpetition Non-Employee Director Compensation.

66. Forever 21, Inc. maintains a boards of directors that includes non-Employee directors. As of the Petition Date, the Debtors' boards of directors includes 3 non-Employee

directors. The non-Employee Directors currently each receive a $260,000 annual retainer, which is paid in advance on a quarterly basis in cash (the "Annual Retainer").[11] The non-Employee Directors are also entitled to expense reimbursement for out-of-pocket expenses (together with the Annual Retainer, the "Director Compensation"). As of the Petition Date, the Debtors do not owe any amounts on account of Director Compensation. The Debtors believe that they are authorized to pay any postpetition Director Compensation in the ordinary course; however, out of an abundance of caution, by this Motion, the Debtors seek authority to continue to pay the Director Compensation on a postpetition basis in the ordinary course of business (including any prepetition amounts that may be outstanding) and consistent with their prepetition practices pursuant to the Final Order only. For the avoidance of doubt, the Debtors do not seek authority to pay any amounts on account of Director Compensation on an interim basis.

## Basis for Relief

### I. Sufficient Cause Exists to Authorize the Debtors to Honor the Employee Compensation and Benefits.

#### A. Certain Employee Compensation and Benefits Are Entitled to Priority Treatment.

67. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the majority of the Employee Compensation and Benefits to priority treatment. As priority claims, the Debtors are required to pay such claims in full to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims for (a) wages, salaries, or commissions,

[11] In addition to his service as a member of the Board of Directors of Forever 21, Inc., Lawrence H. Meyer serves as the Chief Strategy Officer of the Debtors. Under Mr. Meyer's consulting agreement with the Debtors, the parties have agreed that: (a) Mr. Meyer will receive a quarterly retainer of $65,000 for a minimum of at least two quarters; and (b) Mr. Meyer will receive $2,000 in cash, on a "per diem" basis, for days on which he devotes more than five hours of time outside the scope of normal board duties and scheduled board meetings. As of the Petition Date, no amounts were outstanding under Mr. Meyer's consulting agreement with respect to quarterly retainer payments.

including sick leave pay earned by an individual and (b) contributions to an employee benefit plan). Thus, granting the relief sought herein should only affect the timing of certain payments to the Employees and should not negatively affect recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of the Employee Compensation and Benefits at this time enhances value for the benefit of all interested parties. Finding, attracting, and training new qualified talent would be extremely difficult and would most likely require higher salaries, guaranteed bonuses, and more comprehensive compensation packages than are currently provided to Employees.

**B. Payment of Certain Employee Compensation and Benefits Is Required by Law.**

68. The Debtors seek authority to pay the Withholding Obligations to the appropriate third-party entities. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from the Employees' paychecks. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from the Employees' paychecks on another party's behalf. *See* 11 U.S.C. § 541(b)(1), (d). Further, federal and state laws require the Debtors to withhold certain tax payments from the Employees' paychecks and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Withholding Obligations to the proper parties in the ordinary course of business.

69. Similarly, state laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Payment of all workers' compensation amounts is therefore crucial to the Debtors' continued operations and the success of the Debtors' ongoing chapter 11 process.

## II. Payment of the Employee Compensation and Benefits Is Proper Pursuant to Section 363(b)(1) of the Bankruptcy Code and the Doctrine of Necessity.

70. Section 363(c)(1) of the Bankruptcy Code expressly grants the Debtors the authority to "enter into transactions . . . in the ordinary course of business" and "use property of the estate in the ordinary course of business without notice or a hearing." Therefore, the Debtors believe they are permitted to pay all postpetition amounts due pursuant to the Employee Compensation and Benefits as such actions are in the ordinary course of business. Out of an abundance of caution, however, the Debtors seek entry of an order granting the relief requested herein to avoid any disruptions to their business operations.

71. The relief requested herein may be granted by the Court pursuant to sections 363(b) and 105(a) of the Bankruptcy Code. Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363(b), courts require only that the debtor "show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (internal citations omitted) (requiring that the debtor show a "sound business purpose" to justify its actions under section 363 of the Bankruptcy Code); *see also In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987). Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not

entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

72. In addition, courts may authorize payment of prepetition claims in appropriate circumstances under section 105(a) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of a bankruptcy court, empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." The Court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of the Employee Compensation and Benefits under the "necessity of payment" rule (also referred to as the "doctrine of necessity").

73. The United States Court of Appeals for the Third Circuit recognized the "necessity of payment" doctrine in *In re Lehigh and New England Railway Co.* 657 F.2d 570, 581 (3d Cir. 1981). The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. *Id.* (stating a court may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment").

74. The necessity of payment doctrine is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession

of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of toolmakers as "necessary to avert a serious threat to the Chapter 11 process").

