<u>**Exhibit A**</u>

**Evidentiary Support for First Day Motions**

<u>**Evidentiary Support for First Day Motions**</u>[1]

I.  **Debtors' Motion Seeking Entry of an Order (I) Directing Joint Administration of Their Related Chapter 11 Cases and (II) Granting Related Relief (the "<u>Joint Administration Motion</u>").**

1.  Pursuant to the Joint Administration Motion, the Debtors request entry of an order (a) directing procedural consolidation and joint administration of their related chapter 11 cases and (b) granting related relief. Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience and cost savings to the Debtors without harming the substantive rights of any party in interest.

2.  Many of the motions, hearings, and orders in these chapter 11 cases will affect each and every Debtor entity. For example, virtually all of the relief sought by the Debtors in the First Day Motions is sought on behalf of all of the Debtors. The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections. Joint administration of these chapter 11 cases, for procedural purposes only, under a single docket, will also ease the administrative burdens on the Court by allowing the Debtors' cases to be administered as a single joint proceeding, instead of multiple independent chapter 11 cases. Accordingly, I respectfully submit that the Joint Administration Motion should be approved.

---

[1]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the applicable first day motion.

II.     **Debtors' Motion Seeking Entry of Interim and Final Orders Authorizing the Debtors to (I) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (II) File a Consolidated List of the Debtors' Fifty Largest Unsecured Creditors, (III) Redact Certain Personal Identification Information for the Debtors' Employees and European Union Member Countries' Citizens, and (IV) Granting Related Relief (the "<u>Creditor Matrix Motion</u>").**

3.      Pursuant to the Creditor Matrix Motion, the Debtors seek entry of interim and final orders: (a) authorizing the Debtors to file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor; (b) authorizing the Debtors to file a consolidated list of the Debtors' fifty largest unsecured creditors in lieu of filing lists for each Debtor; (c) authorizing the Debtors to redact certain personal identification information for the Debtors' employees and European Union member countries' citizens; and (d) granting related relief.

4.      Although I understand that a list of creditors usually is filed on a debtor-by-debtor basis, in a complex chapter 11 bankruptcy case involving more than one debtor, the debtors may file a consolidated creditor matrix "in the interest of justice."  Requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task and result in duplicate mailings.[2]

5.      Additionally, I believe that it is appropriate to authorize the Debtors to redact from the Creditor Matrix address information of individual creditors—including the Debtors' employees and European Union member countries' citizens—and interest holders because such information could be used to perpetrate identity theft or locate survivors of domestic violence or stalking.  The Debtors propose to provide an unredacted version of the Creditor Matrix to the

---

[2]     The Debtors submit that if any of these chapter 11 cases converts to a case under chapter 7 of the Bankruptcy Code, the applicable Debtor will file its own creditor mailing matrix.

U.S. Trustee, any official committee of unsecured creditors appointed in these chapter 11 cases, and the Court.

6. Accordingly, I respectfully submit that the Court should approve the Creditor Matrix Motion.

**III. Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions and (II) Granting Related Relief (the "<u>Cash Management Motion</u>").**

7. Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders: (a) authorizing the Debtors to (i) continue to operate their Cash Management System; (ii) honor certain prepetition obligations related thereto; (iii) maintain existing Business Forms in the ordinary course of business; and (iv) continue to perform Intercompany Transactions consistent with historical practice and (b) granting related relief.

8. The Debtors' Cash Management System is similar to the centralized cash management systems used by other comparably sized companies to manage cash flow. The Debtors use their Cash Management System in the ordinary course to transfer and distribute funds and to facilitate cash monitoring, forecasting, and reporting. The Debtors' treasury department maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds. Additionally, the Debtors' corporate accounting, treasury, and internal audit departments regularly reconcile the Debtors' books and records to ensure that all transfers are accounted for properly. The Debtors estimate that total disbursements will average approximately $52 million per week during these chapter 11 cases.

9. In the ordinary course of business, the Debtors engage in routine business relationships with each other and their non-Debtor affiliates (the "<u>Intercompany Transactions</u>"),

resulting in intercompany receivables and payables (the "Intercompany Balances"). Accordingly, at any given time there may be Intercompany Balances owing by one Debtor to another Debtor or by a non-Debtor affiliate to a Debtor. Such Intercompany Transactions are typically conducted pursuant to intercompany trade arrangements and joint use of certain shared service platforms, among others.

10. Debtor to Debtor Intercompany Transactions are the most common. For example, in the normal course of business, Debtor Forever 21 transfers funds from the Master Operating Account to certain Disbursement Accounts so that Debtor F21 Retail can undertake transactions necessary for its day-to-day operations, such as satisfying accounts payable and payroll. Additionally, Debtor F21 Retail transfers funds to Debtor F21 Logistics to settle Intercompany Balances that arise from shipping services provided by Debtor F21 Logistics to Debtor F21 Retail.

