**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FOREVER 21, INC., *et al.*,[1] | ) | Case No. 19-12122 (KG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Requested Hearing Date: February 4, 2020 at ___:___ a.m. EST** |
| | ) | **Requested Objection Deadline: February 3, 2020 at 12:00 p.m. EST** |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF
AN ORDER (A) APPROVING BIDDING PROCEDURES
AND BID PROTECTIONS IN CONNECTION WITH THE SALE OF
SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) APPROVING
THE FORM AND MANNER OF NOTICE THEREOF, (C) SCHEDULING AN
AUCTION AND SALE HEARING, (D) APPROVING PROCEDURES FOR
THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS, (E) APPROVING
THE SALE OF THE DEBTORS' ASSETS, AND (F) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[2]

respectfully state as follows in support of this motion (this "Motion") for the relief set forth herein.[3]

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Forever 21, Inc. (4795); Alameda Holdings, LLC (2379); Forever 21 International Holdings, Inc. (4904); Forever 21 Logistics, LLC (1956); Forever 21 Real Estate Holdings, LLC (4224); Forever 21 Retail, Inc. (7150); Innovative Brand Partners, LLC (7248); and Riley Rose, LLC (6928).  The location of the Debtors' service address is:  3880 N. Mission Road, Los Angeles, California 90031.

[2]   A detailed description of the Debtors and their business, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Jonathan Goulding, Chief Restructuring Officer of Forever 21, Inc., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 23] (the "First Day Declaration"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), on September 29, 2019 (the "Petition Date"). Capitalized terms used but not otherwise defined in this Motion shall have the meanings given to them in the Bidding Procedures, the DIP Order (as defined herein), or the First Day Declaration, as applicable.

[3]   In support of this Motion, the Debtors anticipate filing the *Declaration of Tyler Cowan in support of the Debtors' Motion for Entry of an Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Substantially All of the Debtors' Assets, (B) Approving the Form and Manner of Notice Thereof, (C) Scheduling an Auction and Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts, (E) Approving the Sale of the Debtors' Assets, and (F) Granting Related Relief* prior to the hearing on this Motion. .

**Preliminary Statement**

1.      In order to advance these chapter 11 cases toward the Debtors' ultimate goal—a going concern transaction—the Debtors, in close coordination with the Committee and the DIP Lenders, intend to conclude a process that began in the summer of 2019 to maximize the value of their estates.  The Debtors and their advisors have solicited proposals for all transaction forms in an effort to deliver the best available recoveries for the estates.  Now, the Debtors are engaged in substantial, round-the-clock negotiations concerning a going concern Stalking Horse Purchase Agreement while simultaneously developing bids for alternative transaction structures.  The Debtors intend on entering into and filing a Stalking Horse Purchase Agreement, a substantially final form of which is attached hereto as **Exhibit C**, subject to Court approval, in advance of the hearing on this Motion.  Although time is of the essence, the Debtors will nonetheless continue to entertain and develop any proposal that, in their business judgment, could maximize the value of the estates.

2.      The Debtors intend to market test the Stalking Horse Bid with an open and competitive sale process—albeit on a relatively expedited basis—to ensure all parties in interest have an opportunity to advance a "best and final" offer and deliver value to these estates.  In the event the Debtors receive additional Qualified Bids, the Debtors propose to hold an auction.  The Debtors intend to seek approval of the Stalking Horse Purchase Agreement, or other Successful Bid (as defined in the Bidding Procedures), on February 11, 2020.  The Debtors believe that this Motion presents the best available path forward in terms of maximizing the value of these estates under the present facts and circumstances.  The Debtors will continue to work in good faith with the DIP Agents to comply with their obligations under the DIP Order.[4]

---

[4]     *See generally, Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Grant the Releases Included in the Second DIP ABL Amendment and (II) Granting Related Relief* [Docket No. 692] and the *Debtors' Supplemental Motion for Entry of an Order (I) Authorizing the Debtors to Grant the Releases Included in the DIP*

3.     Consistent with the Debtors' need to consummate a sale of their Assets as quickly and efficiently as practicable, the Debtors propose the following key dates and deadlines for the sale process, certain of which dates and deadlines may be subject to extension in accordance with the Bidding Procedures:

| Event or Deadline | Date and Time |
|---|---|
| Bid Deadline | February 7, 2020 at 4:00 p.m. (prevailing Eastern Time) |
| Auction (if applicable) | February 10, 2020 at 10:00 a.m. (prevailing Eastern Time) |
| Sale Hearing | February 11, 2020 at __:__ _.m. (prevailing Eastern Time) |

4.     Simply put, the Debtors have conducted a robust marketing process for their assets over the past several months.  The Debtors contacted more than 115 parties soliciting proposals to recapitalize the Debtors and otherwise maximize recoveries for their creditors.  Among other things, the Debtors have explored raising additional debt through a variety of structures, raising additional capital through an equity raise, and selling the Debtors' assets.  The DIP Lenders have agreed to provide the Debtors with certain runway to realize on those prior efforts.  The proposed sale process will help drive these chapter 11 cases to a value-maximizing conclusion.

