IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FOREVER 21, *et al.*,[1] | Case No. 19-12122 (KG) |
| Debtors. | (Jointly Administered) |

**LIMITED OBJECTION OF SCHINDLER ELEVATOR CORPORATION TO THE DEBTORS' MOTION FOR AN ORDER APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS**

Schindler Elevator Corporation ("Schindler"), by and through its undersigned counsel, respectfully submits this limited objection to the *Debtors' Motion for Entry of an Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Substantially All of the Debtors' Assets, (B) Approving the Form and Manner of Notice Thereof, (C) Scheduling an Auction and Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts, (E) Approving the Sale of the Debtors' Assets, and (F) Granting Related Relief* [Dkt. No. 802] (the "Sale Motion"). In support of its objection, Schindler respectfully states as follows:

**BACKGROUND**

1. Schindler provides elevator maintenance and repair services to the Debtors in dozens of Forever 21 stores across the country pursuant a Master Services Elevator Maintenance

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Forever 21, Inc. (4795); Alameda Holdings, LLC (2379); Forever 21 International Holdings, Inc. (4904); Forever 21 Logistics, LLC (1956); Forever 21 Real Estate Holdings, LLC (4224); Forever 21 Retail, Inc. (7150); Innovative Brand Partners, LLC (7248); and Riley Rose, LLC (6928). The location of the Debtors' service address is: 3880 N. Mission Road, Los Angeles, California 90031.

Agreement, dated January 1, 2014 (the "Agreement").

2. The services performed by Schindler under the Agreement involve labor, transportation, supplies, materials, parts, tools, scaffolding, machinery, hoists, employee safety equipment, equipment, lubricants, supervision, applicable taxes, and other work and materials.

3. The initial five (5) year period for the Agreement expired on December 31, 2018 and either party may now cancel the Agreement on thirty (30) days' written notice.

4. On September 29, 2019 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. A description of the Debtors' businesses and the reasons for commencing their bankruptcy cases are set forth in the Declaration of Jonathan Goulding, Chief Restructuring Officer of Forever 21 Inc., in Support of Chapter 11 Petitions and First Day Motions. *See* Dkt. No. 23.

6. As of the Petition Date, the Debtors owed Schindler an amount not less than **$399,158.16** for services provided under the Agreement (the "Pre-Petition Claim"). *See* Claim No. 1898.

7. Schindler has provided, and continues post-petition to provide, elevator maintenance and repair services for the Debtors' benefit in accordance with the Agreement.

8. Notwithstanding Schindler's provision of services for the Debtors' benefit post-petition, the Debtors have not paid for Schindler's post-petition services which, as of December 31, 2019, totals **$337,407.42**.

9. Because Schindler's post-petition services allowed the Debtors to continue

operating their businesses while in bankruptcy, Schindler's services provided an actual and necessary benefit to the Debtors' estates entitling Schindler to payment of its post-petition services as an administrative expense pursuant to section 503(b) of the Bankruptcy Code.

10. On January 31, 2020, Schindler filed a Motion seeking allowance of its administrative expense claim and immediate payment or, alternatively, seeking relief from the automatic stay to permit Schindler to cancel the Agreement pursuant to the terms thereof [Dkt. No. 809] (the "Administrative Expense Motion") to avoid significant additional losses arising out of Schindler's continued provision of post-petition services to the Debtors. The Administrative Expense Motion is currently awaiting a hearing date.

11. Schindler has continued to provide post-petition services to the Debtors throughout January and February 2020, which amounts are also entitled to administrative expense status. Schindler will supplement its Administrative Expense Motion prior to the hearing date to update the amounts due on account of Schindler's post-petition services.

12. On January 30, 2020 the Debtors filed the Sale Motion along with an application to shorten time. *See* Dkt. Nos. 802-803.

13. That same day, the Court entered an Order shortening the notice periods applicable to the Sale Motion, scheduling a hearing on the bid procedures portion of the Sale Motion for February 4, 2020 and setting February 3, 2020 as the deadline to object to the proposed bid procedures. *See* Dkt. No. 804.

14. On February 4, 2020, following the bid procedures hearing, the Court entered an *Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Substantially All of the Debtors' Assets, (B) Approving the Form and Manner of Notice Thereof, (C) Scheduling an Auction and Sale Hearing, (D) Approving the Sale of the Debtors' Assets, and*

*(E) Granting Related Relief* [Dkt. No. 854] (the "Bid Procedures Order").

