## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| FOREVER 21, INC., *et al.*,[1] | ) Case No. 19-12122 (KG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) **Ref. Docket No. 802** |

**ORDER (I) AUTHORIZING (A) ENTRY INTO AND
PERFORMANCE UNDER THE ASSET PURCHASE
AGREEMENT, (B) THE SALE OF THE DEBTORS' ASSETS TO THE
BUYER, AND (C) THE BUYER TO CONDUCT STORE CLOSINGS
AND GOING OUT OF BUSINESS SALES, AND (II) GRANTING RELATED RELIEF**

Upon the Motion[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"): (a) approving the transactions pursuant to the Asset Purchase Agreement, which for purposes of this Order shall include all exhibits, schedules, and ancillary documents related thereto, and authorizing the Debtors to perform thereunder, (b) authorizing the sale of the Debtors' assets identified in the Asset Purchase Agreement as Acquired Assets to F21 OpCo, LLC  (together with its designees (if any), the "Buyer"), (c) authorizing the Buyer to conduct Store Closings and going out of business sales, and (d) granting related relief, all as more fully set forth in the Motion; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Forever 21, Inc. (4795); Alameda Holdings, LLC (2379); Forever 21 International Holdings, Inc. (4904); Forever 21 Logistics, LLC (1956); Forever 21 Real Estate Holdings, LLC (4224); Forever 21 Retail, Inc. (7150); Innovative Brand Partners, LLC (7248); and Riley Rose, LLC (6928).  The location of the Debtors' service address is:  3880 N. Mission Road, Los Angeles, California 90031.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion, the Bidding Procedures Order, or the Asset Purchase Agreement, as applicable.

§ 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion, at the Hearing, and at the Sale Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

## I.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

**NOW, THEREFORE, THIS COURT HEREBY FINDS AND CONCLUDES THAT:[3]**

A.    The legal and factual bases set forth in the Motion and Sale Hearing establish just and sufficient cause to grant the relief set forth herein.

B.    On January 30, 2020, the Debtors filed the *Debtors' Motion for Entry of (I) an Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Substantially All of the Debtors' Assets, (B) Approving the Form and Manner of Notice Thereof, (C) Scheduling an Auction and Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts, (E) Approving the Sale of the Debtors' Assets and (F) Granting Related Relief* [Docket No. 802] (the "Motion").

---

[3]    Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, as appropriate, pursuant to Bankruptcy Rule 7052.

C.      On February 2, 2020, the Debtors and the Buyers entered into an Asset Purchase Agreement (such agreement together with all schedules and exhibits attached thereto and the Related Agreements, the "Asset Purchase Agreement" and the transactions contemplated therein, collectively, the "Sale Transaction").

D.      On February 4, 2020, the Court held a hearing to consider the Bidding Procedures and the Bid Protections (the "Bidding Procedures Hearing") and entered the *Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Substantially All of the Debtors' Assets, (B) Approving the Form and Manner of Notice Thereof, (C) Scheduling an Auction and a Sale Hearing, (D) Approving the Sale of the Debtors' Assets and (E) Granting Related Relief* [Docket No. 854] (the "Bidding Procedures Order"), which, among other things, (i) authorized and approved the Bidding Procedures attached to the Bidding Procedures Order as Schedule 1, (ii) approved the form and manner of notice thereof, (iii) scheduled the Bid Deadline and the Auction, (iv) approved the form and manner of notice of the Auction, and (v) granted related relief.

E.      As demonstrated by the testimony proffered and the evidence adduced at the Bidding Procedures Hearing and the Sale Hearing and the representations of counsel made on the record at the Sale Hearing, the Debtors have adequately marketed the Debtors' Assets under the facts and circumstances of these cases, and conducted the sale process in compliance with the Bidding Procedures and the Bidding Procedures Order, and the bidding process was conducted in a non-collusive, fair, and good faith manner. The Debtors and their professionals conducted the sale process in compliance with the Bidding Procedures and the Bidding Procedures Order and have afforded Potential Bidders a full and fair opportunity to participate in the bidding process and to make higher or better offers. In accordance with the Bidding Procedures and the Bidding

Procedures Order, the Asset Purchase Agreement was the only Qualified Bid and the Debtors determined that the Buyer was the Successful Bidder and the Buyer's Bid memorialized by the Asset Purchase Agreement was the Successful Bid.

F.      The Buyer acted in compliance with the Bidding Procedures and the Bidding Procedures Order, acted in good faith, and conducted itself in a non-collusive and fair manner. The Buyer is a "good faith purchaser" within the meaning of sections 363(m) and 364(e) of the Bankruptcy Code, and, as such, is entitled to all the protections afforded thereby in the event that this Order is modified, amended, vacated, or reversed by a subsequent order of this Court or any other court on appeal.  No such appeal, modification, amendment, or vacatur shall affect the validity and enforcement of the Sale, Liens, and the priorities authorized or created under the Asset Purchase Agreement or this Order.  Neither the Debtors nor the Buyer has engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided and/or costs and damages to be imposed under section 363(n) of the Bankruptcy Code, or that would prevent the application of sections 363(m) and 364(e) of the Bankruptcy Code.  The Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction.  The Buyer's payment of amounts owing under the Asset Purchase Agreement are in good faith and for valid business purposes and uses.  The Buyer is not an "insider" of any of the Debtors, as that term is defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders exists between the Buyer and the Debtors.

G.      Subject to the entry of this Order, each Debtor has: (i) full requisite corporate or other organizational power and authority to execute, deliver, and perform its obligations under the Asset Purchase Agreement and all other documents contemplated thereby and (ii) taken all requisite corporate or other organizational action and formalities necessary to authorize and

approve the execution, delivery and performance of its obligations under the Asset Purchase Agreement and to consummate the Sale Transaction, including as required by their respective organizational documents, and, upon execution thereof, the Asset Purchase Agreement and the related documents were or will be duly and validly executed and delivered by such Debtor and enforceable against such Debtor in accordance with its terms and, assuming due authorization, execution, and delivery thereof by the other parties thereto, constituted or will constitute a valid and binding obligation of such Debtor. No government, regulatory, or other consents or approvals, other than those expressly provided for in the Asset Purchase Agreement, are required for the execution, delivery, and performance by the Debtors of the Asset Purchase Agreement or the consummation of the Sale Transaction contemplated thereby.

H.    The total consideration provided by the Buyer for the Acquired Assets as reflected in the Asset Purchase Agreement is the highest and otherwise best offer received by the Debtors for the Acquired Assets. No other person or entity or group of Persons submitted a Qualified Bid prior to the Bid Deadline. Therefore, in accordance with the Bidding Procedures Order, (i) the Debtors did not conduct the Auction and (ii) the Debtors determined that the Asset Purchase Agreement constituted the highest and otherwise best offer and selected the Asset Purchase Agreement as the Successful Bid. The Debtors' determination, in consultation with the Consultation Parties, that the Asset Purchase Agreement constitutes the highest and otherwise best offer and the Debtors' selection of the Asset Purchase Agreement as the Successful Bid each constitute a valid and sound exercise of the Debtors' business judgment and the Debtors' decision to enter into the Asset Purchase Agreement and the Sale Transaction constitutes a proper exercise of the fiduciary duties of the Debtors and their officers, directors and managers. The offer of the Buyer, upon the terms and conditions set forth in the Asset Purchase Agreement,

including the total consideration to be realized by the Debtors thereunder, (i) is the highest and otherwise best offer received by the Debtors after an extensive and thorough marketing process, including through the Bidding Procedures, and (ii) is in the best interests of the Debtors, their creditors, their estates and other parties in interest.  Taking into consideration all relevant factors and circumstances, no other entity has submitted a higher or otherwise better offer to purchase the Acquired Assets from the Debtors.