75. Payment of the Employee Compensation and Benefits is warranted under this authority and the facts of these chapter 11 cases. The majority of the Employees rely exclusively on the Employee Compensation and Benefits to satisfy their daily living expenses. Consequently, Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Employee Compensation and Benefits. Additionally, continuing ordinary course benefits will help maintain Employee morale and minimize the adverse effect of the commencement of these chapter 11 cases on the Debtors' ongoing business operations.

76. Moreover, Employees provide the Debtors with services necessary to conduct the Debtors' business, and the Debtors believe that, absent the payment of the Employee Compensation and Benefits, the Debtors may experience turnover and instability at this critical time in these chapter 11 cases. The Debtors believe that, without these payments, the Employees may become demoralized and unproductive because of the potential significant financial strain and other hardships these Employees may face. Such Employees may then elect to seek alternative employment opportunities. Additionally, a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts—efforts that might not be successful given the overhang of these chapter 11 cases. Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario. The Debtors therefore believe that

payment of the prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their business in these chapter 11 cases.

77. Indeed, courts in this district have recognized the importance of satisfying employee obligations in cases requesting relief similar to that requested here. *See, e.g.*, *In re PES Holdings, LLC*, Case No. 19-11626 (KG) (Bankr. D. Del. Aug. 20, 2019) (authorizing debtors to continue employee compensation and benefit programs and pay certain prepetition obligations related thereto on a postpetition basis); *In re Blackhawk Mining LLC*, Case No. 19-11595 (LSS) (Bankr. D. Del. Aug. 9, 2019) (same); *In re Z Gallerie, LLC*, Case No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019) (same); *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 6, 2019) (same); *In re ATD Corp.*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 4, 2018) (same).[12] Accordingly, the Debtors request that the Court authorize the Debtors to pay and continue the Employee Compensation and Benefits in the ordinary course of business and consistent with past practice.

## III. A Limited Waiver of the Automatic Stay for Workers' Compensation Claims Is Appropriate Here.

78. Section 362(a)(1) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . .

---

[12] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." 11 U.S.C. § 362(d)(1).

79. The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit their Employees to proceed with their claims under the Workers' Compensation Program in the appropriate judicial or administrative forum. The Debtors believe that cause exists to modify the automatic stay because staying an Employee's workers' compensation claim could have a detrimental effect on the financial well-being and morale of the Employees and lead to the departure of certain Employees. Such departures could cause a severe disruption in the Debtors' business to the detriment of all stakeholders. In addition, as noted above, if the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Accordingly, the Debtors request a limited waiver of the automatic stay for purposes of allowing the Workers' Compensation Program to proceed.

**Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers**

80. The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations, the proposed debtor-in-possession financing, and anticipated access to cash collateral. Under the Debtors' existing cash management system, the Debtors have made arrangements to readily identify checks or wire transfer requests relating to the Employee Compensation and Benefit obligations, as applicable. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

**The Requirements of Bankruptcy Rule 6003 Are Satisfied**

81. Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." Fed. Bankr. P. 6003. For the reasons discussed above, authorizing the Debtors to (i) pay prepetition wages, salaries, non-insider severance, other compensation, and reimbursable employee expenses and (ii) continue the Employee Benefits Programs in the ordinary course, including prepetition obligations related thereto, and granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases smoothly. Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture. For the reasons discussed herein, the relief requested is necessary in order for the Debtors to operate their business in the ordinary course, preserve the going concern value of the Debtors' operations and, maximize the value of their estates for the benefit of all stakeholders. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

**Reservation of Rights**

82. Nothing contained in this Motion or any actions taken by the Debtors pursuant to relief granted in the Interim Order and Final Order is intended or shall be construed as: (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume any

agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party in interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid and the Debtors and all other parties in interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's Interim Order and Final Order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party in interest's right to subsequently dispute such claim.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

83. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Notice**

84. The Debtors will provide notice of this Motion to: (a) the U.S. Trustee for the District of Delaware; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agent under the Debtors' prepetition revolving credit facility and the Debtors' proposed debtor in possession ABL financing facility and counsel thereto; (d) the administrative agent under the Debtors' proposed debtor in possession term loan facility and counsel thereto; (e) counsel to certain of the Debtors' landlords; (f) the United States Attorney's Office for the District of Delaware; (g) the Internal Revenue Service; (h) the state

attorneys general for all states in which the Debtors conduct business; (i) counsel to certain majority equity holders for Debtor Forever 21, Inc.; (j) ADP; and (k) any party that requests service pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

85. No prior request for the relief sought in this Motion has been made to this or any other court.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Debtors respectfully request entry of Interim and Final Orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, (a) granting the relief requested herein, and (b) granting such other relief as is just and proper.

Dated: September 30, 2019
Wilmington, Delaware

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Timothy P. Cairns (DE Bar No. 4228)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
pkeane@pszjlaw.com
tcairns@pszjlaw.com

-and-

Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
Aparna Yenamandra (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

-and-

Anup Sathy, P.C. (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Proposed Co-Counsel for the Debtors and Debtors in Possession*