11. Certain Intercompany Transactions also occur between the Debtors and their non-debtor foreign affiliates (the "International Entities"). **First**, pursuant to these Intercompany Transactions, Intercompany Balances arise from the Debtors' purchase of merchandise and other goods (the "Goods") from third-party vendors on behalf of certain International Entities, and, in exchange for which, the International Entities provide cash to the Debtors. Specifically, the International Entities sweep their remaining cash at the end of every month, after accounting for rent and operating expenditures, to Forever 21. Historically, this has resulted in Forever 21 recouping less than the total cost of the Goods from the International Entities, and the Debtors anticipate that the historical rate of return will improve during these chapter 11 cases as the Debtors exit certain underperforming foreign jurisdictions. Given the Debtors' intention to significantly reduce their international store portfolio (as described in greater detail in the First

Day Declaration), the Debtors intend to continue performing these Intercompany Transactions on a go-forward basis for the Philippine, Mexican, and Latin American International Entities (the "Go-Forward International Entities").  Conversely, the Debtors will be winding down the operations of those International Entities that are not Go-Forward International Entities (the "Wind-Down International Entities").  As of the Petition Date, the Wind-Down International Entities are not receiving, and will no longer receive, Goods from the Debtors.

12.      ***Second***, in addition to continuing to provide the Go-Forward International Entities with Goods, as described above, the Debtors will also continue to provide the Go-Forward International Entities with continued access to certain shared services.  Historically, Forever 21 provided certain shared services for the benefit of all the International Entities, including, among other services, strategic and marketing functions, development of overall marketing strategy, performance of market research, design of marketing activities, selection of external service providers, collection and analysis of customer feedback, logistics, and day-to-day operational needs such as executive, legal, accounting, information technology support services, buyer's agency services, and warehousing services.  Employees at the Debtors' two representative offices in China and Korea (the "Rep Offices") historically have assisted in providing these services to both the International Entities and the Debtors.  Additionally, certain International Entities, in exchange for corresponding Intercompany Balances, utilize the Debtors' intellectual property portfolio.[3]  The Debtors expect that the Wind-Down International Entities will continue to access the above-described shared services as needed until their wind down is

---

[3]     The intellectual property portfolio includes trade names, trademarks, and service marks, as well as certain business systems, including marketing programs, merchandizing strategies, store designs, store specifications, and operations manuals.

complete.[4] Continued access to the shared services for the Wind-Down International Entities will ensure an orderly international wind-down process that does not disrupt the United States' reorganization process. Specifically, access to these shared services consistent with historical practice will allow the International Entities to operate in the ordinary course during the Debtors' reorganization and international wind-down process, thereby protecting the Debtors' overall brand integrity and ultimately serving as a benefit to all of the Debtors' stakeholders.

13. Importantly, the Debtors will also continue to receive the benefits of these historical shared services. For example, Forever 21 Trading (Shanghai) Company Ltd. provides, and will continue to provide, the Debtors with warehousing and logistics services. Given that a majority of the Debtors' vendors are located in Asia, an Asian warehouse and logistical presence is vital to the continued maintenance of an orderly supply chain. Additionally, the Rep Offices provide the Debtors with back-office support at a discounted rate.

14. The Debtors settle Intercompany Balances arising from these Intercompany Transactions periodically and journal entries are recorded for receivables and payables, as applicable, in the respective Debtor's and non-Debtor entity's accounting system. The non-Debtor participants in such Intercompany Transactions satisfy their Intercompany Balances based on available cash on hand after paying rent obligations and other operational expenses. Notably, and importantly, the Debtors will not be sending cash to *any* of the International Entities to support store-level operations during these chapter 11 cases. The Debtors will continue to track postpetition Intercompany Transactions in the ordinary course of business. Any interruption of the Intercompany Transactions would severely disrupt the Debtors'

---

[4] The Debtors will provide certain shared services to non-Debtor Forever XXI, ULC during the course of its wind down pursuant to that certain Shared Services Agreement, dated September 28, 2019, by and among Forever 21 and Forever XXI, ULC.

operations and result in great harm to the Debtors' estates and their stakeholders. Further, notwithstanding the Debtors' continuing provision of the shared services described above, the Debtors will not provide funds to any of the International Entities during the course of these chapter 11 cases. Accordingly, the Debtors seek the authority to continue the Intercompany Transactions in the ordinary course of business, in a manner consistent with prepetition practice.

15. Because of the disruption that would result if the Debtors were forced to close their existing bank accounts, I believe that it is critical that the existing Cash Management System remain in place. I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

**IV.    Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing, but Not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief (the "<u>Wages Motion</u>").**

16. Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to (i) pay prepetition wages, salaries, other compensation, withholding obligations, payroll processing fees, reimbursable employee expenses, non-insider employee incentive programs and (ii) continue employee benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto, in an aggregate amount not to exceed $25 million pursuant to the Interim Order and $37.1 million pursuant to the Final Order; and (b) granting related relief.

17. As of the Petition Date, the Debtors employ approximately 28,500 Employees, including approximately 5,000 full-time Employees and approximately 23,500 part-time and seasonal Employees. In addition to the Employees, the Debtors also periodically retain

independent contractors and temporary workers (collectively, the "Temporary Staff") sourced regularly from various Staffing Agencies to fulfill certain duties on a short- and long-term basis. Typically, at any given time the Debtors retain approximately 500 Temporary Staff.  In addition, over the next four to six months, in preparation for and during the retail holiday season, as well as relocation of the domestic distribution center, the Debtors anticipate that the number of Employees and Temporary Staff will increase by approximately 4,000 and 700 respectively.