## The Marketing Process

5.     With the backing of its DIP Lenders and the Committee, the Debtors' investment bank, Lazard Frères & Co. LLC ("Lazard"), launched an extensive marketing process in early November 2019.  At that time, Lazard commenced a widespread outreach to potential bidders,

---

*Forbearance Agreements and (II) Granting Related Relief* [Docket No. 733] (collectively, the "Forbearance Motion").  While the Debtors have previously reached agreement with the DIP Agents in respect of recent defaults under the Debtors' postpetition financings, the DIP Agents have not yet consented to the Debtors' currently proposed timeline, which is outside the current forbearance period that expires on February 8, 2020.  The current Forbearance Period (as defined in the Forbearance Motion) is set to expire no later than February 8, 2020.  As of the filing of this Motion, the Forbearance Period has not been modified, and the DIP Agents and DIP Lenders have not yet consented to the relief sought herein.

As used herein, the "DIP Order" shall mean the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting liens and Providing Superpriority Administrative Exepnse Status, (IV) Granting Adequate Protection to the Prepetition ABL Secured Parties, (V) Modifying the Automatic Stay,  and (VI) Granting Related Relief* [Docket No. 397].

including a broad universe of traditional banks, alternative investment firms, private equity firms, and strategic investors.  Initially, Lazard contacted 80 potential lenders and investors; more than 50 such parties signed NDAs and received access to diligence materials.  Following this initial outreach, Lazard identified 14 parties they believed most likely to provide exit financing.  Lazard received 13 debt-financing proposals—six proposals to provide an exit ABL facility, and seven proposals to provide an exit term loan.  Lazard also received two proposals that contemplated investments from new secured debt or new equity.

6.    Meanwhile, as described in the Forbearance Motion, the Debtors' access to liquidity under the DIP Facilities came under pressure in mid-December.  The Debtors and their advisors accelerated their engagement with parties in interest during this period and further expanded their outreach to find investors and buyers.  In the aggregate, Lazard reached out to more than 115 potential investors.  That sale process would continue with the selection of a Stalking Horse Bidder and culminate with the bid deadline and, if appropriate, the auction.  The Debtors, as estate fiduciaries, submit this is the best available path forward.

## Jurisdiction and Venue

7.    The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  The Debtors confirm their consent, pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final

orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The bases for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, and 6006(a) of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and Local Rules 2002-1, 6004-1, and 9006-1.

### Background

10.     The Debtors are a specialty fashion retailer of women's and men's apparel and accessories. As of the Petition Date, the Debtors operated 549 stores across the United States, and 251 stores are operated internationally by non-Debtor affiliates. Of the 251 international stores, 181 are owned and operated exclusively by the non-Debtor affiliates, 54 are franchises, and 16 are operated as joint ventures. The Debtors also maintain a substantial online presence, with their e-commerce platform accounting for approximately 16 percent of all sales as of the Petition Date. In addition to the 534 stores operated under the Forever 21 brand, the Debtors formed a beauty and wellness brand, Riley Rose, in 2017, which operated 15 stores in the United States as of the Petition Date.

11.     On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket No. 99]. No party has requested the appointment of a trustee or examiner in these chapter 11 cases. On October 11, 2019, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official

committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee") [Docket No. 197].

### Relief Requested

12.    By this Motion, pursuant to sections 105(a), 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014 of the Bankruptcy Rules, and Rule 6004-1 of the Local Rules, the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"):

(a)    authorizing and approving the Bidding Procedures attached to the Bidding Procedures Order as **Schedule 1**, by which the Debtors will solicit and select the highest or otherwise best offer(s) for the Sale (as defined below);

(b)    approving the Bid Protections (as defined below) in connection with the sale of substantially all of the Debtors' assets (the "Assets");

(c)    approving the form and manner of notice of an auction (the "Auction") and sale hearing (the "Sale Hearing") with respect to the sale of the Assets free and clear of liens, claims, encumbrances, and other interests (the "Sale"), attached as **Schedule 2** to the Bidding Procedures Order (the "Sale Notice");

(d)    scheduling the Auction and Sale Hearing;

(e)    authorizing procedures for the assumption and assignment of the Debtors' executory contracts and unexpired leases (the "Contracts"); and

(f)    granting related relief.

13.    In addition, the Debtors intend to seek entry of an order at the conclusion of the Sale Hearing, substantially in the form attached hereto as **Exhibit B** (the "Sale Order"):

(a)    authorizing and approving the Sale of the Assets to the Successful Bidder on the terms substantially set forth in the Successful Bid (each as defined in the Bidding Procedures);

(b)    authorizing and approving the Sale of all or substantially all of the Assets free and clear of liens, claims, encumbrances, and other interests to the extent set forth in the Successful Bid;

(c)    authorizing and approving assumptions and assignment and designation rights with respect to the Debtors' executory contracts and unexpired leases;

(d)     authorizing the Buyer to conduct GOB Sales and Store Closings (each as defined in the Sale Order); and

(e)     granting any related relief.

14.     The Debtors reserve the right to file and serve any supplemental pleading or declaration that the Debtors deem appropriate or necessary in their reasonable business judgment, including any pleading summarizing the competitive bidding and sale process and the results thereof, in support of their request for entry of the Sale Order before the Sale Hearing.