15. The Bid Procedures Order scheduled a sale approval hearing for February 11, 2020 at 10 a.m. and set February 11, 2020 at 9 a.m. as the deadline to object to the proposed sale. *See* Dkt. No. 854.

16. With the Sale Motion, the Debtors seek approval of an Asset Purchase Agreement (the "APA") providing for the sale of substantially all of the Debtors' assets to the Buyer—a group of the Debtors' largest landlords—for a purchase price approaching or in excess of $200 million comprised of $81 million in cash, plus the assumption by Buyer of $53 million in "post-signing" merchandise liability and $30 million in post-petition, pre-closing non-merchandise administrative expense liability and certain other liability-assumption consideration unrelated to the Debtors' trade vendors (the "Sale").

17. In addition to the Debtors' outstanding secured debt, the exact amount of which is unclear, the Debtors estimate their aggregate post-petition vendor liability at over $100 million, plus millions of dollars in pre-petition vendor payables.

18. Based on Schindler's review of the APA and Sale Motion documents in advance of the Sale Hearing, it remains unclear: 1) how the Sale proceeds are intended to be distributed to creditors after satisfaction of the Debtors' DIP Facilities; and 2) which creditors will share in the $30 million portion of the Sale proceeds the Debtors are seeking to allocate to post-petition, pre-closing non-merchandise administrative expense liability.

19. This is an important consideration in assessing the Sale as it is Schindler's understanding serious concerns exist as to whether the Sale as presently contemplated will render these cases administratively insolvent. *See, e.g.*, February 4, 2020 Hr'g Tr. at 19:8-9) ("The second [category of objections is that this transaction will leave the estate administratively

insolvent"); 32:1-5 (testimony of the Debtors' investment banker estimating the Debtors' aggregate post-petition vendor liability at over $100 million).

20. For example, the APA refers to a "Professional Fee Reserve" and "Surplus Cash Amount," defined as the cash remaining in the Professional Fee Reserve after (i) the DIP Facilities have been paid in full; and (ii) the cash set aside in the wind-down budget, "*in each case after payment of the fees of the [estates'] professionals . . . .*" See Dkt. No. 859-1 at 21-23 (emphasis added). Further, the Professional Fee Reserve is defined as holding the "Professional Fees Amount," which is in turn defined as "all fees and expenses incurred and estimated to be incurred [by professionals] on or prior to the Closing Date, subject to a potential Carve-Out[2] reduction pursuant to the terms of the DIP Order, if "applicable." *See id.* at 21.

21. In addition, the APA provides for the payment in full of professional fees as a condition precedent to the release of the Surplus Cash Amount to the Buyer, but it is unclear what provision, if any, has been made for the satisfaction of all other administrative expense claims.

22. Further, though the APA provides that part of the purchase price includes the Buyer assuming up to $30 million of the Debtors' post-petition non-merchandise liability, the APA permits the Buyer, in its "sole and absolute discretion," to "elect which post-petition claims . . . are assumed." *Id.* at 7. Unless this provision is intended to address the Buyer's payment of post-petition administrative expense arising under pre-petition leases and executory contracts that Buyer elects to assume, on its face, this provision would appear to allow the Buyer to dictate the allocation of the Sale proceeds in a manner contrary to the Bankruptcy Code, with the

---

[2] Capitalized terms not defined herein shall have the meaning ascribed to them in the Sale Motion or APA, as applicable.

possibility that certain administrative claims are satisfied in full, while others go unpaid. *See* 11 U.S.C. § 726(b) (requiring *pro rata* treatment for similarly situated claims).

**LIMITED OBJECTION**

I. **THE COURT SHOULD NOT APPROVE THE SALE WITHOUT DISCLOSURE OF HOW THE SALE PROCEEDS ARE INTENDED TO BE DISTRIBUTED AFTER SATISFACTION OF THE DEBTORS' DIP FACILITIES**

23. Based on the testimony of the Debtors' investment banker at the hearing on February 4, 2020, Schindler understands the Debtors' desire to proceed expeditiously with approval of the Sale on a going concern basis—subject to higher or otherwise better offers—given the Debtors' rapidly depleting cash and mounting administrative costs to avoid a conversion of these cases to Chapter 7. *See* Examination of Tyler Cowan, February 4, 2020 Hr'g Tr. at 23:3-6 (estimating the proposed Sale would result in "over a hundred million dollars of additional value brought into the estate relative to what we believe is reasonab[ly] achievable in the context of a liquidation").