I.      The Debtors have articulated good and sufficient business reasons for the Court to authorize (i) the Debtors' entry into the Asset Purchase Agreement and consummation of the Sale Transaction including the sale of the Acquired Assets to the Buyer, pursuant to the terms of the Asset Purchase Agreement, (ii) the assumption of the Assumed Liabilities as set forth herein and in the Asset Purchase Agreement, (iii) the Buyer's designation rights as set forth in the Asset Purchase Agreement, including the designation rights set forth in Sections 2.7(c), 2.7(d) and 6.15 thereof with respect to the Designated Contracts, Designated Leases and Designated Foreign Subsidiaries, (iv) the assumption and assignment to Buyer of Designated Contracts and Designated Leases in accordance with the procedures set forth herein and (v) the Buyer to conduct the GOB Sales and Store Closings in accordance with the process and procedures set forth in this Court's *Order (I) Authorizing the Debtors to Enter Into the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief* [Docket No. 340], attached hereto as **Exhibit 1** (the "Store Closing Order").  The Store Closing Order is incorporated and modified as described herein.  Entry into the Asset Purchase Agreement and consummation of the Sale Transaction are sound exercises of business judgment, and such acts are in the best interests of the Debtors, their estates and creditors, and all parties in interest.

J.        Sound business justifications also exist for the deposit of the Carve-Out Reserves (as defined in the DIP Order) to be funded on the Closing Date in accordance with this Order and the DIP Order using proceeds of the Sale into a segregated account (the "Carve-Out Account") held in trust for the benefit of the parties entitled to the protections of the Carve-Out Reserves as set forth in the DIP Order and to be governed by a customary agreement governing such segregated account that is otherwise consistent with this Order, the DIP Order, and the Asset Purchase Agreement (the "Carve-Out Agreement," and, together with the Asset Purchase Agreement, the "Transaction Documents"), and the funding of the Wind Down Amount.  The Carve-Out Account shall satisfy the requirement set forth in the DIP Order that the Carve-Out Reserves be held in trust in a segregated account at the DIP ABL Agent.  The Wind Down Amount will avoid a freefall shutdown of the Debtors' remaining estates and will be used for the sole purpose of providing funding of those professional fees necessary to implement an orderly and responsible wind-down of the Debtors' estates.  The Wind Down Amount is reasonable under the facts and circumstances of these chapter 11 cases.

K.        The Debtors may sell the Acquired Assets free and clear of all claims, liens, interests and encumbrances (other than Permitted Post-Closing Liens) because, with respect to each creditor asserting a claim, lien, interest or encumbrance, one or more of the standards set forth in sections 363(f)(1)-(5) of the Bankruptcy Code have been satisfied.  Those holders of claims, liens, interests or encumbrances that did not object to or that withdrew their objections to the sale of the Acquired Assets or the Motion, are deemed to have consented to the Motion, the Sale, and the Sale Transaction pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of claims, liens, interests, or encumbrances that did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code or are adequately protected.  In

addition, each of the DIP Agents (as defined in the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition ABL Secured parties, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. 397] (the "DIP Order")), which hold a security interest in the Assets, have consented to the Sale on the terms set forth herein subject to (a) the occurrence of the conditions to closing set forth in paragraph 23 herein; (b) the receipt of (x) a payoff letter acceptable to the DIP ABL Agent (the "Payoff Letter"); (y) the Backup L/C (as defined below) (or provision of cash collateral arrangements) and blocked account, control, or other customary agreements in form and substance acceptable to the DIP ABL Agent in its sole discretion (the "Backup L/C Arrangements"); and (z) payment of professional fees and expenses incurred by the DIP ABL Agent through the Closing Date and payable pursuant to the DIP Order, (c) the DIP ABL Obligations being paid in full in cash in accordance with the Payoff Letter from the proceeds from the Sale, *provided* that following the satisfaction of the conditions set forth in clauses (a), (b) and (c) and the approval of releases satisfactory to the DIP ABL Agent as set forth in paragraph 27 of this Order, the DIP ABL Liens shall be deemed released (except with respect to the DIP ABL Indemnity Account, if any, and cash collateral securing any Continuing L/C or otherwise provided under the Payoff Letter) without further action by any party or order of the Bankruptcy Court; and (c) the remittance to the DIP Term Lenders of all proceeds of the Purchase Price, net only of the Wind Down Amount, payments on account of outstanding DIP ABL Obligations and the Carve-Out Reserves.

L.    The protections afforded to the Buyer under the Bankruptcy Code and this Order, including the sale of the Acquired Assets free and clear of all Liens, are critical to the Buyer.

Absent such protections, the Buyer would not have entered into the Asset Purchase Agreement. Further, absent such protections, the Buyer will not consummate the transactions contemplated thereby, thus materially and adversely affecting the Debtors, their estates, and their creditors.

M.    The total consideration to be provided under the Asset Purchase Agreement reflects the Buyer's reliance on this Order to provide, pursuant to section 363(f) of the Bankruptcy Code, that, upon the Closing, the Buyer will have title to and possession of the Acquired Assets free and clear of all Liens (other than Permitted Post-Closing Liens).

N.    The Buyer's designation rights with respect to Designated Contracts, Designated Leases and Designated Foreign Subsidiaries are integral to the Asset Purchase Agreement, are in the best interests of the Debtors and their estates, and represent the reasonable exercise of the Debtors' sound business judgment.  Specifically, the Designation Rights (i) are necessary to sell the Acquired Assets to the Buyer, (ii) limit the losses suffered by counterparties to the Transferred Contracts and Assumed Leases, and (iii) maximize the recoveries to creditors of the Debtors by limiting the number and amount of claims against the Debtors' estates by avoiding the rejection of the Transferred Contracts and Assumed Leases.

O.    None of the Buyer or its affiliates, successors, assigns, equity holders, officers, directors, employees or professionals shall have or incur any liability to, or be subject to any action by any of the Debtors or any of their estates, predecessors, successors, or assigns, arising out of the negotiation, investigation, preparation, execution, or delivery of the Asset Purchase Agreement and the entry into and consummation of the sale of the Acquired Assets, except as expressly provided in the Asset Purchase Agreement or this Order.