18.     The majority of Employees and Temporary Staff rely on the Employee Compensation and Benefits Programs to pay their daily living expenses.  Thus, Employees and Temporary will face significant financial consequences if the Debtors are not permitted to continue the Employee Compensation and Benefits Programs in the ordinary course of business. The Debtors seek to minimize the personal hardship the Employees and Temporary Staff would suffer if employee obligations are not paid when due or as expected.  Consequently, I believe the relief requested is necessary and appropriate.

19.     The Debtors are seeking authority to pay and honor certain prepetition claims relating to the Employee Compensation and Benefits, including, among other things, wages, salaries, other compensation, withholding obligations, payroll processing fees, reimbursable expenses, non-insider employee incentive programs, health insurance, life insurance, workers' compensation benefits, short-term disability coverage, supplemental benefits, retirement plans, paid time off, severance, and other benefits that the Debtors have historically directly or indirectly provided to the Employees in the ordinary course of business and as further described in the Wages Motion.

20.     Pursuant to the Wages Motion, the Debtors also seek authority to continue their incentive programs and to honor their obligations to non-insider Employees under the

pre-existing bonus programs, described more fully in the Wages Motion. The Debtors believe the Non-Insider Employee Incentive Programs drive Employees' performance, align Employees' interests with those of the Debtors generally, and promote the overall efficiency of the Debtors' operations. I understand that "insiders" (as the term is defined in section 101(31) of the Bankruptcy Code) of the Debtors are excluded from the relief requested in the Wages Motion with respect to any bonus programs or severance payments.

21. I believe the Employees provide the Debtors with services necessary to conduct the Debtors' business, and, absent the payment of the Employee Compensation and Benefits Programs owed to the Employees, the Debtors will likely experience Employee turnover and instability at this critical time. I believe that, without these payments, the Employees may become demoralized and unproductive because of the potential significant financial strain and other hardships the Employees may face. Employees may then elect to seek alternative employment opportunities. I believe enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario. I, therefore, believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their business in these chapter 11 cases.

22. Therefore, I believe that the relief requested in the Wages Motion inures to the benefit of all parties in interest. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Wages Motion.

**V.**     **Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of (A) Lien Claimants and (B) Import Claimants, and (II) Granting Related Relief (the "<u>Lien Claimants Motion</u>").**

23.     Pursuant to the Lien Claimants Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to pay prepetition amounts in the ordinary course owing on account of certain (i) Lien Claimants and (ii) Import Claimants (each as defined herein), in an aggregate interim amount not to exceed $20 million and in an aggregate final amount not to exceed $29 million; (b) continuing to honor outstanding obligations to Lien Claimants and Import Claimants on a postpetition basis in the ordinary course of business and consistent with historical practice; and (c) granting related relief.

24.     ***Lien Claimants.***     The Debtors' business depends on the uninterrupted flow of inventory and other goods through their supply chain and distribution network, including the purchase, importation, storage, and shipment of the Debtors' Merchandise.  The Debtors pay various freight forwarders, common carriers, shipping lines, trucking companies, custom brokers, and other logistics service providers (collectively, the "<u>Shippers</u>") to transport the Merchandise.

25.     In addition to Shippers, the Debtors also routinely transact business with a number of other third parties, including mechanics, technicians, and repairmen in connection with their brick-and-mortar stores and distribution centers (the "<u>Materialmen</u>," and together with the Shippers, the "<u>Lien Claimants</u>").

26.     Collectively, the Debtors estimate approximately $31 million of charges on behalf of the Lien Claimants (the "<u>Lien Charges</u>") were due and owing as of the Petition Date, the vast majority of which will become due and owing within 30 days after the Petition Date. Accordingly, the Debtors seek authority, but not direction, to pay and discharge, on a

case-by-case basis, the Lien Charges in an aggregate amount up to approximately $17 million on an interim basis and up to approximately $23 million on a final basis.

27. ***Import Claimants.*** In the ordinary course of their business, the Debtors import inventory and related materials (collectively, the "Imported Goods"). Timely receipt or transmittal, as applicable, of the Imported Goods is critical to both the Debtors' domestic and foreign business operations. Any disruption or delay would adversely affect the Debtors' business operations and affect the Debtors' ability to efficiently administer these chapter 11 cases.

28. In connection with the import of goods, the Debtors may be required to pay various charges (the "Import Charges"), including customs duties, detention and demurrage fees, tariffs and excise taxes, and other similar obligations. The Debtors pay approximately $30 million annually on account of Import Charges. The Debtors estimate that approximately $6 million in Import Charges for goods currently in transit is outstanding as of the Petition Date, approximately $3 million of which will come due in the first 30 days after the Petition Date. Accordingly, the Debtors seek authority, but not direction, to pay and discharge, on a case-by-case basis, the Import Charges incurred on account of prepetition transactions in an aggregate amount up to $3 million on an interim basis and up to $6 million on a final basis.