## Need for a Timely Sale Process

15.     The Debtors believe that the milestones set forth herein and in the Bidding Procedures are reasonable and will provide parties with sufficient time and information to submit a competitive bid for the Assets.  In formulating the Bidding Procedures, the Debtors balanced the need to provide adequate notice to parties in interest and potential bidders with the various milestones set forth in the forbearance agreements the Debtors have entered into with the DIP Lenders and the Debtors' increasing liquidity needs.  The Bidding Procedures are designed to generate the highest or otherwise best available recoveries to the Debtors' stakeholders by encouraging prospective bidders to submit competitive, value-maximizing bids for the Assets.

16.     Potential bidders have had, and will, in accordance with the Bidding Procedures, continue to have access to comprehensive information prepared by the Debtors and their advisors and compiled in an electronic data room.  In light of the foregoing, the Debtors have determined that the Bidding Procedures are in the best interests of the Debtors' estates, will establish whether and to what extent any additional market for the Assets exists, and provide interested parties with sufficient opportunity to participate.

**I.     The Stalking Horse Bidder and Bid Protections.[5]**

17.     The Debtors also request approval of the Bid Protections (as defined in the Bidding Procedures).  In accordance with the terms of the Stalking Horse Purchase Agreement, the Debtors request authority to provide the Stalking Horse Bidder with an allowed superpriority administrative claim in the Debtors' chapter 11 cases in an amount equal to the Breakup Fee and Expense Reimbursement, the priority of which shall be junior to (x) the Carve-Out (as defined in the DIP Order), if applicable, and (y) Claims arising under the DIP ABL Financing Agreement and DIP Term Financing Agreement (including Claims of the DIP ABL Agent and DIP Term Loan Agent provided for pursuant to the DIP Order).

18.     The Bid Protections provided to the Stalking Horse Bidder (i) are an actual and necessary cost and expense of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code, (ii) are commensurate to the real and material benefits conferred upon the Debtors' estates by the Stalking Horse Bidder, (iii) are fair, reasonable, and appropriate, including in light of the size and nature of the proposed Sale, the commitments that will be made, and the efforts that have been and will be expended by the Stalking Horse Bidder.  The Bid Protections are necessary to induce the Stalking Horse Bidder to pursue the Sale and to be bound by the Stalking Horse Purchase Agreement.

19.     Given the Debtors' need to maximize value for creditors and other stakeholders through a timely and efficient marketing and sale process, the ability to offer Bid Protections to the Stalking Horse Bidder is a reasonable and sound exercise of the Debtors' business judgment and provides an actual benefit to the Debtors' estates.

---

[5]     The Debtors may file a Stalking Horse Agreement in advance of the hearing on this Motion and may seek approval of the specific Bid Protections included therein at such hearing.

## II.    The Bidding Procedures.

20.    To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner, the Debtors have developed and proposed the Bidding Procedures, attached as **Schedule 1** to the Bidding Procedures Order.  The following describes the salient points of the Bidding Procedures and discloses certain information required pursuant to Local Rule 6004-1:[6]

(a)    **Bid Requirements (Local Bankr. R. 6004-1(c)(i)(A), (B)).**  Any bid by an Acceptable Bidder must be submitted in writing and satisfy the following requirements, in each case, to the satisfaction of the Debtors:

(i)    ***Purpose.***  Each Acceptable Bidder must state that the Bid includes an offer by the Acceptable Bidder to purchase some or all of the Assets, and which Assets with reasonable specificity.

(ii)    ***Total Consideration.***  The Bid must identify the form and amount of the total consideration to be provided to the Debtors in cash and assumed liabilities (the "Bid Value").

(iii)    ***Consolidated Bids.***  Bids must identify whether or not the Acceptable Bidder is willing to aggregate its Bid into an acceptable consolidated Bid with other Potential Bidders as set forth in the Bidding Procedures.

(iv)    ***Minimum Bid.***  The Bid Value proposed by each Bid or sum of Bids for different assets must be equal to, or exceed, the sum of (i) the Bid Value of the Stalking Horse Bid; plus (ii) the Bid Protections; plus (iii) the Overbid Increment.

(v)    ***Deposit.***  Each Bid must be accompanied by a cash deposit in the amount equal to 10% of the aggregate cash purchase price of the Bid to be held in an interest-bearing escrow account to be identified and established by the Debtors.

(vi)    ***Sources of Financing.***  To the extent that a Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the Sale set forth in its Bid with cash on hand, each Bid must include committed financing, documented to the Debtors' satisfaction, that demonstrates that the Acceptable Bidder has received sufficient debt and/or equity funding commitments to satisfy the Acceptable

---

[6]   This summary is qualified in its entirety by the Bidding Procedures attached as Schedule 1 to the Bidding Procedures Order.  All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings given to such terms in the Bidding Procedures.  To the extent there are any conflicts between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern.

Bidder's obligations under the proposed Sale and other obligations under its Bid. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors.

(vii)    ***Structure.***    The Bid must identify the structure proposed for undertaking the Sale, including the specific assets of the Debtors being acquired and liabilities being assumed, the proposed steps to accomplish such acquisition, and any financial, legal, or tax considerations upon which the Bid's proposed structure relies.

(viii)    ***Tax Structure.***    The Bid must specify with particularity its tax structure, including whether it is intended to be structured in a tax-free manner or if the Debtors, under the Bid, will incur any incremental tax liabilities.