24. By all accounts, however, serious concerns exist as to whether the Sale as presently contemplated will render these cases administratively insolvent. *See, e.g.*, February 4, 2020 Hr'g Tr. at 19:8-9) ("The second [category of objections] is that this transaction will leave the estate administratively insolvent").

25. The Office of the U.S. Trustee shares in this concern. *See* February 4, 2020 Hr'g Tr. at 65:19-2 ("Number one is to just put on the record I do have a concern that the sale will leave the debtors administratively insolvent").

26. As set forth in Schindler's Administrative Expense Motion, Schindler continues post-petition to provide important elevator maintenance services to the Debtors, which are critical to the Debtors' ability to operate its stores while in bankruptcy. Schindler agreed to

provide these post-petition services with the expectation that it would be paid for its services along with other post-petition vendors on an administrative expense priority basis as contemplated by Chapter 11 of the Bankruptcy Code.

27. Schindler objects to the proposed Sale without further disclosure regarding: (1) the amount of the DIP Facilities to be satisfied by the Sale proceeds; 2) how the Sale proceeds are intended to be distributed to creditors after satisfaction of the Debtors' DIP Facilities; and 3) which creditors will share in the $30 million portion of the Sale proceeds the Debtors are seeking to allocate to post-petition, pre-closing non-merchandise administrative expense liability. Schindler also objects to the proposed Sale to the extent the Sale renders the estate administratively insolvent and **all** administrative claims, including those of the Debtors' professionals, are not required to share *pari passu* in whatever distribution is ultimately paid to administrative claim-holders such as Schindler. *See* 11 U.S.C. § 726(b) ("Payment on claims of a kind specified in paragraph (1), (2), (3), (4), (5), (6), (7), or (8) of section 507(a) of this title, or in paragraph (2), (3), (4), or (5) of subsection (a) of this section, *shall be made pro rata* among claims of the kind specified in each such particular paragraph.") (emphasis added)); 11 U.S.C. § 507(a)(2) (listing administrative expenses under 503(b), which includes compensation and reimbursement awarded under section 330 of the Bankruptcy Code, as an administrative expense of the estate).[3]

28. As the Sixth Circuit has noted, "[c]ounsel is a gambler in [bankruptcy] proceedings like every other administrative claimant." *Specker Motor Sales Co. v. Eisen*, 393 F.3d 659, 664 (6th Cir. 2004). In the context of debtor-in-possession financing and section 363

---

[3] If the Sale renders the estate administratively insolvent, it is also unclear how the Debtors could confirm a plan or otherwise exit their Chapter 11 cases. *See* 11 U.S.C. § 1129(a)(9) (requiring that the allowed amount of all administrative claims must be paid in full in cash on the effective date, unless the claimholder agrees to contrary treatment).

sales, other courts have likewise found that a debtor's success or failure should not solely be balanced on the back of administrative trade claims. *See, e.g.*, *In re Altantis Plastics, Inc.*, Case No. 08-75473 (PWB) (Bankr. N.D. Ga.), Tr. of Aug. 11, 2008 Hr'g on First Day Motions (Dkt. No. 58), at 42:7-9, ("I don't see that Congress says we can pay one administrative expense and not another.").

## CONCLUSION

For the foregoing reasons, Schindler objects to the Sale to the extent it disparately impacts claimholders of the same class and is therefore inconsistent with the provisions of the Bankruptcy Code.

Respectfully submitted,

SNYDER & ASSOCIATES, P.A.
3801 Kennett Pike
Suite 201, Building C
Wilmington, DE19807
Telephone: (302) 657-8300
Telecopy: (302) 657-8301

By: */s/ Bayard J. Snyder*
   Bayard J. Snyder, Esq. (DE#175)

And

WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, New Jersey 07102
Telephone: (973) 757-1100
Telecopy: (973) 757-1090
Stephen V. Falanga (*Pro hac vice*)
Christopher M. Hemrick (*Pro hac vice*)
Sydney J. Darling (*Pro hac vice*)

Dated: February 10, 2020