P.    The Asset Purchase Agreement was negotiated in good faith and at arm's-length. The Buyer participated in good faith in the Chapter 11 Cases.  The consideration to be paid by

the Buyer under the Asset Purchase Agreement was negotiated at arm's-length and constitutes (i) fair and reasonable consideration for the Acquired Assets and (ii) reasonably equivalent value and fair and adequate consideration for the Acquired Assets. The terms and conditions set forth in the Asset Purchase Agreement are fair and reasonable under these circumstances and were not entered into for the purpose of, nor do they have the effect of, hindering, delaying, or defrauding the Debtors or their creditors under any applicable laws.

Q.    The Buyer is not, and shall not be deemed to be, a mere continuation, alter ego, or successor in interest, and there is no continuity between the Buyer and the Debtors based upon the Sale Transaction, the Asset Purchase Agreement or this Order. The Sale Transaction does not amount to a consolidation, merger, or *de facto* merger of the Buyer and the Debtors.

R.    The Sale Transaction does not constitute a *sub rosa* chapter 11 plan. The Sale Transaction neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates a chapter 11 plan of reorganization for any of the Debtors.

S.    This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Order, and, sufficient cause having been shown, waives any such stay, and expressly directs entry of judgment as set forth herein. The Debtors have demonstrated compelling circumstances and a good, sufficient and sound business purpose and justification for the immediate approval and consummation of the Sale Transaction as contemplated by the Asset Purchase Agreement and the other transactions contemplated by the Related Agreements. The Buyer, being a good faith purchaser under section 363(m) of the Bankruptcy Code, may close the Sale Transaction contemplated by the Asset Purchase Agreement at any time after entry of this Order.

T.    On February 4, 2020, the *Notice of Sale by Auction and Sale Hearing* [Docket No. 857] (the "Sale Notice") was served by first class mail on the parties listed on the proof of service of the Sale Notice filed with this Court.  The Sale Notice is sufficient notice of the Sale Transaction and no other notice is required.

U.    Parties-in-interest were afforded a full opportunity to participate in the hearing on the Motion and the Sale Hearing.

V.    During the Designation Rights Period, the Buyer intends to negotiate with the Designation Counterparties to Designated Contracts and Designated Leases on terms mutually acceptable for assumption and assignment of such Designated Contracts and Designated Leases to the Buyer.

W.    The relief granted herein is in the best interests of the Debtors, their estates and creditors, and other parties in interest.

**BASED ON THE FOREGOING FINDINGS OF FACT, IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:**

1.    The Motion is granted to the extent set forth herein.

2.    All objections to the Motion, or any other relief granted in this Order, to the extent not resolved, adjourned for hearing on a later date, waived, or withdrawn or previously overruled, and all reservations of rights included in any objection, are hereby overruled and denied on the merits, except as otherwise provided on the record at the hearing; for the avoidance of doubt, nothing herein constitutes a waiver of any rights or remedies that the Ad Hoc Exporters Committee or its members may have against any party with respect to the allowance and payment of their administrative claims in these cases, except to the extent such rights and remedies are inconsistent with or precluded by the terms of the Asset Purchase Agreement or the

Court's oral ruling in connection with the Sale on February 11, 2020, or the DIP Order, including without limitation any attempt to preserve Estate rights (if any) against the DIP Agents or DIP Lenders or any other claims inconsistent with any releases granted in this Order, the DIP Order, the DIP Documents (as defined in the DIP Order), the Transaction Documents, the Payoff Letter, any amendments or modifications to the DIP Order made in accordance with the DIP Order, or any other order entered by the Bankruptcy Court.

3.      For the avoidance of doubt, and notwithstanding anything to the contrary in this Order or the Asset Purchase Agreement, the rights of all counterparties to unexpired leases or executory contracts under section 365 of the Bankruptcy Code are reserved as they relate to the assumption, assumption and assignment, assignment, rejection, or cure amounts of any such agreements.

4.      The Asset Purchase Agreement and the Sale Transaction are hereby approved and the Debtors are authorized to enter into and perform under the Asset Purchase Agreement and the other Related Agreements pursuant to sections 363, 364, and 554 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, and 9014, each as applicable.  Each of the Debtors and the Buyer are hereby authorized and directed to take any and all actions necessary or appropriate to consummate the transactions contemplated therein.

5.      Notwithstanding anything to the contrary herein or in the Asset Purchase Agreement, all amounts Buyer is responsible for paying pursuant to the Asset Purchase Agreement to the extent payable to a Designation Counterparty shall be paid by Buyer directly to such Designation Counterparty.  The Buyer shall obtain and maintain insurance coverage as required of the tenant under the Leases of premises at which the Buyer occupies and/or operates

during the period from and after Closing through the effective date of assumption and assignment or rejection of the Leases.

6.      During the Designation Rights Period, the Buyer may (i) assume and assign Designated Contracts and Designated Leases pursuant to Section 2.7(d) of the Asset Purchase Agreement with the consent of the Designation Counterparties or (ii) direct the Debtors to file a motion with the Court to assume and assign Designated Contracts and Designated Leases to the Buyer in each case pursuant to Section 365 of the Bankruptcy Code.

7.      For any Designated Contract or Designated Lease, which the Buyer directs the Debtors to assume and assign to the Buyer pursuant to clause (i) of paragraph 6 of this Order, the Debtors shall file a notice on the docket (the "Assumption Notice"), and in the event the Designation Counterparty requests an order approving such assumption or assignment and assumption, an order, identifying (x) with respect to a Designated Contract, the Designation Counterparty and Contract, and the proposed assignee or (y) with respect to a Designated Lease, the Designation Counterparty, Lease, store number, the street address for the real property subject to such Designated Lease and the proposed assignee.  Upon the filing of an Assumption Notice, any Contract or Lease identified on the Assumption Notice, subject to a written agreement to assume such contract or lease (each, an "Assumption Agreement") executed by and between the Buyer and the Designation Counterparty, shall be deemed assumed by the Debtors and assigned to the Buyer pursuant to Section 365 of the Bankruptcy Code in accordance with and effective as provided in the Assumption Agreement between the Buyer and Designation Counterparty without further order of this Court, unless otherwise requested by the Designation Counterparty; *provided* that failure to file the Assumption Notice related to the Assumption Agreement shall have no effect on the enforceability or effectiveness of such Assumption

Agreement.  For the avoidance of doubt, the Buyer is authorized to enter into Assumption Agreements with Designation Counterparties without the need of obtaining consent from the Debtors.  To the extent liabilities related to Cure Costs are assigned to the Buyer pursuant to the APA, the Debtors shall not be liable for any Cure Costs related to Designated Contracts and Designated Leases.  For the avoidance of doubt, the Buyer shall assume open purchase orders for merchandise not taken in by or delivered to the Debtors provided that the merchandise and goods that are the subject of such open purchase orders pass the Buyer's quality control review and are deemed of quality for purchase and not defective as determined in Buyer's sole discretion.