29. The Debtors rely on timely and frequent delivery of critical inventory items, goods, and services and any interruption in this supply—however brief—would disrupt the Debtors' operations and could potentially cause irreparable harm to their businesses, goodwill, employees, customer base, and market share. Such harm would likely far outweigh the cost of payment of the Lien Charges and Import Charges. I believe that the relief requested in the Lien Claimants Motion will allow the Debtors to preserve stakeholder value by paying the prepetition

claims of certain counterparties that are critical to the Debtors' business enterprise. I believe that the relief requested in the Lien Claimants Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Lien Claimants Motion.

**VI.** **Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of (A) Critical Vendors, (B) Foreign Vendors, and (C) 503(b)(9) Claimants and (II) Granting Related Relief (the "<u>Critical Vendors Motion</u>").**

30. Pursuant to the Critical Vendors Motion, The Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to pay prepetition amounts in the ordinary course owing on account of certain (i) Critical Vendors, (ii) Foreign Vendors, and (iii) 503(b)(9) Claimants in an aggregate interim amount not to exceed $65 million and in an aggregate final amount not to exceed, inclusive of amounts paid pursuant to the Interim Order, $100 million; (b) authorizing, but not directing, the Debtors to honor outstanding obligations to the Critical Vendors, the Foreign Vendors, and the 503(b)(9) Claimants on a postpetition basis in the ordinary course of business and consistent with historical practice; and (c) granting related relief.

31. *Critical Vendors.* Pursuant to the Critical Vendors Motion, the Debtors seek entry of interim and final orders: (a) authorizing the Debtors to pay the Critical Vendors Claims in an amount not to exceed $8 million pursuant to the Interim Order and, in the aggregate, inclusive of amounts paid pursuant to the Interim Order, an amount not to exceed $14 million pursuant to the Final Order, in each case absent further order of the Court; and (b) granting related relief.

20.     In the ordinary course of business, the Debtors engage a limited number of providers for certain of the critical services, inventory, and other materials the Debtors depend upon to provide top-quality product and service to their customers.  The Debtors obtain such services, inventory, or materials from a limited number of highly specialized vendors, service providers, and other businesses, often on an order-by-order basis and without long-term contracts—replacement of which would likely be impossible or would result in substantially higher costs for the Debtors at this early, critical juncture in these chapter 11 case.  Additionally, the Debtors also engage the services of certain Factors, who facilitate and enable the continuing provision of goods and services by the Factor Client Vendors to the Debtors.  The Factors enable, provide, and aggregate the extension of trade credit to the Debtors by the provision of Financial Accommodations.  Without the Financial Accommodations, such trade credit would not otherwise be directly available from the Factor Client Vendor.  The maintenance of an uninterrupted supply chain depends upon the Factors continuing to provide the same Financial Accommodations to the Debtors' vendors in the ordinary course of business throughout these chapter 11 cases.

21.     Recognizing that payment of all prepetition claims of such third-party vendors outside of a plan of reorganization would be extraordinary relief, the Debtors, with the assistance of their advisors, reviewed their books and records, consulted operations management and purchasing personnel, reviewed contracts and supply agreements, and analyzed applicable laws, regulations, and historical practices to identify the limited number of vendors that are critical to the continued and uninterrupted operation of the Debtors' businesses—the loss of which could materially harm their businesses, shrink their market share, reduce their enterprise value, and impair going-concern viability.  The Debtors estimate that they owe approximately $350 million

to their vendors as of the Petition Date. The Debtors submit that the requested relief will allow the Debtors to preserve stakeholder value by paying certain prepetition claims of certain counterparties where critical to unlock incremental liquidity for the Debtors' business enterprise. Accordingly, the Debtors seek authority, but not direction, to pay and discharge, on a case by case basis, the Critical Vendor Claims in an aggregate amount up to approximately $8 million on an interim basis and up to approximately $14 million on a final basis.

32. ***Foreign Vendors.*** A critical component of the Debtors' supply chain involves transacting with certain foreign vendors, including by purchasing the Merchandise and other goods and materials from entities located in the People's Republic of China, Korea, Hong Kong, and others (collectively, the "Foreign Vendors"). Many of the Foreign Vendors supply goods, materials, or services to the Debtors that are crucial to the Debtors' ongoing U.S. operations— specifically, the Merchandise necessary to stock the shelves and racks in the Debtors' stores and populate the Debtors' e-commerce platform.

33. The Debtors propose to pay the Foreign Vendor Claims only to the extent necessary and only on such terms and conditions as are appropriate, in the Debtors' business judgment, to avoid disruptions to their business. The Debtors estimate that as of the Petition Date, approximately $267 million is accrued and outstanding on account of Foreign Vendor Claims, of which $220 million may come due within the first 30 days after the Petition Date. The Debtors further estimate that $47 million of additional prepetition Foreign Vendor Claims will become due and owing during the pendency of these chapter 11 cases.