(ix)    Same or Better Terms; Bid Documents. Except as otherwise provided in the Bidding Procedures, each Bid must be, in the Debtors' reasonable business judgment, after consultation with the Consultation Parties, substantially on the same or better terms than the terms of the Stalking Horse Purchase Agreement. Each Bid must include duly executed ancillary transaction documents necessary to effectuate the transactions contemplated in such Bid (such documents, the "Bid Documents").

(x)    ***Assumption.***    The Bid must specify which, if any, of the obligations of the Debtors the Acceptable Bidder proposes to assume.

(xi)    ***Marked Agreement.***    Each Bid must include, at a minimum, a draft asset purchase agreement, the form of which will be provided to any Acceptable Bidder prior to the Bid Deadline, together with a redline version of such agreement relative to the Stalking Horse Purchase Agreement, as applicable, pursuant to which the Acceptable Bidder proposes to effectuate a transaction.

(xii)    ***Adequate Assurance.***    Each Bid must contain evidence that the Acceptable Bidder has the ability to perform thereunder and otherwise complies with any requirement of adequate assurance of future performance under section 365(b)(1) of the Bankruptcy Code.

(xiii)    ***Employees.***    The Bid must detail the treatment of the employees of the Debtors and their subsidiaries.

(xiv)    ***Conditions to Closing.***    The Bid must identify with particularity each and every condition to closing.

(xv)    ***No Financing Approval, or Diligence Outs.***    The Bid must not be conditioned on obtaining any of the following: (a) financing;

(b) board of directors or other similar approval; or (c) the outcome or completion of a due diligence review by the Acceptable Bidder.

(xvi) ***Due Diligence Acknowledgement.*** The Bid must include a written acknowledgement and representation that the Acceptable Bidder: (a) has had an opportunity to conduct any and all due diligence regarding the proposed Sale before making its Bid; (b) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Sale in making its Bid; and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Sale or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Acceptable Bidder's proposed form of definitive agreement.

(xvii) ***No Collusion.*** The Acceptable Bidder must acknowledge in writing (a) that it has not engaged in any collusion with respect to any Bids or the Sale, specifying that it did not agree with any Acceptable Bidders or Potential Bidders to control price; and (b) agree not to engage in any collusion with respect to any Bids, the Auction, or the Sale.

(xviii) ***Good Faith Offer.*** The Bid must constitute a good faith, *bona fide* offer to consummate the Sale.

(xix) ***Identification Information.*** Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Acceptable Bidder, including if such Acceptable Bidder is an entity formed for the purpose of consummating the proposed Sale contemplated by such Bid), and the complete terms of any such participation. Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid. Each Bid must also include contact information for the specific person(s), counsel and other advisors whom the Debtors' Representatives should contact regarding such Bid. Nothing herein shall preclude multiple Acceptable Bidders from submitting a joint Bid, subject to the Debtors' prior written consent to such submission and the disclosure requirements set forth herein.

(xx) ***Consent to Jurisdiction.*** The Acceptable Bidder must submit to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of Bids, the Auction, the construction and enforcement of these Bidding Procedures, and the Sale documents and the closing, as applicable.

11

      (xxi)   ***Disclaimer of Fees.***  Each Bid must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation (other than the Stalking Horse Bid, if any).  For the avoidance of doubt, no Qualified Bidder (as defined herein) (other than a Stalking Horse Bidder, if any) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

      (xxii)   ***Authorization.***  Each Bid must contain evidence that the Acceptable Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors) with respect to the submission of its Bid and the consummation of any transactions contemplated in such Bid.

      (xxiii)   ***As-Is, Where-Is.***  Each Bid must include a written acknowledgement and representation that the Acceptable Bidder: (1) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer; (2) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid; and (3) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bid Documents.

(b)    **Bid Deadline.**  Each Bid by an Acceptable Bidder must be transmitted via email (in pdf format) so as to be ***actually received*** by co-counsel to the Debtors, the Debtors' Representatives, and Committee's Counsel on or before **February 7, 2020, at 4:00 p.m.** (prevailing Eastern Time) (as may be extended from time to time by the Debtors in their business judgment in consultation with the Consultation Parties, the "Bid Deadline").

(c)    **Right to Credit Bid.**  Any Qualified Bidder who has a valid and perfected lien on any Assets (a "Secured Creditor") shall have the right to credit bid all or a portion of such Secured Creditor's allowed secured claims pursuant to section 363(k) of the Bankruptcy Code; provided that a Secured Creditor shall have the right to credit bid its claim only with respect to the collateral by which such Secured Creditor is secured; provided, that a credit bid shall not constitute a Qualified Bid if the Bid does not include a cash component sufficient to pay in full, in cash all claims for which there are valid, perfected, and unavoidable liens on any of the Assets included in such Bid

that are senior in priority to those of the party seeking to credit bid (unless such senior lien holder consents to alternative treatment). For the avoidance of doubt, a Secured Creditor shall be required to provide cash consideration in respect of any assets to be acquired but that do not constitute collateral securing such Secured Creditor's claim(s), if any.