8.    Notwithstanding anything to the contrary included in Section 2.7(c) of the Asset Purchase Agreement and subject to paragraph 13 of this Order, the Buyer may, but is not required, to direct the Debtors to file one or more motions to assume and assign certain Designated Contracts and Designated Leases that have not previously been assumed and assigned pursuant to clause (i) or (ii) of paragraph 6 above or otherwise rejected (each an "Assumption Motion").  If filed, each Assumption Motion must comply with the Local Rules and the Bankruptcy Rules and shall include (i) the Proposed Cure Costs, if any, associated with such Designated Contract or Designated Lease as designated by the Buyer, (ii) a brief description of the information being supplied by the Buyer to such Designation Counterparty to show adequate assurance of future performance, and (iii) the deadline to object to the related Assumption Motion (the "Objection Deadline"), which deadline shall be no less than fourteen (14) calendar days from service of such notice.  If no objection is filed by the Objection Deadline, the Debtors may file a certificate of no objection and the Court may enter an order approving the assumption and assignment of a Designated Contract or Designated Lease without a hearing.

9.      For any Designated Contract or Designated Lease to be rejected with the prior consent of the Designation Counterparty thereto, as soon as reasonably practicable after the Buyer provides notice to the Debtors of such rejection, the Debtors shall file a notice on the docket (the "Consensual Rejection Notice") identifying the effective date of such rejection and (x) with respect to a Designated Contract, the Designation Counterparty and Contract or (y) with respect to a Designated Lease, the Designation Counterparty, Lease, store number and the street address for the real property subject to such Designated Lease.  For the avoidance of doubt, failure to file a Consensual Rejection Notice shall have no effect on any agreements between the Buyer and the counterparty to the Contract or Lease.

10.      For any Designated Contract or Designated Lease to be rejected without the prior consent of the Designation Counterparty thereto, as soon as reasonably practicable after the Buyer provides notice to the Debtors of such rejection, the Debtors shall file a notice on the docket (the "Rejection Notice"), and in the event the Designation Counterparty requests an order approving such rejection, an order, identifying (i) with respect to a Designated Contract, the Designation Counterparty, and the proposed effective date of rejection, and the Designated Contract or (ii) with respect to a Designated Lease, the Designation Counterparty, the Designated Lease, store number and the street address for the real property subject to such Designated Lease, the proposed effective date of rejection, and the deadlines and procedures for filing objections to the Rejection Notice, which deadlines shall be no less than fourteen (14) calendar days from the filing of such Rejection Notice, and shall serve such Rejection Notice on the applicable Designation Counterparty by overnight delivery.  For any Designated Contract or Designated Lease subject to a Rejection Notice, the rejection of such Designated Contract or Designated Lease shall be effective without further order of the Court pursuant to the terms of this Order as

of: (i) for any Designated Contract, the date on which the Debtors file the applicable Rejection Notice with the Court (unless the applicable Designation Counterparty timely files and serves an objection as set forth herein, in which case the Rejection Effective Date will be determined by further order of the Court or written agreement of the Debtors, the Buyer, and the Designation Counterparty); (ii) for any Designated Lease, the later of (a) the date on which the Debtors file the Rejection Notice with the Court (unless the applicable Designation Counterparty timely files and serves an objection as set forth herein, in which case the Rejection Effective Date will be determined by further order of the Court or written agreement of the Debtors, the Buyer, and the Designation Counterparty); and (b) the date the Debtors deliver possession of the premises subject to the Lease to the applicable landlord by delivering keys, key codes, and/or security codes, as applicable, to such landlord or, if not delivering such keys and codes, providing notice to the landlord that the landlord may re-let the premises; and (iii) for any Designated Contract or Designated Lease that is not assumed and assigned or rejected before the expiration of the Designation Rights Period, the date on which the Designation Rights Period expires (each of (i), (ii), and (iii) above and the date specified in a Consensual Rejection Notice, the "Rejection Effective Date").  Within two (2) business days of the expiration of the Designation Rights Period, the Debtors shall file a notice with an exhibit listing all of the Designated Leases that were rejected during the Designation Rights Period.  Any property remaining in the leased premises on the Rejection Effective Date shall be deemed abandoned and may be used or disposed of by the applicable landlord without notice or liability to any party claiming an interest in such abandoned property.

11.     The deadline to file proofs of claim to assert any damage claim arising from the rejection of a Contract or Lease shall be filed in accordance with the Bar Date Order entered at Docket No. 396.

12.     The Debtors are hereby authorized in accordance with section 365 of the Bankruptcy Code and the procedures set forth in this Order and in the Asset Purchase Agreement to assume and assign the Transferred Contracts and Assumed Leases to the Buyer free and clear of all Liens, and to execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Transferred Contracts and Assumed Leases to the Buyer as provided in the Asset Purchase Agreement; *provided* that Designated Contracts and Designated Leases shall only be transferred free and clear upon assumption or assumption and assignment of such Designated Contracts and Designated Leases.  The Buyer shall be fully and irrevocably vested with all right, title, and interest of the Debtors under the Transferred Contracts and Assumed Leases assumed and assigned in accordance with the procedures set forth in the Asset Purchase Agreement or this Order, and, to the extent permitted under section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from further liability with respect to Transferred Contracts and Assumed Leases.

13.     Upon the Debtors' assignment of Transferred Contracts and Assumed Leases, to the Buyer in accordance section 365 of the Bankruptcy Code, no default shall exist under any Transferred Contracts and Assumed Leases unless otherwise stipulated in the Assumption Agreement or in any order assuming or assuming and assigning a Designated Contract and Designated Lease, and no counterparty to any Transferred Contracts and Assumed Leases shall be permitted to declare a default by any Debtor or the Buyer, or otherwise take action against the Buyer, as a result of any of the Debtors' financial condition, bankruptcy, or the Debtors' failure

to perform any of its obligations under the relevant Transferred Contracts and Assumed Leases. Any provision in a Transferred Contract or Assumed Lease that prohibits or conditions the assignment or sublease of such Transferred Contract or Assumed Lease or allows the counterparty thereto to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon such assignment or sublease, constitutes an unenforceable anti-assignment provision under section 365 of the Bankruptcy Code that is void and of no force and effect, but only in connection with the assumptions and assignments authorized by this Order.  The failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of any Transferred Contract or Assumed Lease shall not be a waiver of such terms or conditions, or of the Debtors' or the Buyer's rights to enforce every term and condition of the Transferred Contract or Assumed Lease.

14.     Notwithstanding anything herein to the contrary, the Buyer's and the Debtors' rights are reserved to seek authority from the Court to shorten the notice and objection periods related to motions to assume or reject Designated Leases and Designated Contracts in accordance with the Local Rules and the Bankruptcy Rules and to schedule a hearing with the Court to effectuate the assumption and assignment of a Designated Contract or Designated Lease pursuant to such authority; *provided* that in the event exigent circumstances exist, the rights of any party to seek relief on shortened notice on an emergency basis are reserved.

15.     Should F21 OpCo, LLC seek to assign any of its rights, interests or obligations or exercise its rights to designate under section 9.6 of the Asset Purchase Agreement to any third party that is not its Affiliate, notice of the same shall be filed, and counterparties to Leases shall have ten (10) days to object to the same.