34. Accordingly, the Debtors seek authority, but not direction, to pay and discharge, on a case-by-case basis, the Foreign Vendor Claims in an aggregate amount up to approximately $17 million on an interim basis and up to approximately $24 million on a final basis.

35.    ***503(b)(9) Claimants.***    The Debtors have received certain inventory, goods, and materials from various foreign and domestic vendors (collectively, the "503(b)(9) Claimants") within the 20-day period immediately preceding the Petition Date.    Certain of the 503(b)(9) Claimants do not have long-term contracts with the Debtors.    Rather, the Debtors obtain inventory, goods, or other materials from the 503(b)(9) Claimants on an order-by-order basis. As a result, the 503(b)(9) Claimants may refuse to supply new orders without payment of their prepetition claims.    Such refusal could negatively impact the Debtors' estates as the Debtors' business is dependent on the steady flow of inventory to stock their stores.    The Debtors believe that, as of the Petition Date, they owe approximately $62 million on account of goods delivered within the 20 days immediately preceding the Petition Date, approximately $40 million of which may come due in the first 30 days after the Petition Date and the value of which may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

36.    Accordingly, the Debtors seek authority, but not direction, to pay and discharge, on a case by case basis, the 503(b)(9) Claims in an aggregate amount up to approximately $42 million on an interim basis and up to approximately $63 million on a final basis..

37.    The Debtors rely on timely and frequent delivery of critical inventory items, goods, and services and any interruption in this supply—however brief—would disrupt the Debtors' operations and could potentially cause irreparable harm to their businesses, goodwill, employees, customer base, and market share.    Such harm would likely far outweigh the cost of payment of the Critical Vendor Claims, Foreign Vendor Claims, and 503(b)(9) Claims.  I believe that the relief requested in the Critical Vendors Motion will allow the Debtors to preserve stakeholder value by paying the prepetition claims of certain counterparties that are critical to the Debtors' business enterprise.  I believe that the relief requested in the Critical Vendors Motion is

in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Critical Vendors Motion.

**VII. Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief (the "Customer Programs Motion").**

38.     Pursuant to the Customer Programs Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors to maintain and administer their customer-related programs (collectively, the "Customer Programs") as described in the motion and honor certain prepetition obligations related thereto and (b) granting related relief.

39.     The Debtors have historically provided certain incentives, discounts, and accommodations to their customers to attract and maintain positive customer relationships. The Customer Programs promote customer satisfaction and inure to the goodwill of the Debtors' business and the value of their brand. Accordingly, maintaining the goodwill of their customers is critical to the Debtors' ongoing operations in these chapter 11 cases, and is necessary to maximize value for the benefit of all of the Debtors' stakeholders.

40.     In the ordinary course of business, the Debtors offer discounts, special promotions, and other benefits through the Loyalty Program. The Debtors also maintain a Gift Card Program pursuant to which their customers can purchase physical, pre-paid, non-expiring gift cards in various denominations, with a maximum denomination of $200. The Debtors estimate that as of the Petition Date, approximately $118 million in issued Gift Cards are outstanding. Based on historical redemption rates and breakage, however, the Debtors estimate the value of outstanding Gift Cards to be approximately $38 million as of the Petition Date.

41.     The Debtors occasionally conduct Sales Promotions both online and at selected stores.  The Sales Promotions consist of clearance discounts, seasonal discounts, and other promotions.  The Debtors also issue coupons for discounts on future purchases which can be presented by customers at the time of purchase of goods at the Debtors' retail stores or online on the Debtors' e-commerce platform.

42.     I believe that continuing to administer the Customer Programs without interruption during the pendency of the chapter 11 cases will help preserve the Debtors' valuable customer relationships and goodwill, which will inure to the benefit of all of the Debtors' creditors and benefit their estates.  In contrast, if the Debtors are unable to continue the Customer Programs postpetition, the Debtors risk alienating certain customers (who might then initiate business relationships with the Debtors' competitors) and might suffer corresponding losses in customer loyalty and goodwill that will harm their prospects maximizing the value of their estates.  The Debtors' Customer Programs are essential marketing strategies for attracting new customers.

43.     I believe that the failure to honor the Customer Programs could place the Debtors at a competitive disadvantage in the marketplace, amplifying the negative effect of customer uncertainty that may arise from the chapter 11 filings.  Such uncertainty could erode the Debtors' hard-earned reputation and brand loyalty, which, in turn, could adversely impact their prospects for a successful emergence from bankruptcy.

44.     I believe that the relief requested herein will pay dividends with respect to the long-term reorganization of their businesses, both in terms of profitability and the engendering of goodwill, especially at this critical time following the filing of the chapter 11 cases.

Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Customer Programs Motion.