Pursuant to the DIP Order, each of the Secured Parties shall have the right to credit bid some of all of their DIP Claims (as defined in the DIP Order) to the extent permitted by section 363(k) of the Bankruptcy Code, subject in each case to the rights and duties of the parties under the Intercreditor Agreement (as defined in the DIP Order) and to the provision of consideration sufficient to indefeasibly pay in full in cash any senior liens on the collateral that is subject to the Secured Parties' Bid except to the extent otherwise agreed by the holder of such senior lien in their sole and absolute discretion, and is deemed a Qualified Bidders with respect to their rights to acquire all or any of the Assets by credit bid.

(d)    **The Auction.**  If the Debtors make such a determination, in consultation with the Consultation Parties, the Debtors may cancel the Auction, including, but not limited to, if the Debtors select one or more Acceptable Bidders to act as a Stalking Horse Bidder and the Debtors do not receive any other higher or otherwise better Qualified Bids prior to the Bid Deadline other than the Stalking Horse Bid, in which case the Debtors, in consultation with the Consultation Parties, reserve the right to designate the Stalking Horse Bidder as the Successful Bidder without holding an Auction.

(e)    **Bidding Increments (Local Bankr. R. 6004-1(c)(i)(C)).**  Any Overbid following the Initial Minimum Overbid or following any subsequent Prevailing Highest Bid (as defined herein) shall be in increments of no less than a value equal to $1,000,000, as determined by the Debtors in an exercise of their business judgment.

(f)    **Backup Bidder (Local Bankr. R. 6004-1(c)(i)(E)).**  Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid at the Auction, as determined by the Debtors in the exercise of their business judgment shall be required to serve as the backup bidder (the "Backup Bidder") until such time that the Sale is consummated, and each Qualified Bidder shall agree and be deemed to agree to be a Backup Bidder if so designated by the Debtors.

(g)    **Highest or Otherwise Best Bid.**  When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Debtors may consider the following factors in addition to any other factors that the Debtors deem appropriate: (a) the number, type, and nature of any changes to the Stalking Horse Purchase Agreement, if any, requested by the Qualified Bidder, including the type and amount of Assets sought and obligations to be assumed in the Bid; (b) the amount and nature of the total

consideration; (c) the likelihood of the bidder's ability to close a transaction and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Bid Documents; and (e) the tax consequences of such Qualified Bid.

(h) **Reservation of Rights (Local Bankr. R. 6004-1(c)(i)(D)).** The Debtors reserve their rights to modify these Bidding Procedures, in their business judgment, in any manner that will best promote the goals of these Bidding Procedures or impose at or prior to the Auction, additional customary terms and conditions on a Sale.

21.     Importantly, the Bidding Procedures recognize the Debtors' fiduciary obligations to maximize sale value, and, as such, do not impair the Debtors' ability to consider all Qualified Bids, and, as noted, preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtors' estates.

### III.     Key Dates and Deadlines

22.     The Debtors believe that the proposed timeline maximizes the prospect of receiving a higher or otherwise better offer without unduly prejudicing these chapter 11 estates.  To further ensure that the Debtors' proposed Auction and Sale process maximizes value to the benefit of the Debtors' estates, the Debtors will use the time following entry of the Bidding Procedures Order to actively market the Assets in an attempt to solicit higher or otherwise better bids.  The Debtors believe the relief requested in this Motion is in the best interests of their creditors, their other stakeholders, and all other parties in interest, and should be approved.

### A.     Form and Manner of Sale Notice.

23.     Upon entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter, the Debtors will cause the Sale Notice to be served on the following parties or their respective counsel, if known:  (a) the U.S. Trustee; (b) co-counsel to the Committee; (c) counsel to the Stalking Horse Bidder, if applicable; (d) counterparties to the Contracts (the "Contract Counterparties"), if known; (e)  all parties who are known or reasonably believed, after reasonable

inquiry, to have asserted any lien, encumbrance, claim, or interest in the Assets; (f) the Internal Revenue Service; (g) all applicable state and local taxing authorities; (h) all the Debtors' other creditors; (i) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; and (j) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.  In addition, the Debtors will also publish an abbreviated version of the Sale Notice on their restructuring website, https://cases.primeclerk.com/forever21 (the "Case Website").

24.    The Debtors respectfully submit that the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including:  (a) the date, time, and place of the Auction (if one is held); (b) the Bidding Procedures; (c) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing; (d) instructions for promptly obtaining a copy of the Stalking Horse Purchase Agreement; (e) a description of the Sale as being free and clear of liens, claims, interests, and other encumbrances, with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the Sale proceeds; and (f) notice of the proposed assumption and assignment of the Contracts to the Stalking Horse Bidder pursuant to the Stalking Horse Purchase Agreement (or to another Successful Bidder arising from the Auction, if any).

25.    The Debtors further submit that notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice and the Cure Notice (where applicable), as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  The Debtors propose that no other or further notice of the Sale shall be required.  Accordingly, the Debtors request that this Court approve the form and manner of the Sale Notice.

### IV.    Summary of the Assumption Procedures.[7]

26.    The Debtors are also seeking approval of certain procedures to facilitate the fair and orderly assumption and assignment of the Contracts in connection with the Sale (the "Assumption Procedures").  Because the Bidding Procedures Order sets forth the Assumption Procedures in detail, they are not restated herein.  Generally, however, the Assumption Procedures: (a) outline the process by which the Debtors may serve notice to certain Contract Counterparties regarding the proposed assumption and assignment and related cure amounts, if any, informing such parties of their right and the procedures to object thereto; and (b) establish objection and other relevant deadlines and the manner for resolving disputes relating to the assumption and assignment of the Contracts to the extent necessary.