16.     To the extent the Buyer and its agent determine to conduct GOB Sales and Store Closings at any of the Stores, the Buyer and its agent are authorized to conduct such GOB Sales and Store Closings and shall have the benefit of the relief set forth in the Store Closing Order to conduct the GOB Sales and Store Closings to the fullest extent such relief is provided to the Debtors and their Consultant with respect to the following provisions of the Store Closing Order, except as otherwise modified herein: paragraphs 17-24, paragraphs 27-30, paragraphs 42-44 (provided that the Dispute Notice described in paragraph 43(d) thereof need only be sent to the Buyer, the Debtors and their respective counsel).  Notwithstanding anything in the Store Closing Order to the contrary, (a) the Buyer and its agent's decision to conduct GOB Sales and Store Closings shall be in their sole and absolute discretion, and the Buyer and its agent shall not be required to consult with any parties with respect thereto; and (b) the notice and objection process for GOB Sales and Store Closings are as follows (i) seven days prior to commencing the GOB Sales and Store Closings, the Debtors, at the direction of the Buyer or its agent, shall serve a notice by overnight mail of the Buyer and its agent's intent to conduct, and the estimated date of completion of, GOB Sales and Store Closings on the applicable landlords and their counsel of record and other interested parties as required by applicable law (ii) such landlords and interested parties shall have seven days after service of such notice to object to the application of this Order (iii) if no objection is filed, the Buyer and its agent are authorized to proceed with conducted the GOB Sales and Store Closings in accordance with this Order, and (iv) if an objection is filed and not otherwise resolved, the Debtors, at the direction of the Buyer and its agent, shall schedule a hearing for resolution of such objection with this Court on seven days' notice to the landlord and their counsel of record if known, subject to the rights of any party to seek relief on an emergency basis on shortened notice in the event exigent circumstances exist.

17.     In the event the Buyer and its agent determine to conduct GOB Sales and Store Closings, the Buyer and its agent may only conduct the GOB Sales and Store Closings in accordance with the Store Closing Procedures attached to the Store Closing Order[4] and previously approved in the Store Closing Order, as such Store Closing Procedures may be modified by a Side Letter (as defined below) between the Buyer and/or its agent and any of the landlords at the closing locations.  The Buyer and/or its agent and each landlord of a Closing Stores are authorized to enter into agreements (each, a "Side Letter") between themselves modifying the Store Closing Procedures, Store Closing Order, and this Order, as applicable, without further order of the Court, and such Side Letters shall be binding as among the Buyer and/or its agent and any such landlords.  In the event of any conflict between the Store Closing Order, this Order, and any Side Letter, the terms of such Side Letter shall control; *provided* that this Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of any Side Letter.

18.     The Buyer and its agent are authorized and empowered to (a) transfer Merchandise, Furnishings and Equipment out of, and into, the Stores that are subject to Store Closings, and (b) sell the Furnishings and Equipment and abandon the same, in each case, as provided for and in accordance with the terms of the Store Closing Order and this Order, including, but not limited to, closing Store signage; *provided* that the Buyer and its agent are not authorized to abandon, and are directed to remove, any hazardous materials defined under applicable law from any leased premises as and to the extent they are required to do so by applicable law; *provided*, *further* that the Buyer

---

[4]     Any notice delivered in accordance with paragraph 14 of the Store Closing Procedures shall not be delivered to the Debtors and instead shall be delivered to: F21 OpCo, LLC c/o Simon Property Group, 225 West Washington Street, Indianapolis, Indiana 46204.  Attention: Stanley Shashoua (sshashoua@simon.com); Steven Fivel (sfivel@simon.com); Dave Dick (ddick@aeropostale.com) and Fried, Frank, Harris, Shriver & Jacobson, LLP, One New York Plaza, New York, New York 10004, Attention: Jennifer Rodburg (jennifer.rodburg@friedfrank.com) and Gary Kaplan (gary.kaplan@friedfrank.com).

and its agent shall not abandon Furnishings and Equipment that were sold to the Buyer under the Asset Purchase Agreement and the Debtors have identified in writing to the Buyer and its agent that a third party has asserted a lien against, or an ownership interest in, without providing notice to such party and the applicable lease counterparty for the Store; *provided, further,* that neither the Buyer nor the Debtor may sell any Furnishings and Equipment that are or have become property of the Designation Counterparty to such Designated Lease or Designated Contract.  To the extent that the Buyer propose to sell or abandon FF&E or any other property that may contain "personally identifiable information," as that term is defined in section 101(41A) of the Bankruptcy Code, or other personal and/or confidential information about the Debtors' employees and/or customers, or any other individual (the "Confidential Information"), the Buyer shall destroy or otherwise remove the Confidential Information from such items of FF&E or other property before such sale or abandonment.

19.    In accordance with the terms of the Asset Purchase Agreement, all proceeds from the GOB Sales, Store Closings or liquidation of the Acquired Assets are property of the Buyer and shall not be subject to any liens or claims except as set forth in the Asset Purchase Agreement.  For the avoidance of doubt, none of the proceeds of the GOB Sales, Store Closings or liquidation of the Acquired Assets shall be or shall be deemed or construed to be property of the Debtors' estates.

20.    The Buyer and its agent shall not be required to comply with any state or local law requiring that the Buyer pay an employee substantially contemporaneously with his or her termination; *provided* that the Buyer or its agent shall pay any accrued wages for which it is liable under the Asset Purchase Agreement or otherwise to each terminated employee as expeditiously as possible.

21.    At Closing, all of the Debtors' right, title, and interest in and to, and the possession of, the Acquired Assets shall be immediately vested in the Buyer pursuant to sections 363(b), 363(f), and 365 of the Bankruptcy Code; *provided* that right, title, and interest in and to Designated Contracts and Designated Leases shall be vested only upon assumption, or assumption and assignment, of such Designated Contract or Designated Lease.  The transfer to the Buyer of the Debtors' rights, title, and interest in the Acquired Assets pursuant to the Asset Purchase Agreement shall be, and hereby is deemed to be, a legal, valid and effective transfer of the Debtors' rights, title, and interest in the Acquired Assets, and vests with or will vest in the Buyer all rights, title, and interest of the Debtors in the Acquired Assets, free and clear of all claims, liens, interests, and encumbrances of any kind or nature whatsoever (other than the Permitted Post-Closing Liens), with any such claims, liens, interests, and encumbrances attaching to the proceeds with the same validity, extent, and priority as immediately prior to the sale of the Acquired Assets, subject to any rights, claims, and defenses of the Debtors and other parties in interest.

22.    This Order (a) shall be effective as a determination that upon the Closing (i) no claims arising from any period prior to the Closing other than the Assumed Liabilities can be asserted against the Buyer or any of their respective assets, (ii) the Acquired Assets shall have been transferred to the Buyer free and clear of all liens, claims, interests, and encumbrances, other than Permitted Post-Closing Liens, and (iii) the conveyances described herein have been effected, (b) is and shall be binding upon and govern the acts of all entities, including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks, or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and

local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.