**VIII.**     **Debtors' Motion Seeking Entry of Interim and Final Orders (I) Determining Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Utility Services, (III) Establishing Procedures for Determining Adequate Assurance of Payment, (IV) Authorizing Certain Fee Payments for Services Performed, (V) Requiring Utility Providers to Return Deposits for Utility Services No Longer in Use, and (VI) Granting Related Relief (the "Utilities Motion").**

45.      Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders: (a) determining adequate assurance of payment for future utility services; (b) prohibiting utility providers from altering, refusing, or discontinuing services; (c) establishing procedures for determining adequate assurance of payment; (d) authorizing payment of prepetition fees to Engie Insight Services, Inc. f/k/a Ecova ("Engie"), the Debtors' third party administrator for the payment of utility fees, and Universal Environmental Consulting, Inc. ("UEC"), the Debtors' waste collection and disposal service provider, for services performed, (e) requiring utility providers to return deposits for utility services no longer in use, and (f) granting related relief.

46.      In connection with the operation of their business and management of their properties, the Debtors historically obtain water, sewer service, electricity, waste disposal, natural gas, telecommunication, cloud, and other similar services (collectively, the "Utility Services") from a number of utility providers or their brokers (collectively, the "Utility Providers").

47.      To manage the Debtors' payments owed to most of their Utility Providers, the Debtors entered into those Service Agreements with Engie and UEC. Pursuant to the Service Agreements, the Debtors pay Service Fees for managing the Debtors' various service providers.[5]

---

[5]    The Service Fees do not include any amounts paid directly by the Debtors to the Utility Providers.

Pursuant to the Engie Service Agreement, the Debtors pay Engie the amounts invoiced for the Utility Services managed by Engie, plus a monthly fee of approximately $8,000, in the ordinary course of business. Pursuant to the UEC Service Agreement, the Debtors pay UEC the amounts invoiced for the Utility Services managed by UEC, plus a monthly fee of approximately $5,000, in the ordinary course of business. The Debtors seek authority, but not direction, to pay all prepetition Service Fees.

48. On average, the Debtors pay approximately $3,570,000 each month for third-party Utility Services, calculated as a historical average payment for the twelve-month period ending June 30, 2019, including Service Fees paid directly by the Debtors and excluding Utility Services billed directly to the Debtors' landlords. The Debtors estimate that their cost for Utility Services during the next 30 days (not including any deposits to be paid or the Service Fees payable to Engie or UEC) will be approximately $3,570,000. The Debtors estimate the aggregate amount currently held as deposits or prepayments by the Utility Providers providing services to stores that the Debtors intend to continue operating is approximately $952,000. The Debtors also have 9 surety bonds outstanding with 4 Utility Providers, totaling approximately $369,000. Additionally, the Debtors provide a $40,000 letter of credit for the benefit of a certain Utility Provider.

49. Over the next 30 days, the Debtors estimate that their cost for Utility Services (not including any deposits or fees paid to Engie) will be approximately $3,570,000. The Debtors propose depositing $1,428,552 into a segregated account as additional assurance of payment (the "Adequate Assurance Deposit"), which is an amount sufficient to cover one-half of the Debtors' average monthly cost based on the historical average payment. The Adequate

Assurance Deposit will be held at JPMorgan Chase, N.A., and the Debtors' creditors will have no lien on any Adequate Assurance Deposit.

50.     The Debtors are conducting store closing sales for certain retail locations, which are expected to be completed on or before October 31, 2019.  After these stores are closed and utility accounts associated therewith are settled, the Debtors will reduce the amount of the Adequate Assurance Deposit to reflect Utility Services that are no longer being provided.  The applicable Utility Providers will be required to return deposits within 21 calendar days of receiving notice from the Debtors that the respective Utility Service is no longer in use.

51.     Additionally, the Debtors seek approval of their proposed Adequate Assurance Procedures.  These procedures allow Utility Providers to request adequate assurance for unpaid Utility Services and additional adequate assurance when they believe the proposed amount is not sufficient.  This ensures that all key stakeholder groups obtain notice of such request before it is honored.

52.     Furthermore, the Debtors request that Utility Providers be prohibited from refusing or disrupting Utility Services, for any duration, including those that are indirectly obtained through nonresidential real property leases with landlords associated with certain retail locations.  Landlords must continue to honor their obligations and pay for Utility Services in accordance with such leases until the applicable lease is rejected pursuant to section 365 of the Bankruptcy Code, notwithstanding any current or future nonpayment, deferral, waiver, or other compromise of rent.  Utility Services should be preserved on an uninterrupted basis because it is essential to the Debtors' ongoing operations and a successful reorganization.  The Debtors' retail enterprise requires maintaining open and active stores to entice and allow customers to make purchases.  Any disruption would adversely impact customer relationships and result in a

significant decline in the Debtors' revenues and profits. This, in turn, jeopardizes the value of the Debtors' estates and impact creditor recoveries. Therefore, it is critical that Utility Services continue uninterrupted during these chapter 11 cases. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Utilities Motion.

## IX. Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief (the "**Taxes Motion**").

53.     The Debtors request authority to: (a) negotiate, remit and pay certain accrued and outstanding prepetition obligations accrued in the ordinary course of business on account of the Taxes and Fees (as defined herein) in an aggregate amount not to exceed $19,910,000 on an interim basis and $23,680,000 on a final basis, absent further order of the Court; and (b) continue negotiating and paying the Taxes and Fees accrued in the ordinary course of business on a postpetition basis.