## Basis for Relief

### I.    The Relief Sought in the Bidding Procedures Order Is in the Best Interests of the Debtors' Estates and Should Be Approved.

27.    Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets.  *See, e.g., In re Culp*, 550 .R. 683, 697 (D. Del. 2015) ("In determining whether to authorize use, sale or lease of property of the estate under Section 363, courts require the [Debtor] to show that a sound business purpose justifies such actions.  If the [Debtor's] decision evidences a sound business purpose, then the Bankruptcy Court should approve the sale.") (quoting *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999));  *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'" (internal citations omitted)); In re Martin, 91 F.3d 389, 395 (3d Cir. 1996)

---

[7]    Pursuant to the Bidding Procedures Order, the Debtors request approval of the form of notice of cure amount attached to the Bidding Procedures Order as Schedule 3 (the "Cure Notice").

(quoting *In re Schipper*); see also In re Integrated Resources, Inc., 147 B.R. 650, 656–7 (S.D.N.Y. 1992) (noting that bidding procedures that have been negotiated by a trustee are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

28.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See In re Adams Res. Expl. Corp.*, No. 17-10866 (KG), at 12 (Bankr. D. Del. 2017) ("The relief requested in the Sale Motion is a necessary and appropriate step toward enabling the Debtor to maximize the value of its bankruptcy estate, and it is in the best interests of the Debtor, its estate and its creditors."); *In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir 2004) (debtor-in-possession "had a fiduciary duty to protect and maximize the estate's assets"); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Resources*, 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted).

29.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions.  *See, e.g.*, *In re Dura Auto, Sys.,* 379 B.R. 257, 263 (Bankr. D. Del. 2007); *Integrated Resources*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991)

17

("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

30.     The Debtors believe that the proposed Bidding Procedures will promote active bidding from seriously interested parties and will elicit the highest or otherwise best offers available for the Assets.  The proposed Bidding Procedures will allow the Debtors to conduct the Sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the Assets and who can demonstrate the ability to close a transaction.  Specifically, the Bidding Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

31.     At the same time, the Bidding Procedures provide the Debtors with a robust opportunity to consider competing bids and select the highest or otherwise best offer for the completion of the Sale.  Entering into the Stalking Horse Purchase Agreement with the Stalking Horse Bidder ensures that the Debtors obtain fair market value by setting a minimum purchase price for the Assets that will be tested in the marketplace.  As such, creditors of the Debtors' estates can be assured that the consideration obtained will be fair and reasonable and at or above market.

32.     The Debtors submit that the proposed Bidding Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings, and are consistent with other procedures previously approved by this District and others.  *See e.g., In re Barneys New York, Inc.*, No. 19-36300 (CGM) (Bankr. S.D.N.Y. Aug. 6, 2019); *In re Z Gallerie, LLC*, No. 19-10488 (KBO) (Bankr. D. Del. Mar. 11, 2019); *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 21, 2019); *In re Argos Therapeutics Inc.*, No. 18-12174 (KJC) (Bankr. D. Del. Dec. 20, 2018); *In re Bertucci's Holdings Inc.*, No. 18-10894 (MFW) (Bankr. D. Del. May 7, 2018); *In re*

*GAL Liquidating Corp.*, No. 17-12100 (LSS) (Bankr. D. Del. Nov. 15, 2017); *In re TerreStar Networks, Inc.*, No. 10-15446 (SHL) (Bankr. S.D.N.Y. Feb. 16, 2011).[8]

**II.      The Bid Protections Have a Sound Business Purpose and Should Be Approved.**

33.     The Debtors are also seeking authority to offer customary bid protections to the Stalking Horse Bidder (if any).  The Debtors have agreed to pay the Expense Reimbursement and the Breakup Fee (if triggered) to the Stalking Horse Bidder as an allowed superpriority administrative expense, the priority of which shall be junior to (x) the Carve Out (as defined in the DIP Order), if applicable, and (y) the claims arising under the DIP ABL Financing Agreement and DIP Term Financing Agreement (as each is defined in the Stalking Horse Purchase Agreement). The use of a stalking horse in a public auction process for sales pursuant to section 363 of the Bankruptcy Code is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value."  *Official Committee of Unsecured Creditors v. Interforum Holding LLC*, 2011 WL 2671254, No. 11-219, *1 (E.D. Wis. July 7, 2011).  As a result, stalking horse bidders virtually always require breakup fees and, in many cases, other forms of bidding protections as an inducement for "setting the floor at auction, exposing its bid to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement."  *Id.* (internal citations omitted). Thus, the use of bidding protections has become an established practice in chapter 11 cases.

34.     Indeed, breakup fees and other forms of bidding protections are a normal and, in many cases, necessary component of significant sales conducted under section 363 of the Bankruptcy Code:  "Breakup fees are important tools to encourage bidding and to maximize the

---

8    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' counsel.

value of the debtor's assets . . . .  In fact, because the . . . corporation has a duty to encourage bidding, break-up fees can be ***necessary*** to discharge [such] duties to maximize value." *Integrated Res.*, 147 B.R. at 659–60 (emphasis added).  Specifically, bid protections "may be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking." *995 Fifth Ave.*, 96 B.R. at 28 (quotations omitted); *see also Integrated Resources*, 147 B.R. at 660–61 (bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Int'l Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence.").