23.    ***DIP ABL Obligations***.    Notwithstanding anything to the contrary contained in this Order, upon the closing of the Sale, (a) proceeds of the Sale shall be used to make payments and/or provide funding to pay, in full, in cash, all DIP ABL Obligations (as defined in the DIP Order) (including, without limitation, to fund the DIP ABL Indemnity Account, if any, (as defined in the DIP Order), which may be used, among other things, to satisfy the DIP ABL Agent's costs and expenses in connection with the Backup L/C Arrangements) (b) with respect to each outstanding letter of credit issued pursuant to the DIP ABL Facility the Buyer shall either (i) cause the cancellation and return undrawn of all outstanding letters of credit issued pursuant to the DIP ABL Facility, and/or (ii) with respect to the outstanding letters of credit issued pursuant to the DIP ABL Facility (the "Continuing L/C"), the furnishing to the DIP ABL Agent of a cash deposit, or at the discretion of the DIP ABL Agent a standby letter of credit satisfactory to the DIP ABL Agent, in an amount equal to 105% of the face amount of all letters of credit (subparagraph (b), collectively, the "Backup L/C"), and (c) the DIP ABL Agent is authorized to issue non-renewal notices under any outstanding letters of credit issued pursuant to the DIP ABL Facility without the need for any further order of this Court.  Professionals for the DIP ABL Agent are authorized to immediately receive and apply any amounts received pursuant to the Payoff Letter; *provided, however*, that the DIP ABL Agent shall provide the U.S. Trustee and

Counsel to the Committee with invoices reflecting such professional fees and expenses, and the U.S. Trustee shall have the right to object to the amounts set forth therein in accordance with paragraph 35 of the DIP Order.  Any and all amounts paid to professionals for the DIP ABL Agent pursuant to the Payoff Letter are hereby approved in full and shall not be subject to avoidance, disgorgement or any similar form of recovery by the Debtors or any other person subject only to the rights of review of the U.S. Trustee.

24.     Upon entry of this Order the closing of the Sale and the occurrence of the events set forth in paragraph 23 herein, and funding of the Carve-Out in accordance with the DIP Order, all ongoing commitments under the DIP ABL Facility (as defined in the DIP Order) shall be deemed terminated and canceled, and the DIP Agents' obligations under paragraph 39 of the DIP Order shall be satisfied and none of the DIP Agents or DIP Lenders shall have any further liability whatsoever for any fees or amounts constituting the Carve Out, regardless of when arising or incurred; *provided, however*, that the Debtors expressly agree that all letter of credit applications and reimbursement agreements relating to the Continuing L/C and those portions of the DIP ABL Credit Documents relating to the Continuing L/C shall, in each case, remain in full force and effect and nothing herein shall be deemed to constitute a release by the DIP ABL Agent of its rights under such documents relating to the Continuing L/C.

25.     ***DIP Term Loan Obligations***.     Notwithstanding anything to the contrary contained in this Order, upon the closing of the Sale, (a) all proceeds of the Purchase Price, net only of the Wind Down Amount and the Carve-Out Fee Amount funded in accordance with this Order shall be applied to reduce the DIP Term Loan Obligations on a dollar-for-dollar basis and (b) all then accrued and unpaid professional fees and expenses incurred by the DIP Term Loan Agent through the anticipated Closing Date shall be paid; *provided, however*, that the DIP Term

Loan Agent shall provide the U.S. Trustee with invoices reflecting such professional fees and expenses, and the U.S. Trustee shall have the right to object to the amounts set forth therein in accordance with paragraph 35 of the DIP Order.  Any and all amounts paid to professionals for the DIP Term Loan Agent pursuant to this Order are hereby approved in full and shall not be subject to avoidance, disgorgement or any similar form of recovery by the Debtors or any other person except in accordance with the provisions of paragraph 35 of the DIP Order.

26.    ***Additional DIP Obligations***.  The Carve Out Trigger Notice (as defined in the DIP Order) shall be deemed to be delivered on the Closing Date, and such amount shall be reported in writing to the DIP Agents on the Closing Date (including the calculation thereof in accordance with Paragraph 39 of the DIP Order). The Carve Out Reserves (as defined in the DIP Order) shall be funded on the Closing Date with the proceeds from the Sale.  The DIP Agents shall be deemed to have satisfied each of its obligations with respect to the Carve Out and the Carve Out Reserves as set forth in the DIP Order upon such funding.  Prior to the Closing Date, the Debtors shall provide good-faith, non-binding estimates to the DIP Agents regarding the expected amount of the Carve Out Reserves to be funded on the Closing Date.  Except as set forth in this paragraph, nothing in this Order shall impair, modify, or otherwise affect the Carve Out (as defined in the DIP Order).  The creation and funding of the Carve Out Account is approved pursuant to section 363(b) of the Bankruptcy Code.  The Debtors and the other parties thereto are authorized, without further notice or relief from this Court, to enter into the Carve-Out Agreement, take any and all actions that are necessary or appropriate in the exercise of their business judgment to implement the Carve-Out Agreement, including engaging applicable escrow agents and to make or authorize the payments contemplated in connection therewith. The Carve-Out Reserves funded into the Carve-Out Account shall be treated as the Carve-Out

Reserves are treated under the DIP Order.  Such funds (including any residual funds) may be released and applied in accordance with the terms thereof and the terms of the Asset Purchase Agreement, upon entry of an order of this Court approving such fees and expenses on a final basis; *provided*, *that*, prior to the date on which the DIP Term Loan Obligations (as defined in the DIP Order) are paid in full, in cash, the DIP Term Loan Agent shall retain its Lien on the Carve-Out Account and shall have a claim on the proceeds of the Carve-Out Account which claim shall be junior to, and subordinated to, the claims of professionals retained by the Debtors and the Committee (as well as any Committee member expenses reimbursable pursuant to the Interim Compensation Order).  Except as expressly set forth in this Order, nothing herein shall otherwise impair, modify, or affect the DIP Order.

27.    Upon entry of this Order, each of the DIP Agents and DIP Lenders (each as defined in the DIP Order) and their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees shall be deemed released and discharged by each and all of the Debtors, the Debtors' estates, any party acting on behalf of the Debtors or their Estates, and the Buyer, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any cause of action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Debtors' estates and the Buyer, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Debtors' estates, the Buyer or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any claim against,

or interest in, the Debtors or the Buyer, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the transactions or events giving rise to, the business or contractual arrangements between any Debtors and the DIP Agents or DIP Lenders, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Sale, the DIP Agreements, the DIP Facilities, the Prepetition ABL Facility, the Prepetition ABL Documents, the Chapter 11 Cases, or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Sale, the DIP Agreements, the DIP Facilities, the Prepetition ABL Facility, the Prepetition ABL Documents, the filing of the Chapter 11 Cases, this Order, or the distribution of proceeds from the Sale or any other related agreement, or upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the closing; *provided* that any right to enforce this Order is not so released.