54.     In the ordinary course of business, the Debtors incur and/or collect certain Taxes and Fees and remit such Taxes and Fees to various governmental authorities. The Debtors must continue to pay the Taxes and Fees to avoid potential costly distractions during these chapter 11 cases. Specifically, the Debtors' failure to pay the Taxes and Fees could adversely affect the Debtors' estate because the governmental authorities could file liens or seek to lift the automatic stay.

55.     I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

**X.** **Debtors' Motion Seeking Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and (II) Granting Related Relief (the "NOL Motion").**

56. The Debtors seek entry of interim and final orders: (a) approving certain notification and hearing procedures related to certain transfers of, or declarations of worthlessness with respect to, Debtor Forever 21, Inc.'s existing common stock or any Beneficial Ownership[6] therein (any such record or Beneficial Ownership of common stock, the "Common Stock"),[7] as detailed in Annex 1 to the interim order and final order (the "Procedures"); (b) directing that any purchase, sale, other transfer of, or declaration of worthlessness with respect to Common Stock in violation of the Procedures shall be null and void *ab initio*; and (c) granting related relief.

57. The Debtors currently estimate that, as of the end of their 2018 tax year,[8] they have approximately $567.6 million of federal NOLs and approximately $13.6 million of general business credit carryforwards (together with the federal NOLs and state and certain other tax attributes, the "Tax Attributes"). The Debtors further estimate that they may generate additional

---

[6] "Beneficial Ownership" will be determined in accordance with the applicable rules of section 382 of the Internal Revenue Code of 1986, 26 U.S.C. §§ 1–9834, as amended (the "IRC"), and the Treasury Regulations thereunder (other than Treasury Regulations section 1.382-2T(h)(2)(i)(A)), and includes direct, indirect, and constructive ownership (*e.g.*, (1) a holding company would be considered to beneficially own all equity securities owned by its subsidiaries, (2) a partner in a partnership would be considered to beneficially own its proportionate share of any equity securities owned by such partnership, (3) an individual and such individual's family members may be treated as one individual, (4) persons and entities acting in concert to make a coordinated acquisition of equity securities may be treated as a single entity, and (5) a holder would be considered to beneficially own equity securities that such holder has an Option to acquire). An "Option" to acquire stock includes all interests described in Treasury Regulations section 1.382-4(d)(9), including any contingent purchase right, warrant, convertible debt, put, call, stock subject to risk of forfeiture, contract to acquire stock, or similar interest, regardless of whether it is contingent or otherwise not currently exercisable.

[7] For the avoidance of doubt, the definition of Common Stock shall not include any securities issued in connection with a chapter 11 plan of reorganization of the Debtors.

[8] As is common for many retailers, the Debtors utilize a non-calendar fiscal tax year, which ended March 2, 2019. These attribute estimates are based on the Debtors' current "provision" work for the 2018 tax year and will remain subject to change until the tax return for the 2018 tax year is filed. Additionally, the Debtors believe that they have certain disallowed business interest expense under section 163(j) of the IRC.

Tax Attributes in the 2019 tax year. The Tax Attributes are potentially of significant value to the Debtors and their estates because the Debtors may be able to carry forward certain Tax Attributes to offset future taxable income or utilize the Tax Attributes to offset any taxable income generated by transactions consummated during these chapter 11 cases. Accordingly, the value of the Tax Attributes will inure to the benefit of all of the Debtors' stakeholders.

58.     Notably, the Debtors have limited the relief requested herein to the extent necessary to preserve estate value. Specifically, the proposed Interim Order and Final Order will affect only: (a) holders of the equivalent of Beneficial Ownership of more than 7,587 shares of Common Stock[9] (*i.e.*, 4.5 percent or more of outstanding Common Stock); (b) parties who are interested in purchasing sufficient Common Stock to result in such party becoming a holder of 4.5 percent or more of Beneficial Ownership of outstanding Common Stock; and (c) any "50-percent shareholder" seeking to claim a worthless stock deduction.

59.     I believe that the relief requested in the NOL Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest. Accordingly, on behalf of the Debtors, I respectfully submit that the NOL Motion should be approved.

**XI.     Debtors' Motion Seeking Entry of an Order Establishing a Record Date for Notice and Sell-Down Procedures for Trading in Certain Claims against the Debtors' Estates (the "<u>Sell-Down Procedures Motion</u>").**

60.     Debtors seek entry of an order: (a) establishing the date the Court enters the Record Date Order as the effective date (the "<u>Record Date</u>") for notice and sell-down procedures for trading in certain claims against the Debtors' estates in order to preserve the Debtors' ability to formulate a plan of reorganization that maximizes the use of their Tax Attributes; and (b) granting related relief.

---

[9]     Based on approximately [168,611] shares of Common Stock outstanding for purposes of section 382 of the IRC as of the Petition Date.