35.     As a result, courts routinely approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999).  The Debtors believe that the allowance of the Bidding Protections is in the best interests of the Debtors' estates and their creditors, as the Stalking Horse Bid will establish a floor for further bidding that may increase the consideration given in exchange for the Assets for the benefit of the Debtors' estates.

36.     Based on the marketing process that the Debtors and their advisors have conducted thus far, the Debtors have determined that the Bid Protections are necessary to attract and retain the Stalking Horse Bidder.  Any Bid Protections will be negotiated through back-and-forth, arm's-length negotiations.  By inducing the Stalking Horse Bidder to hold its offer open as a baseline from which other potential bidders can submit higher or better offers, the Bid Protections will serve to encourage more competitive bidding, which will hopefully increase the purchase price of the Assets.  As such, the Bid Protections will, among other things, enable the Debtors to maximize the value of their estates for the benefit of all economic stakeholders in these chapter 11 cases.

37.     If the Court does not approve the Bid Protections, the Stalking Horse Bidder, to the extent one may otherwise exist, may elect not to serve as the stalking horse, to the detriment of the Debtors' estates.  Further, if the Bid Protections were to be paid, it will be because the Debtors have received higher or otherwise superior offers for the Assets.  In short, the proposed Bid Protections are fair and reasonable under the circumstances because it constitutes a "fair and reasonable percentage of the proposed purchase price" and is "reasonably related to the risk, effort, and expenses of the prospective purchaser."  *Integrated Res.*, 147 B.R. at 662 (*quoting 995 Fifth Ave.*, 96 B.R. at 28).  Accordingly, the Bid Protections should be approved.

38.     The Bid Protections that may be granted to a Stalking Horse Bidder fall well within the range of bid protections typically approved by the bankruptcy courts in the Third Circuit.  In the event the Debtors elect to enter into a Stalking Horse Agreement, the Bid Protections will likely consist of an Expense Reimbursement in an amount not to exceed $1,000,000, and the Breakup Fee not to exceed an amount equal to 3.0% of (i) the Purchase Price (as defined in the Stalking Horse Purchase Agreement) *plus* (ii) the aggregate value of the Standby Letters of Credit (as defined in the Stalking Horse Purchase Agreement) identified in the Stalking Horse Purchase Agreement.  These Bid Protections are consistent with the range of bid protections typically paid in sale transactions that have been recently approved.  *See also In re Weinstein Company Holdings LLC*, No. 18-0601 (MFW) (Bankr. D. Del. Apr. 6, 2018) (approving break-up fee and expense reimbursement equal to 5% of the purchase price); *In re ATopTech, Inc.*, No. 17-10111 (MFW) (Bankr. D. Del. Apr. 21, 2017) (approving breakup fee and expense reimbursement equal to 5% of the purchase price); *In re Phoenix Brands LLC*, No. 16-11242 (BLS) (Bankr. D. Del. June 8, 2016) (approving breakup fee and expense reimbursement equal to 5.3% of the purchase price); *In re American Hospice Management Holdings, LLC*, No. 16-10670 (LSS) (Bankr. D. Del. Apr. 7, 2016) (approving breakup fee and expense reimbursement equal to 5% of the purchase price); *In re Haggen*

*Holdings, LLC*, No. 15-11874 (KG) (Bankr. D. Del. Oct. 19, 2015) (approving breakup fee and expense reimbursement equal to 5% of the purchase price); *In re AgFeed USA, LLC*, No. 13-11761 (BLS) (Bankr. D. Del. Aug. 1, 2013) (approving breakup fee and expense reimbursement equal to 4% of the purchase price).

39.     For the foregoing reasons, the Debtors respectfully request that the Court authorize the Bid Protections.

**III.     The Form and Manner of the Sale Notice Should Be Approved.**

40.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21 days' notice of the Sale Hearing.  Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested herein.

41.     Under Bankruptcy Rule 9006(c), however, "the court for cause shown may in its discretion with or without motion or notice order the [notice] period reduced."   Local Rule 9006-1(e) further provides that a motion may be heard on less notice than as otherwise required if authorized "by order of the Court, on written motion (served on all interested parties) specifying the exigencies justifying shortened notice."   Indeed, as reflected in section 102(1) of the Bankruptcy Code, "notice and a hearing" is an elastic phrase meant to take into account the "particular circumstances" of a motion.   11 U.S.C. § 102(1) (stating that "'after notice and a hearing', or similar phrase . . . means after such notice as is appropriate in the particular circumstances . . ."); *see Rockwell Int'l Corp. v. Harnischfeger Indus., Inc. (In re Harnischfeger Indus., Inc.)*, 316 B.R. 616, 620 (D. Del. 2003) ("The policy of Section 102 is to permit the court flexibility, while ensuring that all parties have proper notice.").