28.     Nothing in this Order affects the priorities set forth in the DIP Order with respect to professional fees and expenses incurred by the Debtors' retained professionals and the Committee's retained professionals.  The Wind Down Amount shall be funded in the amount of $5,000,000 on the Closing Date; *provided*, *that*, $3,000,000 of such Wind Down Amount shall be distributed to the DIP Term Loan Agent on the Closing Date and shall reduce on a dollar-for-dollar basis the outstanding DIP Term Loan Obligations; *provided, further*, *that* any amendment to or other modification of the Wind Down Amount prior to the date on which the DIP Term Loan Obligations (as defined in the DIP Order) are paid in full, in cash shall only be effective with the consent of the DIP Term Loan Agent or further order of the Court; *provided*, *further*, *that* following such date on which the DIP Term Loan Obligations are paid in full, in cash, the Wind Down Amount may be increased to an amount not to exceed $5,000,000.

29.     The Asset Purchase Agreement has been entered into, and the Sale Transaction contemplated under the Asset Purchase Agreement is undertaken, by the Buyer in good faith and the Buyer is a good faith purchaser of the Acquired Assets as that term is used in section 363(m) of the Bankruptcy Code.  The Buyer is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.  Neither the Debtors nor the Buyer have engaged in any action or inaction that would cause or permit the Sale Transaction to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code.  The consideration provided by the Buyer for the Acquired Assets under the Asset Purchase Agreement shall be deemed for all purposes to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law, and the sale of the Acquired Assets may not be avoided, or costs or damages imposed or awarded under section 363(n) of the Bankruptcy Code or any other provision of the Bankruptcy Code, the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, or any other similar federal or state laws.

30.     The Asset Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, supplemented or restated by the parties thereto in a writing signed by such parties, and in accordance with the terms thereof, without further order of this Court, provided that any such modification, amendment, supplement or restatement does not have a material adverse effect on the Debtors' estates; *provided* that in the event such modification, amendment, supplement, or restatement materially and adversely effects a Designation Counterparty, the Debtors shall notify such Designation Counterparty as soon as reasonably practicable via first class mail; *provided*, *further*, that such materially adversely affected Designation Counterparty may file an objection within 14 days of receipt of such notice;

*provided, further,* that notice of any such modification, amendment, supplement, or restatement is provided to the Committee as soon as reasonably practicable.

31.     The terms and provisions of the Asset Purchase Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, and their creditors (whether known or unknown), the Buyer, and each of their respective affiliates, successors, and assigns, and any affected third parties, including, without limitation, all Persons asserting Liens (collectively, the "Bound Parties"), notwithstanding any subsequent appointment of any trustee, examiner, or receiver under the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee, examiner, receiver, party, entity, or other fiduciary under the Bankruptcy Code or any other law with respect to any of the Bound Parties, and all such terms shall likewise be binding on such trustee, examiner, receiver, party, entity, or other fiduciary, and shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors or any trustee, examiner, receiver, party, entity, or other fiduciary.  The provisions of this Order and the terms and provisions of the Asset Purchase Agreement, shall survive the entry of any order that may be entered confirming or consummating any chapter 11 plan of the Debtors or converting these chapter 11 cases to cases under chapter 7, and the terms and provisions of the Asset Purchase Agreement.  The rights and interests granted pursuant to this Order and Asset Purchase Agreement shall continue in these or any superseding cases and shall be binding upon the Bound Parties and their respective successors and permitted assigns including, without limitation, any trustee, party, entity, or other fiduciary hereafter appointed as a legal representative of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.  Any trustee appointed for the Debtors under any provision of the Bankruptcy Code, whether the Debtors are proceeding under chapter 7 or chapter 11 of the Bankruptcy Code, shall be

authorized and directed to perform under the Asset Purchase Agreement and this Order without the need for further order of the Court.

32.     The Designation Rights Period with respect to the licenses with Infor (US), Inc., SAP Industries, Inc., and Oracle America, Inc. (collectively, the "Licenses") shall terminate on the fourteenth business day following the Closing Date unless extended by agreement of the Buyer and the Applicable Designation Counterparty.  During such Designation Rights Period, the Buyer shall comply with and be bound by the terms of the foregoing license agreements and upon expiration of such Designation Rights Period, any Licenses not assumed and assigned to the Buyer with the consent of Applicable Designation Counterparty shall be automatically rejected, and the Buyer shall terminate its use of any software or services licensed thereunder.

33.     Following the Closing of the Sale Transaction, no holder of any Lien shall interfere with the Buyer's title to or use and enjoyment of the Acquired Assets based on or related to any such Lien or based on any actions or inactions the Debtors may take in these Chapter 11 Cases.

34.     Neither the Buyer nor any of their respective affiliates, members, successors, assigns, equity holders, officers, directors, employees or professionals (each such entity individually and taken together, the "Buyer Group") shall be deemed, as a result of any action taken in connection with the Asset Purchase Agreement, the consummation of the Sale Transaction contemplated by the Asset Purchase Agreement, or the transfer, operation, or use of the Acquired Assets, to (a) be a legal successor, or otherwise be deemed a successor to the Debtors, including a "successor employer" for the purposes of the Internal Revenue Code of 1986, the Employee Retirement Income Security Act of 1974, or other applicable laws (other than as expressly provided in the Asset Purchase Agreement), (b) have any responsibility or

liability for any obligations of the Debtors, or any affiliate of the Debtors based on any theory of successor or similar theories of liability, (c) have, de facto or otherwise, merged with or into the Debtors, (d) be an alter ego or a mere continuation or substantial continuation of the Debtors (and there is no continuity of enterprise between the Buyer and the Debtors) including, without limitation, within the meaning of any foreign, federal, state, or local revenue law, pension law, ERISA, tax law, labor law, products liability law, employment law, environmental law, or other law, rule, or regulation (including without limitation filing requirement under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or (e) be holding itself out to the public as a continuation of any of the Debtors or their respective estates.

35.     The Buyer shall not have any responsibility for (a) any liability or other obligation of the Debtors or related to the Acquired Assets other than as expressly set forth in the Asset Purchase Agreement or (b) any claims against the Debtors or any of their predecessors or affiliates.  Except as expressly provided in the Asset Purchase Agreement with respect to the Buyer, the Buyer shall have no liability whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations (as defined herein, "Successor or Transferee Liability") based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor, or transferee liability, de facto merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any

way relating to the Acquired Assets prior to the Closing.  Except to the extent expressly included in the Assumed Liabilities with respect to the Buyer, the Buyer shall have no liability or obligation under (a) the WARN Act (29 U.S.C. §§ 2101 et seq.), (b) the Comprehensive Environmental Response Compensation and Liability Act, (c) the Age Discrimination and Employment Act of 1967 (as amended), (d) the Federal Rehabilitation Act of 1973 (as amended), (e) the National Labor Relations Act, 29 U.S.C. § 151 et seq. (the "NLRA"), or (f) any foreign, federal, state, or local labor, employment (including any rights under any pension, multiemployer plan (as such term is defined in Section 3(37), or Section 4001(a)(3) of the Employee Retirement Income Security Act of 1974), health or welfare, compensation or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plans of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability) or environmental law, by virtue of the Buyer's purchase of the Acquired Assets or the consummation of the Sale Transaction.  Without limiting the foregoing, the Buyer Group shall have no liability or obligation with respect to any (and there is no continuity of enterprise between the Buyer and the Debtors) liabilities of the Debtors or any environmental liabilities associated with the Acquired Assets except to the extent they are expressly identified as Assumed Liabilities set forth in the Asset Purchase Agreement.  The Buyer shall have no liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the Acquired Assets prior to the Closing.