61.    The Debtors' ability to use their Tax Attributes may be lost (or extremely limited) if they experience an "ownership change" for tax purposes and are unable to take advantage of certain favorable rules that apply to ownership changes that occur pursuant to a bankruptcy plan of reorganization.  Thus, in order to protect their ability to utilitze the Tax Attributes (and, specifically, to rely on the favorable rule described below), the Debtors may ultimately need to seek an order (a "<u>Sell-Down Order</u>") requiring any persons or entities that have acquired debt claims against the Debtors during these chapter 11 cases in such an amount that the holders of such claims would be entitled to receive more than 4.5 percent of the equity of the reorganized Debtors (collectively, the "<u>Substantial Claimholders</u>"), to sell-down their claims below this threshold amount.

62.    At this stage, it is too early to determine whether it is (or will be) necessary for the Debtors to obtain a Sell-Down Order.  Accordingly, the Sell-Down Procedures Motion does not seek entry of a Sell-Down Order.  Instead, the Sell-Down Procedures Motion merely seeks to establish the Record Date through entry of the Record Date Order.  The Record Date Order will provide notice of the Record Date to persons and entities that trade claims against the Debtors that their claims ultimately may be subject to sell-down.

63.    I believe that the relief requested in the Sell-Down Procedures Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the Sell-Down Procedures Motion should be approved.

XII.   **Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Their Obligations Under Insurance Policies Entered into Prepetition, (B) Continue to Pay Brokerage Fees, (C) Renew, Supplement, Modify, or Purchase Insurance Coverage, (D) Continue to Pay Workers' Compensation Coverage Fees, (E) Maintain the Customs Surety Bonds, and (F) Honor the Terms of the Financing Agreement and Pay Premiums Thereunder, and (II) Granting Related Relief (the "<u>Insurance Motion</u>").**

64.   The Debtors request authority to: (i) continue honoring their obligations under insurance policies entered into prepetition (the "<u>Insurance Policies</u>") and satisfy payment of prepetition obligations related thereto, including the payment of related brokerage fees, (ii) renew, supplement, modify, extend, or purchase insurance coverage in the ordinary course of business on a postpetition basis; (iii) pay the Workers' Compensation Coverage Fees, (iv) continue and renew their Surety Bonds on an uninterrupted basis; and (v) honor the terms of the Financing Agreement (as defined herein) and pay premiums thereunder; and (b) granting related relief, all in an aggregate amount not to exceed $920,000 on an interim basis and $3,643,000 on a final basis, absent further order of the Court.

65.   The Debtors' Insurance Policies, Worker's Compensation Program, and Surety Bonds are essential to the preservation of the value of the Debtors' business, properties, and assets.   I understand that, in many cases, insurance coverage such as that provided by the Insurance Policies is required by diverse regulations, laws, and contracts.   Failure to make the payments required by the Debtors' Insurance Policies, including the Financing Agreement, could have a significant negative impact on the Debtors' operations.

66.   The Debtors maintain workers' compensation insurance for their employees at the statutorily required level for each jurisdiction in which the Debtors have employees (collectively, the "<u>Workers' Compensation Program</u>").   The coverage for the Worker's Compensation Program is maintained through Chubb Limited ("<u>Chubb</u>") and administered by Broadspire Services, Inc. ("<u>Broadspire</u>").   The Debtors pay approximately $845,000 per year in fees and premiums

through a down payment and 9 installment payments to fund the Workers' Compensation Program.  As of the Petition Date, the Debtors believe they owe 2 installment payments of approximately $141,000 on account of accrued but unpaid Workers' Compensation Coverage Fees.

67.     Similarly, the Debtors are required by U.S. Customs and certain regulations to provide the Surety Bonds in order to be able to import merchandise into the United States, pay certain utilities, and satisfy consumer protection requirements.  Given that the Debtors rely on imported merchandise to replenish their inventory and invigorate their operations and are required to maintain the Surety Bonds by other utility providers and regulatory authorities, failure to provide, maintain, or timely replace the Surety Bonds will jeopardize the Debtors ability to operate their businesses.

68.     I believe that the relief requested in the Insurance Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

**XIII.     Debtors' Application For Entry of an Order (I) Authorizing and Approving the Appointment of Prime Clerk As Claims and Noticing Agent and (II) Granting Related Relief (the "Prime Clerk 156(c) Retention Application").**

69.     Pursuant to the Claims and Noticing Agent Application, the Debtors seek entry of an order (a) appointing Prime Clerk ("Prime Clerk") as claims and noticing agent for the Debtors and their chapter 11 cases, effective *nunc pro tunc* to the Petition Date, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' chapter 11 cases, and (b) granting related relief.

70.     Based on my discussions with the Debtors' advisors, I believe that the Debtors' selection of Prime Clerk to act as the Claims and Noticing Agent is appropriate under the

circumstances and in the best interest of the estates. Moreover, it is my understanding that based on all engagement proposals obtained and reviewed that Omni's rates are competitive and comparable to the rates charged by their competitors for similar services.

71. The Debtors anticipate that there will be thousands of persons and entities to be noticed in these chapter 11 cases. In light of the number of parties in interest and the complexity of the Debtors' business, the Debtors submit that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the Debtors and/or the Clerk's office of the administrative burden of, noticing and processing proofs of claim and is in the best interests of both the Debtors' estates and their creditors. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Prime Clerk 156(c) Retention Application.

*[Remainder of page intentionally left blank]*