42.     Here, ample cause exists to shorten notice in connection with this Motion. Specifically, pursuant to their forbearance agreements with the DIP Agents and the DIP Lenders,

the Debtors are required to seek approval of the Sale contemplated by the Bidding Procedures Order on or before February 8, 2020. Compliance with such forbearance arrangements, where possible, can provide a more stable platform from which the Debtors may pursue value-maximizing alternatives during these critical stages of their restructuring. In addition, launching the bidding and auction process in accordance with the Bidding Procedure Order as soon as possible will help ensure that any Sale reflects the best or otherwise highest offer available under the circumstances.

43.     As noted above, upon entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter, the Debtors will serve the Sale Notice upon the following parties or their respective counsel, if known: (a) the U.S. Trustee; (b) the Committee; (c) the Stalking Horse Bidder; (d) the Contract Counterparties; (e) all parties who have expressed a written interest in some or all of the Assets; (f) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or other interest in the Assets; (g) the Internal Revenue Service; (h) all applicable state and local taxing authorities; (i) all the Debtors' other creditors; (j) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors shall also publish an abbreviated version of the Sale Notice on the Case Website.

44.     The Debtors submit that notice of this motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice, the Contract Notice, and the Assumption Notice as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of,

the applicable requirements of Bankruptcy Rule 2002.  Accordingly, the Debtors request that this

Court approve the form and manner of the Sale Notice.[9]

## IV.   The Debtors Intend to Seek Approval of the Sale as an Exercise of Sound Business Judgment at the Sale Hearing.

45.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and

a hearing, may use, sell or lease, other than in the ordinary course of business, property of the

estate."   A sale of the debtor's assets should be authorized pursuant to section 363 of the

Bankruptcy Code if a sound business purpose exists for the proposed transaction.  *See, e.g., In re*

*Martin*, 91 F.3d 389, 395 (3d. Cir. 1996) ("Under Section 363, the debtor in possession can sell

property of the estate . . . if he has an 'articulated business justification' . . . .");  *see also In re*

*Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (same);  *In re Abbotts Dairies of Pennsylvania,*

*Inc.*,788 F.2d 143 (3rd Cir. 1986);  *Stephens Indus., Inc. v. McClung*, 789 F. 2d 386, 390 (6th Cir.

1986);  *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070

(2d Cir. 1983);  *In re Telesphere Commc's, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999);  *In re*

*Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991)).  The *Delaware & Hudson*

*Railway* court rejected the pre-Code "emergency" or "compelling circumstances" standard, finding

the "sound business purpose" standard applicable and, discussing the requirements of that test

under *McClung* and *Lionel*, observing:

> A non-exhaustive list of factors to consider in determining if there
> is a sound business purpose for the sale include: the proportionate
> value of the asset to the estate as a whole; the amount of elapsed
> time since the filing; the likelihood that a plan of reorganization will
> be proposed and confirmed in the near future; the effect of the
> proposed disposition of the future plan of reorganization; the
> amount of proceeds to be obtained from the sale versus appraised

---

[9]   Contemporaneously with the filing of this Motion, the Debtors have filed a motion pursuant to Bankruptcy Rule 2002 and 9006(c) seeking to have this Motion heard on shortened notice (the "Motion to Shorten").  As set forth in the Motion to Shorten, the Debtors request the Court consider entry of the Bidding Procedures Order within four days of filing of this Motion.

values of the Property; and whether the asset is decreasing or increasing in value.

124 B.R. at 176.

46.     The *Delaware & Hudson Railway* court further held that "[o]nce a court is satisfied there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the Buyer is proceeding in good faith." *Id.*

47.     Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith,' and in the honest belief that the action was in the best interests of the company." *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill 1995) (citations omitted); *In re Filene's Basement, LLC*, 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate") (citations omitted); *Integrated Res.*, 147 B.R. at 656; *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a debtor's management decisions.").

48.     At the Sale Hearing, the Debtors intend to demonstrate that a sound business purpose exists for the sale, due and adequate notice has been provided, the purchase price reflects fair value, and the transaction has been proposed in good faith without collusion or undue influence, and relief under Bankruptcy Rules 6004(h) and 6004(d), among other things.  The Debtors reserve the right to submit supplemental materials, including declarations, in connection with the Sale Hearing.

**<u>Notice</u>**

49.     The Debtors will provide notice of this Motion to:  (a) the U.S. Trustee for the District of Delaware; (b) the DIP ABL Agent and counsel thereto; (c) the DIP Term Agent and counsel thereto; (d) counsel to certain of the Debtors' landlords; (e) the United States Attorney's Office for the District of Delaware; (f) the Internal Revenue Service; (g) the state attorneys general for all states in which the Debtors conduct business; (h) counsel to certain majority equity holders for Debtor Forever 21, Inc.; (i) counsel to the Committee; and (j) any party that requests service pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**<u>No Prior Request</u>**

50.     No prior request for the relief sought in this motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the Bidding Procedures Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: January 30, 2020
Wilmington, Delaware

*/s/ Laura Davis Jones*

Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Timothy P. Cairns (DE Bar No. 4228)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:         ljones@pszjlaw.com
               joneill@pszjlaw.com
               tcairns@pszjlaw.com

-and-

Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Aparna Yenamandra (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:         jsussberg@kirkland.com
               aparna.yenamandra@kirkland.com

-and-

Anup Sathy, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:         asathy@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*