36.     Notwithstanding any other provisions of this Sale Order or any final orders pertaining to post-petition financing, use of cash collateral, or any agreements validated by any such orders, from the proceeds of the sale of the Debtors' assets, the amount of $31,734.65 shall be set aside by the Debtors in a segregated account as adequate protection for the unpaid secured

claims for pre-petition taxes of Allen, Allen ISD, Bexar County, Cypress-Fairbanks ISD, Dallas County, El Paso, Fort Bend County, Fort Worth, Frisco, Harris County, Hidalgo County, Jefferson County, McAllen, McLennan County, Montgomery County, Northwest ISD, Nueces County, San Marcos CISD, Smith County, Tarrant County, Brazos County, Denton County, Hays County, Williamson County, and the City of Waco, et al.  (collectively, the "Local Texas Tax Authorities"), prior to the distribution of any proceeds to any other creditor.  The liens of the Local Texas Tax Authorities shall attach to these proceeds to the same extent and with the same priority as the liens they now assert against the property of the Debtors.  These funds shall be on the order of adequate protection and shall constitute neither the allowance of the claims of the Local Texas Tax Authorities, nor a cap on the amounts they may be entitled to receive. Furthermore, the claims and liens of the Local Texas Tax Authorities shall remain subject to any objections any party would otherwise be entitled to raise as to the priority, validity or extent of such liens.  These funds may be distributed only upon agreement between the Local Texas Tax Authorities and the Debtors, or by subsequent order of the Court, duly noticed to the Local Texas Tax Authorities.  Further, notwithstanding any other provisions of this Sale Order or any final orders pertaining to post-petition financing, use of cash collateral, or any agreements validated by any such orders, any 2020 ad valorem taxes attributable to the property in Texas transferred to the Purchaser as part of the Sale that are first due and payable following the Closing shall be an Assumed Liability of the Purchaser to be paid in the ordinary course of business.  The property of the Debtors that is located in Texas that is transferred to the Purchaser as part of the Sale also shall be conveyed to the Purchaser subject to the liens of the Local Texas Tax Authorities as Permitted Liens on account of any such unpaid 2020 ad valorem taxes.  In the event any such taxes that are Assumed Liabilities and that are owed by the Purchaser are not timely paid

pursuant to applicable non-bankruptcy law, the Local Texas Tax Authorities and the Certain Texas Taxing Entities may proceed to collect all amounts owed from the Purchasers and/or the collateral using their state law remedies without recourse to this Court.

37.     The Buyer is a party in interest and shall have the ability to appear and be heard on all issues related to or otherwise connected to this Order, the Sale Transaction, and any issues related to or otherwise connected to the Sale Transaction and the Asset Purchase Agreement.

38.     Notwithstanding anything in the Motion, the Bidding Procedures, the Bidding Procedures Order, the Stalking Horse Purchase Agreement, any Cure Notice or assumption notice, this Sale Order, or any document related to any of the foregoing, nothing shall permit or otherwise effect a sale, an assignment or any other transfer at this time of (a) any insurance policies that have been issued by ACE American Insurance Company, ACE Fire Underwriters Insurance Company, ACE Property and Casualty Insurance Company, ACE Indemnity Insurance Company, Indemnity Insurance Company of North America, Illinois Union Insurance Company, Federal Insurance Company, Great Northern Insurance Company, Chubb Custom Insurance Company and Executive Risk Specialty Insurance Company (and, together with each of their affiliates and successors, the "Chubb Companies") and all agreements, documents or instruments relating thereto (collectively, the "Chubb Insurance Contracts"), and/or (b) any rights, benefits, claims, rights to payments and/or recoveries under such Chubb Insurance Contracts, and/or (c) any collateral securing the Debtors' obligations under the Chubb Insurance Contracts (together with any proceeds thereof, the "Chubb Collateral"), unless and until a further order is entered by this Court, at a subsequent hearing, or as submitted under certification of counsel by agreement of the Debtors, the Buyer and the Chubb Companies, with the rights of the parties fully preserved pending entry of such further order.  Such further order, without further notice, may provide,

among other things, that (i) subject to the execution of an assumption agreement by the Debtors, the Buyer and the Chubb Companies, in form and substance satisfactory to each of the parties (the "Chubb Assumption Agreement"), the Debtors are authorized to assume and assign the Chubb Insurance Contracts to the Buyer and the Buyer shall assume and shall be liable for any and all now existing or hereinafter after arising obligations, liabilities, terms, provisions and covenants of any of the Debtors under the Chubb Insurance Contracts; (ii) the rights and interests of the Debtors in the Chubb Collateral shall be transferred and assigned to the Buyer; (iii) the Debtors are authorized to enter into the Chubb Assumption Agreement; and/or (iv) such other and further relief as may be requested by the Chubb Companies, the Debtors and/or the Buyer.

39.     Subject to and upon the Closing, the Debtors hereby waive any and all actions related to, and hereby release the Buyer and its designee, and their respective property, from any and all claims and causes of action relating to the Sale Transaction, whether known or unknown, now existing or hereafter arising, asserted or unasserted, mature or inchoate, contingent or non-contingent, liquidated or unliquidated, material or non-material, disputed or undisputed, and whether imposed by agreement, understanding, law, equity, or otherwise, except to the extent arising under, or specifically assumed or established under the Asset Purchase Agreement, this Order or any of the Related Agreements.

40.     Each and every federal, state and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Sale Transaction contemplated by the Asset Purchase Agreement.  Nothing in this Order or the Asset Purchase Agreement releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability to a Governmental Unit that any entity would be subject to as the owner or operator of property after the Closing

Date.  Without limiting the provisions of the foregoing sentence, but subject to Bankruptcy Code section 525(a), no Governmental Unit may revoke or suspend any right, license, trademark or other permission relating to the use of the Acquired Assets sold, transferred, or conveyed to the Buyer on account of the filing or pendency of these Chapter 11 Cases or the consummation of the sale of the Acquired Assets.

41.     Subject to the restrictions set forth in this Order, the Debtors are hereby authorized to take any and all actions as may be necessary or desirable to implement the Sale Transactions, and any actions taken by the Debtors necessary or desirable to implement the Sale Transaction prior to the date of this Order, are hereby approved and ratified.

42.     To the extent this Order is inconsistent with any prior order or pleading filed in the Chapter 11 Cases.  To the extent there is any inconsistency between the terms of this Order and the terms of the Asset Purchase Agreement, the terms of this Order shall govern.

43.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the Asset Purchase Agreement and the requirements of Bankruptcy Rule 6004(a) are satisfied by such notice.

44.     This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

45.     The Debtors and the Buyer are authorized to take all actions necessary or appropriate to effectuate the relief granted in this Order, and the Asset Purchase Agreement.

46.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order and the Asset Purchase Agreement.

**Dated: February 13th, 2020**
**Wilmington, Delaware**

**KEVIN GROSS**
**UNITED STATES BANKRUPTCY JUDGE**