# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| FOREVER 21, INC., *et al.*,[1] | ) | Case No. 19-12122 (MFW) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## DISCLOSURE STATEMENT FOR THE SECOND AMENDED
## JOINT CHAPTER 11 PLAN OF FOREVER 21, INC. AND ITS DEBTOR
## AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Aparna Yenamandra (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:       (212) 446-4900


- and -


Anup Sathy, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:       (312) 862-2200

Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Timothy P. Cairns (DE Bar No. 4228)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:      (302) 652-4100
Facsimile:       (302) 652-4400

*Counsel to the Debtors and Debtors in Possession*

THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, include:  Forever 21, Inc. (4795); Alameda Holdings, LLC (2379); Forever 21 International Holdings, Inc. (4904); Forever 21 Logistics, LLC (1956); Forever 21 Real Estate Holdings, LLC (4224); Forever 21 Retail, Inc. (7150); Innovative Brand Partners, LLC (7248); and Riley Rose, LLC (6928).  The location of the Debtors' service address is:  3880 N. Mission Road, Los Angeles, California 90031.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE SECOND AMENDED JOINT PLAN OF FOREVER 21, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, HAS PROVIDED THE FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS

REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO MAY BE ELIGIBLE TO SUBMIT BALLOTS BUT DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTION CONTEMPLATED THEREBY.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ..................................................................................................................1

II.    PRELIMINARY STATEMENT ..........................................................................................1

III.   OVERVIEW OF THE PLAN...............................................................................................2

     A.     Purpose and Effect of the Plan. ...............................................................................2
     B.     The Restructuring Transactions. ..............................................................................4
     C.     Sources of Consideration for Plan Distributions and Transfers of Funds Among Debtors. .............5
     D.     The Plan Supplement. ..............................................................................................5
     E.     Releases....................................................................................................................5

IV.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN...................................................................................................................................6

     A.     What is Chapter 11?.................................................................................................6
     B.     Why are the Debtors sending this Disclosure Statement?.......................................6
     C.     Am I entitled to vote on the Plan?...........................................................................6
     D.     What will I receive from the Debtors if the Plan is consummated? ........................7
     E.     How are Administrative Claims and Priority Tax Claims treated under the Plan? ........................10
     F.     What will I receive from the Debtors if I hold United States Trustee Statutory Fees? .................14
     G.     What will I receive from the Debtors if I hold a Crossover Unsecured Claim?............................15
     H.     What will I receive from the Debtors if I hold an Other Unsecured Claim? ..................................15
     I.      Are any regulatory approvals required to consummate the Plan? ...................................................15
     J.     What happens to my recovery if the Plan is not confirmed or does not go effective? ...................15
     K.     If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "consummation?" ....................................................................................................................................15
     L.     Will the final amount of Allowed Crossover Unsecured Claims and Other Unsecured Claims affect the recovery of Holders of Allowed Crossover Unsecured Claims and Other Unsecured Claims under the Plan? ......................................................................................16
     M.     Will there be releases and exculpation granted to parties in interest as part of the Plan? ..............16
     N.     What impact does a potential Claims Bar Date have on my Claim?................................................21
     O.     What is the deadline to vote on the Plan? ...........................................................22
     P.     How do I vote for or against the Plan?.................................................................22
     Q.     Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?..................................................................................................................................23
     R.     Do the Debtors recommend voting in favor of the Plan?.............................................................23
     S.     What is the effect of the Plan on the Debtors' ongoing business? ................................................23
     T.     What will the corporate structure be upon Emergence?................................................................23

V.     IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT ...............................24

     A.     Additional Important Information. ..........................................................................24

VI.   THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW...........25

     A.     The Debtors.............................................................................................................25
     B.     Assets and Operations. ...........................................................................................25
     C.     Prepetition Capital Structure. ..................................................................................26

VII.   EVENTS LEADING TO THE CHAPTER 11 FILINGS....................................................................28

     A.     Challenging Operating Environment and Operational Right Sizing. ..........................................28
     B.     Management Changes. ............................................................................................29

|  | C. | Burdensome International Portfolio. | 29 |
|  | D. | Prepetition Borrowing Base Challenges. | 30 |
|  | E. | Prepetition Efforts to Access Additional Liquidity. | 30 |
|  | F. | DIP Marketing Process. | 30 |

**VIII. EVENTS OF THE CHAPTER 11 CASES** ........................................................ **32**

|  | A. | First Day Relief. | 32 |
|  | B. | Approval of the DIP Facilities. | 32 |
|  | C. | International Wind-Downs. | 33 |
|  | D. | Treatment of Executory Contracts and Unexpired Leases. | 33 |
|  | E. | Substantive Consolidation. | 33 |
|  | F. | Sale of the Debtors' Assets and Debtors' Wind-Down Efforts | 34 |
|  | G. | Appointment and Investigation of the Official Committee. | 35 |
|  | H. | The Administrative Claims Settlement. | 35 |

**IX. RISK FACTORS** ........................................................................................ **36**

|  | A. | Bankruptcy Law Considerations. | 36 |
|  | B. | Risks Related to Recoveries under the Plan. | 39 |

**X. SOLICITATION AND VOTING PROCEDURES** ............................................... **39**

|  | A. | Holders of Claims and Interests Entitled to Vote on the Plan. | 39 |
|  | B. | Voting Record Date. | 40 |
|  | C. | Voting on the Plan. | 40 |
|  | D. | Ballots Not Counted. | 40 |
|  | E. | Confirmation Hearing. | 41 |

**XI. CONFIRMATION OF THE PLAN** ................................................................ **41**

|  | A. | Requirements for Confirmation of the Plan. | 41 |
|  | B. | Best Interests of Creditors/Liquidation Analysis. | 41 |
|  | C. | Feasibility. | 42 |
|  | D. | Acceptance by Impaired Classes. | 42 |
|  | E. | Confirmation Without Acceptance by All Impaired Classes. | 43 |

**XII. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** ....... **44**

|  | A. | Introduction. | 44 |
|  | B. | Certain United States Federal Income Tax Consequences of the Plan to the Debtors and the Wind-Down Debtors. | 45 |
|  | C. | Certain United States Federal Income Tax Consequences of the Plan to United States Holders of Allowed Claims Entitled to Vote. | 45 |
|  | D. | Certain United States Federal Income Tax Consequences of the Plan to Non-United States Holders of Allowed Class 3A and 3B Claims. | 47 |

**XIII. RECOMMENDATION** ............................................................................... **51**

## <u>EXHIBITS</u>

**EXHIBIT A**    Plan

**EXHIBIT B**    Liquidation Analysis

## I.     INTRODUCTION

Forever 21, Inc. ("Forever 21") and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors"), submit this disclosure statement (as amended, modified, or superseded, from time to time, the "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against and Interests in the Debtors in connection with the solicitation of acceptances with respect to the *Second Amended Joint Chapter 11 Plan of Forever 21, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as amended, modified, or superseded, from time to time, the "Plan").[2] A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.

THE DEBTORS BELIEVE THIS IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASES.   THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

## II.     PRELIMINARY STATEMENT

The goal of these Chapter 11 Cases has been clear since the Petition Date:  emerge with a viable and feasible standalone business.  On February 19, 2020, the Debtors accomplished their goal of achieving a going-concern transaction by closing the sale of substantially all of their assets to F21 OpCo, LLC (the "Sale").[3]   The Sale ensured that the Forever 21 brand would continue and thrive beyond these Chapter 11 Cases.  Since that time, the Debtors, along with their advisors, have been working diligently to identify and effectuate a value maximizing wind down of the Debtors' estates, enabling them to exit these Chapter 11 Cases while maximizing value to Holders of Claims and Interests.

The Debtors are a specialty fashion retailer of women's and men's apparel and accessories.  As of the Petition Date, the Debtors operated 549 stores across the United States, and 251 stores were operated internationally by non-Debtor affiliates.  Of the 251 international stores, 181 were owned and operated exclusively by the non-Debtor affiliates, 54 were franchises, and 16 were operated as joint ventures.  The Debtors also maintained a substantial online presence, with their e-commerce platform accounting for approximately 16 percent of all sales.  In addition to the 534 stores operated under the Forever 21 brand, the Debtors formed a beauty and wellness brand, Riley Rose, in 2017, which operated 15 stores in the United States.

During the summer of 2019, the Debtors embarked on a months-long marketing effort to identify a going-concern transaction that would maximize their estates' value.  In early February 2020, the Debtors entered into a stalking horse purchase agreement with a key landlord to sell substantially all their assets on a going-concern basis. The stalking horse proposal was market-tested and Court-approved on February 13, 2020.[4]

Since the closing of the Sale, the Debtors have been working on certain value-accretive workstreams to bring in additional value to their estates for distribution to Holders of Claims.  The Debtors closed on the sale of certain real property (the "Warehouse Sale") that brought approximately $16.0 million

---

[2]   Capitalized terms used but not otherwise defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan. **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern**.

[3]   *See Notice of Occurrence of Closing of Sale of Substantially All of the Debtors' Assets to F21 OpCo, LLC* [Docket No. 960].

[4]   See *Order (I) Authorizing (A) Entry into and Performance Under the Asset Purchase Agreement, (B) the Sale of the Debtors' Assets to the Buyer, and (C) the Buyer to Conduct Store Closings and Going Out of Business Sales, and (II) Granting Related Relief* [Docket No. 927] (the "Sale Order").

of net available proceeds for distribution.[5]  The Debtors also received certain tax refunds in the amount of approximately $22.4 million under the Coronavirus Aid, Relief, and Economic Security Act and approximately $1.9 million of refunds of certain state income tax prepayments upon the filing of the Debtors' fiscal 2019 tax returns.  Additionally, the Debtors anticipate receiving certain additional state tax refunds in the amount of approximately $500,000, proceeds of a certain Court-approved settlement of intercompany claims between the Debtors and Forever 21 Korea Retail, LLC in the amount of approximately $205,000, and proceeds of a certain duty drawback claim.[6]  Such proceeds will be used to fund the distributions provided for in the Plan.

## III.    OVERVIEW OF THE PLAN

The Plan contemplates a resolution of these chapter 11 case and distribution of the proceeds of the Debtors' estates.

### A.    Purpose and Effect of the Plan.

The Debtors propose to wind down their estates under chapter 11 of the Bankruptcy Code. A chapter 11 plan sets forth how a debtor will treat claims and equity interests.

A bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any entity or person acquiring property under the plan, any creditor of or equity security holder in a debtor, and any other entities and persons to the extent ordered by the bankruptcy court pursuant to the terms of the confirmed plan, whether or not such entity or person is impaired pursuant to the plan, has voted to accept the plan, or receives or retains any property under the plan.

Among other things (subject to certain limited exceptions and except as otherwise provided in the Plan or the Confirmation Order), the Confirmation Order will discharge the Debtors from any debt arising before the Effective Date, terminate all of the rights and interests of pre-bankruptcy equity security holders and substitute the obligations set forth in the Plan for those pre-bankruptcy Claims and Interests.  Under the Plan, Claims and Interests are divided into Classes according to their relative priority and other criteria.

Each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.  The Plan contemplates that the Debtors may seek substantive consolidation of the Debtors' estates in connection with confirmation of the Plan.  To the extent the Debtors seek such relief, and such relief is granted, the entry of the Confirmation Order shall constitute approval by the Court of the substantive consolidation of the Debtors and their respective Estates for all purposes relating to the Plan, including for purposes of voting, confirmation, and distributions.  If this substantive consolidation is approved, then for all purposes associated with the confirmation and consummation of the Plan, all assets and liabilities of the Debtors shall be treated as though they were merged into a single economic unit.

The Plan thus provides the Debtors with the necessary latitude to negotiate the precise terms of their ultimate emergence from chapter 11.  The Plan contemplates the following transactions:

---

[5]    *See Order (I) Authorizing the Sale of Certain of the Debtors' Real Property Free and Clear of Liens, Claims, and Encumbrances, (II) Authorizing the Retention and Employment of the Quantum Associates* Nunc Pro Tunc *to November 18, 2019, (III) Approving the Terms of the Purchase Agreements, and (IV) Granting Related Relief* [Docket No. 956].

[6]    The amount of such duty drawback claim remains speculative as of the date hereof, and the receipt of the proceeds thereof, if any, are anticipated to be received no earlier than twelve months after the filing hereof.

- Holders of Allowed Other Secured Claims will be rendered Unimpaired;

- All known Holders of General Administrative Claims, other than Administrative Settlement Claimants, and Other Priority Claims have been sent an Administrative/Priority Claim Consent Form pursuant to which the Debtors are seeking the agreement of each such party to the treatment afforded to such Holder under the Plan. The treatment afforded to Holders of General Administrative Claims and Other Priority Claims hereunder is only available if each such Holder agrees to such treatment. **The failure to return the Administrative/Priority Claim Consent Form or to object to the Plan shall be deemed to be such Holder's consent to accept less than full payment of its Claim as required by section 1129(a)(9) of the Bankruptcy Code, and such Holder shall receive its Pro Rata share of the Administrative and Priority Tax Claims Recovery or the Other Priority Claims Recovery, as applicable, on the Effective Date, or as soon as reasonably practicable thereafter;**

- Holders of Allowed Crossover Unsecured Claims will receive (i) their Pro Rata share of the General Unsecured Claim Recovery on the Effective Date or as soon as reasonably practicable thereafter and (ii) on the Effective Date, any Avoidance Actions held by the Debtors or the Wind-Down Debtors against such Holders will be fully waived, released, and discharged, and Avoidance Actions held by the Debtors or the Wind-Down Debtors against Holders of Crossover Unsecured Claims shall not be Retained Claims or Causes of Action;

- Holders of Allowed Other Unsecured Claims will receive their Pro Rata share of the General Unsecured Claim Recovery on the Effective Date or as soon as reasonably practicable thereafter;

- Subject to the Restructuring Transactions, Intercompany Claims will be, at the option of the Plan Administrator, either compromised, settled, distributed and/or contributed among entities, modified, or canceled and released without any distribution;

- Intercompany Interests shall be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Intercompany Interests will not receive any distribution on account of such Intercompany Interests;

- Existing Equity Interests shall be canceled, released, and extinguished, and will be of no further force or effect and no Holder of Existing Equity Interests shall be entitled to any recovery or distribution under the Plan on account of such Interests; and

- Section 510(b) Claims, if any, will be discharged, canceled, released, and extinguished on the Effective Date, and Holders of Allowed Section 510(b) Claims will not receive any distribution on account of such Allowed Section 510(b) Claims. The Debtors are not aware of any valid Section 510(b) Claim and believe that no such Section 510(b) Claim exists.

The Plan provides the best available alternative for the Debtors' estates and creditor recoveries. If the Debtors' business were liquidated in a chapter 7 process, conversion would increase administrative costs, compromise the estate's ability to monetize its assets, and provide no foreseeable benefit to creditors. Time and money would be lost by the appointment of a trustee, who must retain, educate, and pay new professionals. All of the costs incurred in a chapter 7 liquidation would be senior to Administrative Claims. A chapter 7 liquidation would also necessitate the setting of a new bar date, forcing creditors to yet again submit claims. Additionally, important employees with institutional knowledge would be gone for good, leaving a large and complex liquidation to be managed by new hires unfamiliar with the Debtors' business.

The needless loss of value to creditors and the Debtors' estates would be enormous. Creditors would receive lower recoveries in chapter 7 because the Debtors' estates necessarily would bear additional costs associated with transitioning to chapter 7, retaining a chapter 7 trustee, counsel, and advisors, and administering a chapter 7 process.

Contemporaneously with the filing of the *First Amended Joint Chapter 11 Plan of Forever 21, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1649], the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving the Administrative Claims Settlement and (II) Granting Related Relief* [Docket No. 1652] (the "9019 Motion"). On December 22, 2020, the Court entered an order granting the 9019 Motion [Docket No. 1724]. The 9019 Motion sought approval of certain Settlement Procedures (as defined in the 9019 Motion) that provided Holders of General Administrative Claims the ability to opt in to the Settlement. To the extent that Holders of General Administrative Claims did not opt in to the Settlement, the Debtors and their advisors reached out to such Holders to ensure such Holders were aware of their options with respect to opting in to the Settlement, choosing to forego opting in to the Settlement, the consequences related thereto, and the alternatives to the Settlement. As of the date hereof, the Debtors and their advisors conducted some 6,800 individual outreach efforts to such Holders of General Administrative Claims to ensure such Holders were given every opportunity to engage on the Settlement and terms of the Plan. As a result of such process, as of the date hereof, the Debtors estimate that holders of approximately 90% by dollar amount of known, timely filed, non-duplicative General Administrative Claims have opted-in to the Settlement. Following the multiple communication attempts by the Debtors and their advisors, the Debtors shall rely on deemed consent to treatment under the Plan for those Holders of General Administrative Claims that have not opted in to the Settlement. A further discussion of deemed consent is included in Article IV.E of this Disclosure Statement.

The Debtors believe that the Plan maximizes stakeholder recoveries in these chapter 11 cases and accordingly seek the Court's approval of the Plan. The Debtors urge all Holders of General Administrative Claims and Other Priority Claims to abstain from returning the Administrative/Priority Claim Consent Form or objecting to the Plan and encourage all Holders of Claims who are entitled to vote to accept the Plan by returning their Ballots so that Prime Clerk, the Debtors' solicitation agent (the "Solicitation Agent"), actually receives such Ballots by the Voting Deadline, *i.e.*, [●], 2021 at 4:00 p.m. prevailing Eastern Time. Assuming no Holders of General Administrative Claims or Other Priority Claim return an Administrative/Priority Claim Consent Form or object to the Plan and that the Plan receives the requisite acceptances, the Debtors will seek the Court's approval of the Plan at the Confirmation Hearing.

## B. The Restructuring Transactions.

### 1. Settlement

The Settlement Order shall remain in full force and effect and the Debtor shall continue to fulfill their obligations thereunder. The Settlement shall be incorporated in the Plan as if fully set forth therein.

### 2. Restructuring Transactions

On the Effective Date or as soon as reasonably practicable thereafter, the Wind-Down Debtors, or the Plan Administrator, as applicable, may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan and the transactions described therein, including, without limitation: (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (c) the filing of

appropriate certificates of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution with the appropriate governmental authorities pursuant to applicable law; and (d) all other actions that the Wind-Down Debtors or the Plan Administrator, as applicable, determine are necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

### C. Sources of Consideration for Plan Distributions and Transfers of Funds Among Debtors.

The Debtors shall fund distributions under the Plan, with Cash on hand on the Effective Date, the Wind-Down Amount, and the Tax Refunds. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

### D. The Plan Supplement.

On or before [●], the Debtors will file the Plan Supplement, which is the compilation of documents and forms of documents, schedules, and exhibits to the Plan, the Bankruptcy Code, and the Bankruptcy Rules. The Plan Supplement will include any and all documentation necessary to effectuate the Restructuring Transactions or that is contemplated by the Plan.

### E. Releases.

The Plan contains certain releases (as described more fully in Article IX of the Plan), including mutual releases between: (a) the Debtors; (b) the Wind-Down Debtors; (c) all Holders of Interests; (d) the Official Committee and each of its members; (e) each current and former affiliate of each Entity in clause (a) through (d); and (f) with respect to each of the foregoing parties in clauses (a) through (e), each of such party's current and former directors, officers, members, employees, partners, managers, general partners, limited partners, managing members, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, advisory board members, investment advisors or sub-advisors, and other professionals; *provided* that if any Holder of a Claim or Interest that would otherwise be a Released Party (x) validly opts out of the releases contained in the Plan, (y) files an objection to the releases contained in the Plan, or (z) votes to reject the Plan, such Holder of a Claim or Interest shall not be a Released Party or a Releasing Party.

All Holders of Claims and Interests that (i) vote to accept or are deemed to accept the Plan or (ii) are in voting Classes who abstain from voting on the Plan and do not opt out of, or object to, the release provisions contained in Article IX of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties.

Importantly, all Holders of Claims and Interests that are not in voting Classes that do not opt out of, or object to, the release provisions contained in Article IX of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the release and discharge of all Claims and Causes of Action against the Debtors and the Released Parties. The releases are an integral element of the Plan.

As will be further evidenced at the Confirmation Hearing, the Debtors believe that the releases, exculpations, and injunctions set forth in the Plan are appropriate because, among other things:

(i) the releases, exculpations, and injunctions are specific; (ii) the releases provide closure with respect to prepetition Claims and Causes of Action, which the Debtors determined is a valuable component of the overall restructuring under the circumstances and is integral to the Plan; (iii) the releases are a necessary part of the Plan; and (iv) each of the Released Parties and Exculpated Parties has afforded value to the Debtors and aided in the reorganization process, which facilitated the Debtors' ability to propose and pursue confirmation of a value-maximizing restructuring. The Debtors believe that each of the Released Parties and Exculpated Parties has played an integral role in formulating or enabling the Plan and has expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure. The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each Released Party and Exculpated Party as part of Confirmation of the Plan. Moreover, substantially all avoidance claims or causes of action arising under sections 544, 547, 548, 549, and 550 of the Bankruptcy Code and any similar state Law, as defined in the Asset Purchase Agreement, and all other claims, causes of action, lawsuits, judgments, privileges, counterclaims, defenses, rights of recovery, rights of set-off, rights of subrogation, and all other rights of any kind under any other provision of the Bankruptcy Code or applicable Law, including all actions relating to vendors and service providers used in the Company's business as well as all claims, causes of action, lawsuits, judgments, privileges, counterclaims, defenses, demands, rights of recovery, rights of set-off, rights of subrogation, and all other rights of any kind, in each case to the extent arising from the Intellectual Property, as defined in the Asset Purchase Agreement, owned by the Company, the Acquired Assets, or the Assumed Liabilities, each as defined in the Asset Purchase Agreement, were transferred to the Buyer as Acquired Assets pursuant to the Asset Purchase Agreement.

## IV. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A. What is Chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession." Consummating a plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B. Why are the Debtors sending this Disclosure Statement?

The Debtors are seeking to obtain Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan. This Disclosure Statement is being submitted in accordance with these requirements.

### C. Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold. Each category of Holders of Claims or Interests, as set forth in Article III of the Plan

pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below.

| Class | Claim / Equity Interests | Status | Voting Rights |
|-------|--------------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 2 | Other Priority Claims | Unimpaired / Impaired | Deemed to Accept / Deemed to Reject |
| 3A | Crossover Unsecured Claims | Impaired | Entitled to Vote |
| 3B | Other Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Intercompany Claims | Impaired | Deemed to Reject |
| 5 | Intercompany Interests | Impaired | Deemed to Reject |
| 6 | Existing Equity Interests | Impaired | Deemed to Reject |
| 7 | Section 510(b) Claims | Impaired | Deemed to Reject |

**D.      What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan. Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts allowed by the Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE BASED UPON FACTORS RELATED TO THE DEBTORS' BUSINESS OPERATIONS AND GENERAL ECONOMIC CONDITIONS. ACTUAL RECOVERIES FOR ALL CREDITORS ARE SUBJECT TO MATERIAL CHANGE FROM THOSE PRESENTED.**

**PLEASE REFERENCE THE PLAN FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS.[7]**

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim and Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| 1 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, to the extent such Claim has not already been paid in full during the Chapter 11 Cases, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Other Secured Claim, each Holder thereof shall receive, at the option of the Plan Administrator: (i) payment in full in Cash of the due and unpaid portion of | $0 | 100.0% |

---

[7]     The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions. "Allowed" means, with respect to any Claim or Interest, except as otherwise provided in the Plan, a Claim or Interest allowed under the Plan, under the Bankruptcy Code, as applicable, or by a Final Order.

| Class | Claim/Equity Interest | Treatment of Claim and Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
|---|---|---|---|---|
| | | its Other Secured Claim on the later of (x) the Effective Date (or as soon thereafter as reasonably practicable) or (y) as soon as practicable after the date such Claim becomes due and payable; (ii) the collateral securing its Allowed Other Secured Claim; (iii) Reinstatement of its Allowed Other Secured Claim; or (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | | |
| 2 | Other Priority Claims | All known Holders of Other Priority Claims have been sent an Administrative/Priority Claim Consent Form pursuant to which the Debtors are seeking the agreement of such party to the treatment afforded to such Holder hereunder. The treatment afforded to Holders of Other Priority Claims hereunder is only available if each such Holder agrees to such treatment. The failure to return the Administrative/Priority Claim Consent Form or to object to the Plan shall be deemed to be such Holder's consent to accept less than full payment of its Claim as required by section 1129(a)(9) and as contemplated under sections 1124 and 1123(a)(4) of the Bankruptcy Code, and in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive its Pro Rata share of the Other Priority Claims Recovery on the Effective Date, or as soon as reasonably practicable thereafter. | $0 | Unimpaired / Impaired |
| 3A | Crossover Unsecured Claims | Except to the extent that a Holder of an Allowed Class 3A Claim agrees to less favorable treatment of its Allowed Class 3A Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Class 3A Claim: (i) on the Effective Date, or as soon as reasonably practicable thereafter, each Holder thereof shall receive its Pro Rata share of the General Unsecured Claims Recovery; and (ii) on the | [●] | <1% + value of Avoidance Action waiver |

| Class | Claim/Equity Interest | Treatment of Claim and Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
|-------|-----------------------|----------------------------------------|----------------------------|-----------------------------------|
| | | Effective Date any Avoidance Actions held by the Debtors or the Wind-Down Debtors against such Holder will be fully waived, released, and discharged, and Avoidance Actions held by the Debtors or the Wind-Down Debtors against Holders of Crossover Unsecured Claims shall not be Retained Claims or Causes of Action. | | |
| 3B | Other Unsecured Claims | Except to the extent that a Holder of an Allowed Class 3B Claim agrees to less favorable treatment of its Allowed Class 3B Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Class 3B Claim, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder thereof shall receive its Pro Rata share of the General Unsecured Claims Recovery. | [●] | <1% |
| 4 | Intercompany Claims | On the Effective Date, subject to the Restructuring Transactions, each Intercompany Claim shall be, at the option of the Plan Administrator, either compromised, settled, distributed and/or contributed among entities, modified, or canceled and released without any distribution. | N/A | 0.0% |
| 5 | Intercompany Interests | Intercompany Interests shall be canceled, released, and extinguished as of the Effective Date and will be of no further force or effect, and Holders of Intercompany Interests will not receive any distribution on account of such Intercompany Interests. | N/A | 0.0% |
| 6 | Existing Equity Interests | On the Effective Date, Existing Equity Interests shall be canceled, released, and extinguished, and will be of no further force or effect and no Holder of Existing Equity Interests shall be entitled to any recovery or distribution under the Plan on account of such Interests. | N/A | 0.0% |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim and Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| 7 | Section 510(b) Claims | On the Effective Date, Section 510(b) Claims shall be discharged, cancelled, released, and extinguished without any distribution to Holders of such Claims. | N/A | 0.0% |

**E.      How are Administrative Claims and Priority Tax Claims treated under the Plan?**

Any Allowed unpaid General Administrative Claim arising prior to March 5, 2020, at 11:59 p.m., prevailing Eastern Time, as set forth in the Bar Date Order and not otherwise satisfied prior to the Effective Date or otherwise through the Asset Purchase Agreement will receive the treatment set forth in Article II.A of the Plan. It is anticipated that there will not be enough Distributable Cash[8] to satisfy all remaining Allowed General Administrative Claims in full in Cash.

Moreover, the Plan provides that Allowed Professional Fee Claims will be paid in Cash from the Carve-Out Account in a manner consistent with and contemplated by the Sale Order. The Carve-Out Account was funded by the Carve-Out Reserves for that exact purpose and escrowed into that certain Carve-Out Account as authorized by the Final DIP Order and Sale Order. At this time, there is approximately $8.3 million in Carve-Out Reserves remaining in the Carve-Out Account. When all such Allowed amounts owing to Retained Professionals have been paid in full, any remaining amount in the Carve-Out Account shall be deemed to constitute Distributable Cash without any further action or order of the Court.

The Debtors believe Holders of General Administrative Claims will receive a better recovery under the Plan than in any other alternative path, including dismissal or conversion of these Chapter 11 Cases to proceedings under chapter 7 of the Bankruptcy Code.

For the avoidance of doubt, Priority Tax Claims are General Administrative Claims.

**All known Holders of General Administrative Claims, other than Administrative Settlement Claimants, have been sent an Administrative/Priority Claim Consent Form pursuant to which the Debtors are seeking the agreement of each such party to the treatment afforded to such Holder under the Plan. The treatment afforded to Holders of General Administrative Claims under the Plan is only available if each such Holder agrees to such treatment. The failure to return the Administrative/Priority Claim Consent Form or to object to Confirmation of the Plan by a Holder of a General Administrative Claim prior to [●], 2021 shall be deemed to be such Holder's consent and agreement to receive treatment for such Claim that is different from that set forth in 11 U.S.C. § 1129(a)(9), which otherwise requires payment in full in cash. If a Holder of a General Administrative Claim or Other Priority Claim returns the Administrative/Priority Claim Consent Form or objects to Confirmation of the Plan asserting that it is entitled to payment in full under section 1129(a)(9) of the Bankruptcy Code, the Debtors may not be able to confirm the Plan. If the Debtors are not able**

---

[8]      "*Distributable Cash*" means Cash received pursuant to the Tax Refunds, *plus* the Wind-Down Amount, *plus* any excess Cash from the Carve-Out Account remaining after satisfaction of all Allowed Professional Fee Claims, *less* the Plan Administrator Amount; *provided* that, if any of the Plan Administrator Amount is not used by the Plan Administrator on or before completion of the Wind-Down, any such remaining portion of the Plan Administrator Amount shall be deemed Distributable Cash.

**to confirm the Plan, the Debtors anticipate that Holders of General Administrative Claims will receive a smaller distribution on account of their Allowed Claims under any alternative to the Plan.**

The quantum of the recovery available to Holders of Allowed General Administrative Claims pursuant to the Administrative and Priority Tax Claims Recovery[9] is dependent on a number of variables and conditions. Those factors include, but are not limited to, the following:

- receipt of certain remaining state tax refunds in the amount of approximately $500,000;

- proceeds of a certain Court-approved settlement of intercompany claims between the Debtors and Forever 21 Korea Retail, LLC in the amount of approximately $205,000; and

- the aggregate amount of Allowed General Administrative Claims following reconciliation and objection, as applicable, by the Debtors or the Plan Administrator, as applicable.

Without limiting the variability of the foregoing and for illustrative purposes only, the Debtors estimate that Distributable Cash available for distribution under the Plan could be equal to approximately $31.7 to $32.2 million. In the event these Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code, the Debtors estimate that the Distributable proceeds could be equal to approximately $25.6 to $27.3 million after taking into account additional chapter 7 expenses. Potential, illustrative recoveries for Allowed General Administrative Claims are set forth below. **THE ILLUSTRATIVE RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. ACTUAL RECOVERIES COULD MATERIALLY AND/OR SUBSTANTIALLY DIFFER FROM THE BELOW.**

| Illustrative Administrative Claims Recoveries | | | |
|---|---|---|---|
| **Total Allowed Claims** | | **$240 million** | **$260 million** |
| **Distributable Cash** | **Chapter 11** | $32.2 million | $31.7 million |
| | **Chapter 7** | $27.3 million | $25.6 million |
| **Recovery Percentage** | **Chapter 11** | 13.4% | 12.2% |
| | **Chapter 7** | 11.4% | 9.8% |

The Debtors and their advisors regularly reached out to the Holders of General Administrative Claims to ensure that such Holders were given every opportunity to engage on the Settlement and terms of the Plan. The Debtors submit that it is wholly appropriate for the Plan to deem that the failure to return the Administrative/Priority Claim Consent Form or to object to Confirmation of the Plan by a Holder of a General Administrative Claim constitutes such Holder's consent and agreement to receive treatment for such Claim that is different from that set forth in 11 U.S.C. § 1129(a)(9). In fact, there is nothing in section 1129(a)(9) of the Bankruptcy Code that requires *affirmative* agreement in order to comply with that section. The ordinary and common meaning of the word "agree," as it appears in section 1129(a)(9), is to "consent or accede,"[10] and consent may be "stated expressly, or implied from one's conduct without any direct expression."[11] Given that courts should "properly assume . . . that Congress intends the words in its

---

[9] "*Administrative and Priority Tax Claims Recovery*" means the lesser of (a) any Distributable Cash in excess of amounts necessary to satisfy all Allowed Secured Claims as set forth in Article III, and (b) Cash in an amount equal to the Allowed Administrative Claims and Allowed Priority Tax Claims; *provided* that Administrative Settlement Claimants shall receive such recovery as provided pursuant to the Settlement.

[10] Webster's New World College Dictionary 23 (5th ed. 2014).

[11] *In re Teligent, Inc.*, 282 B.R. 765, 771 (Bankr. S.D.N.Y. 2002) (citing Black's Law Dictionary 300 (10th ed. 2014)).

enactments to carry 'their ordinary, contemporary, common meaning,'"[12] this court should construe the word "agree" in section 1129(a)(9) to include both affirmative consent and consent implied through silence. Indeed, the bankruptcy and plan solicitation, voting, and objection process is replete with situations in which courts have found that it does include implied consent.[13]

Where Congress has intended that a creditor has the right to affirmatively agree to certain treatment, it has expressly stated so in the provision. For example, section 1129(a)(8) requires that each class under a plan "accepts" the plan or is unimpaired. To accomplish this, Rule 3018(c) governing acceptance or rejection of a plan by voting classes, provides that "[a]n acceptance or rejection *shall be in writing*, identify the plan or plans accepted or rejected, be *signed* by the creditor . . . ."[14] Congress clearly specified that voting creditors must affirmatively agree to be bound by a plan by providing a signed writing (in conformance with the Official Forms).[15] Notably, there is no parallel Bankruptcy Rule for establishing how a party can "agree" to a different treatment under section 1129(a)(9). Rather, section 1129(a)(9) has none of the affirmative requirements of Rule 3018(c), simply providing that a holder of a claim "agree" to treatment other than the default standard under section 1129(a)(9). Courts have recognized that the high bar set by the language in Rule 3018(c) in obtaining the agreement of voting creditors to a plan is not representative of other provisions of the Bankruptcy Code.[16] Accordingly, use of the word "agree" without reliance on a specific meaning in section 1129(a)(9) demonstrates a broader usage consistent with the

---

[12] *Pioneer Inv. Sers. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 388 (1993) (quoting *Perrin v. U.S.*, 444 U.S. 37, 42 (1979)).

[13] *See, e.g., In re Toys "R" Us, Inc.*, No. 17–34665 (KLP) (Bankr. E.D. Va. Aug. 8, 2018) (approving opt-out process for administrative claims settlement); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 260–62 (Bankr. S.D.N.Y. 2007) (noting the importance of allowing nonvoting creditors to be deemed to accept the plan in large cases); *In re Trans World Airlines, Inc.*, Case No. 01–0056, (Bankr. D. Del. 2002) (holding "agree" in section 1129(a)(9) should be construed to include implied consent).

[14] Fed. R. Bankr. P. 3018(c) (emphasis added).

[15] *See In re Vita Corp.*, 380 B.R. 525, 528 (C.D. Ill. 2008) ("Failure on the part of creditors in impaired classes to cast ballots either accepting or rejecting the debtor's proposed chapter 11 plan could not be deemed an 'acceptance' of the plan.").

[16] *See, e.g., In re Vita Corp.*, 380 B.R. at 528 ("The requirement for an affirmative writing [in Rule 3018(c)] is in sharp contrast to other provisions of the Code, during which the failure to act is expressly deemed an acceptance."); *In re Friese*, 103 B.R. 90, 91–92 (Bankr. S.D.N.Y. 1989) ("Rule 3018(c) . . . provides that '[a]n acceptance or rejection shall be in writing . . .' . . . the court cannot deem an impaired class to have accepted a plan if no creditors in that class have voted."); *In re Townco Realty, Inc.*, 81 B.R. 707, 708 (Bankr. S.D. Fl. 1987) (holding that "there is no provision deeming a failure to vote as constituting acceptance").

ordinary definition of the word. Courts in various districts have recognized the merit of that approach and confirmed chapter 11 plans incorporating similar constructs as the one suggested here.[17]

While the Debtors acknowledge that the Court has previously refused to allow a "deemed consent mechanism" to be used in the context of third-party releases and required third-party non-debtor claimants to affirmatively consent to release their claims, the Debtors believe that the policy considerations underlying the Court's skepticism as to such mechanisms are not present here in the context of Holders' agreement to a different treatment under section 1129(a)(9). In *In re Washington Mutual, Inc.*, the proposed plan incorporated a global settlement which, if approved, would have caused non-debtor third party creditors and shareholders of the debtors to release their claims against other parties if they failed to opt out of the plan.[18] The court determined that "[f]ailure to return a ballot is not a sufficient manifestation of consent to a third party release"[19] and concluded that any third party releases would only be effective with respect to holders who had affirmatively consented to such releases by voting in favor of the Plan and who did not opt out of the third party releases. The Debtors agree that the Court is wise to approach such third party releases with caution given that "[w]hile it is true that the bankruptcy court's confirmation of the plan binds the creditors vis-à-vis the debtor, it does not follow that a discharge in bankruptcy alters the right of a creditor to collect from third parties."[20] For the court to approve a release of claims where a third-party had failed to return a ballot risked stripping an inadvertent party of its claim while doing little to improve the prospect of an orderly disposition of the debtors' assets for the benefit of such party and other creditors.

Here, in contrast, given that a Holder of a General Administrative Claim is anticipated to receive a greater distribution under the Plan than if the Debtors' Chapter 11 Cases are converted to chapter 7, a failure by such Holder to opt-out would increase such Holder's recovery relative to the alternative.[21] Additionally, requiring Holders of General Administrative Claim to affirmatively agree to receive treatment for such Claim that is different from that set forth in 11 U.S.C. § 1129(a)(9) could threaten the Debtors' ability to confirm the Plan and effectuate the orderly distribution of the Estates' remaining value, to the detriment of such claimant and others. In circumstances where a debtor's assets are insufficient to satisfy claims of

---

[17]     *See, e.g., In re Barneys New York, Inc.*, No. 19-36300 (CGM) (Bankr. S.D.N.Y. Feb. 5, 2020) (confirming a plan where administrative claimant's failure to return a consent form or to object to confirmation was deemed such claimant's consent to receive treatment different from that set forth in section 1129(a)(9)); *In re Sears Holdings Corp.*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Oct. 15, 2019) (confirming a plan deeming administrative claims holders' failure to opt-out as consent to alternative treatment in satisfaction of section 1129(a)(9)); *In re Specialty Retail Shops Holding Corp.*, No. 19-80064 (TLS) (Bankr. D. Neb. June 11, 2019) (confirming a plan providing that "[t]he failure to object to Confirmation by a Holder of an Allowed Administrative Claim or Priority Tax Claim shall be deemed to be such Holder's consent to receive treatment for such Claim that is different from that set forth in section 1129(a)(9) of the Bankruptcy Code"); *In re Toys "R" US, Inc.*, No. 17-34665 (KLP) (Bankr. E.D. Va. Nov. 21, 2018) (approving a plan where administrative creditors were deemed to consent to alternative treatment when such treatment was disclosed and the affected creditor took no affirmative action); *In re MSR Hotels & Resorts, Inc.*, No. 13-11512 (SHL) (Bankr. S.D.N.Y. Feb. 10, 2014) (approving a plan providing that "[t]he failure to object to Confirmation by a Holder of an Allowed General Administrative Claim or Priority Tax Claim shall be deemed to be such Holder's consent to receive treatment for such Claim that is different from that set forth in section 1129(a)(9) of the Bankruptcy Code"); *In re Teligent*, 282 B.R. 765 (Bankr. S.D.N.Y. 2002) (confirming a plan where administrative and priority claims would be paid through a claim fund and provided notice to administrative creditors via a consent form); *see also In re Southern Foods Groups, LLC*, No. 19-36313 (DRJ) (Bankr. S.D. Tex. July 21, 2020) (approving the debtors' protocol setting up a two-part process under which administrative creditors will receive 80% of the amount that is finally determined through a reconciliation process and giving holders the opportunity to opt out from such process).

[18]     442 B.R. 314, 351 (Bankr. D. Del. 2011).

[19]     *Id.* at 356.

[20]     *First Fid. Bank v. McAteer*, 985 F.2d 114, 118 (2d Cir. 1993).

[21]     *See* Liquidation Analysis.

administrative creditors in full, courts have found that fundamental principles of contract law militate in favor of a capacious reading of the word "agree" to include implied consent.[22]  In fact, an exception to the general rule that silence does not constitute acceptance occurs where offerees, here, administrative creditors, have a duty to speak.[23]  Such duty exists where each individual administrative creditor wields the power to derail a plan and drive the debtor into liquidation.[24]  In such circumstances, "one's general right to remain silent in the face of an offer should be subject to question and reconsideration where passivity will threaten the fundamental goals of bankruptcy—rehabilitation, saving jobs, and equality of distribution."[25]  Here, the Debtors completed some 6,800 individual outreach attempts, or an average of over 5.4 outreach attempts per Holder of a General Administrative Claim to ensure such Holders were given every opportunity to engage on the Settlement and terms of the Plan.  Requiring every single General Administrative Claimant that was not responsive to such considerable, sustained outreach efforts to affirmatively consent to its alternative treatment would likely jeopardize recoveries not only for such Claimants but also for all other Holders of Claims that are to receive distributions under the Plan.

The Debtors are including clear language in this Disclosure Statement and the Administrative/Priority Claim Consent Form highlighting the Debtors' position and their intent with respect to Holders of Administrative Claims, Priority Tax Claims, and Other Priority Claims who did not return the Administrative/Priority Claim Consent Form or to Confirmation of the Plan.[26]  The Debtors also intend to provide the Administrative/Priority Claim Consent Form in Cantonese, Korean, and Mandarin to Holders of General Administrative Claims and Other Priority Claims, as applicable.  These provisions were included and notices translated to make sure that affected creditors were fully informed of their rights.  Accordingly, the Debtors submit that to the extent that Holders of Administrative or Priority Claims did not object to the Plan, they are deemed to have consented to alternate treatment and the Plan meets the requirements of section 1129(a)(9).

### F.	What will I receive from the Debtors if I hold United States Trustee Statutory Fees?

The Debtors and the Wind-Down Debtors, as applicable, shall pay all United States Trustee quarterly fees under 28 U.S.C § 1930(a)(6), plus any interest due and payable under 31 U.S.C. § 3717 on all disbursements, including Plan payments and disbursements in and outside the ordinary course of the Debtors' or Wind-Down Debtors' business (or such amount agreed to with the United States Trustee or

---

[22]	*In re Teligent, Inc.*, 282 B.R. 765 (Bankr. S.D.N.Y. 2002) (holding that administrative claimants that did not respond to solicitation by debtors in administrative insolvency case to agree to accept payment less than in full on their claims are deemed, by their silence, to consent to the treatment proposed by the debtors).

[23]	*Id.* at 771 (citing John D. Calamari & joseph M. Perillo, The Law of Contracts § 2–18, at 83 (3d ed. 1987)).

[24]	*Id.* (holding, as regards the duty to speak, that "[b]ankruptcies . . . give rise to unique moral and ethical concerns because each creditor's action may affect the rights of every party in interest").

[25]	*Id.* at 772 (citing *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984) ("The fundamental purpose of reorganization is to prevent the debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources."); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989) (acknowledging that "[t]he paramount policy and goal of Chapter 11, to which all other bankruptcy policies are subordinated, is the rehabilitation of the debtor")).

[26]	*See* Disclosure Statement Art. IV.E ("**The failure to return the Administrative/Priority Claim Consent Form or to object to confirmation of the Plan by a Holder of a General Administrative Claim prior to [●], 2021 shall be deemed to be such Holder's consent and agreement to receive treatment for such Claim that is different from that set forth in 11 U.S.C. § 1129(a)(9), which otherwise requires payment in full in cash.**"); Administrative/Priority Claim Consent Form (same).

ordered by the Court), for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

**G.**      **What will I receive from the Debtors if I hold a Crossover Unsecured Claim?**

Except to the extent that a Holder of an Allowed Class 3A Claim agrees to less favorable treatment of its Allowed Class 3A Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Class 3A Claim: (i) on the Effective Date, or as soon as reasonably practicable thereafter, each Holder thereof shall receive its Pro Rata share of the General Unsecured Claims Recovery; and (ii) on the Effective Date any Avoidance Actions held by the Debtors or the Wind-Down Debtors against such Holder will be fully waived, released, and discharged, and Avoidance Actions held by the Debtors or the Wind-Down Debtors against Holders of Crossover Unsecured Claims shall not be Retained Claims or Causes of Action.

**H.**      **What will I receive from the Debtors if I hold an Other Unsecured Claim?**

Except to the extent that a Holder of an Allowed Class 3B Claim agrees to less favorable treatment of its Allowed Class 3B Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Class 3B Claim, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder thereof shall receive its Pro Rata share of the General Unsecured Claims Recovery.

**I.**      **Are any regulatory approvals required to consummate the Plan?**

No. There are no known regulatory approvals that are required to consummate the Plan.

**J.**      **What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to implement the Restructuring Transactions. It is anticipated that any alternative would provide Holders of Claims or Interests with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of a liquidation scenario, *see* Article XI.B of this Disclosure Statement, entitled "Best Interests of Creditors."

The Debtors believe that liquidation under chapter 7 of the Bankruptcy Code—a very possible event if the Plan is not confirmed—would result in significantly reduced creditor recoveries as compared to those recoveries available under the Plan. Smaller recoveries would result because of, among other things, significant additional administrative expenses associated with the appointment of a chapter 7 trustee and administration of a chapter 7 liquidation, including additional claims that may be entitled to administrative priority.

**K.**      **If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as practicable thereafter, as specified in the Plan. "Consummation" refers to "substantial consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, and means commencement of distributions under the Plan.

**L. Will the final amount of Allowed Crossover Unsecured Claims and Other Unsecured Claims affect the recovery of Holders of Allowed Crossover Unsecured Claims and Other Unsecured Claims under the Plan?**

Except to the extent there is any Distributable Cash in excess of amounts necessary to satisfy all Allowed Other Priority Claims, if any, and after giving effect to the Administrative and Priority Tax Claims Recovery and Other Priority Claims Recovery, each Allowed Crossover Unsecured Claim and Allowed Other Unsecured Claim against the Debtors shall receive no distribution on account of such Allowed Crossover Unsecured Claim or Allowed Other Unsecured Claim; however, Holders of Crossover Unsecured Claims and Other Unsecured Claims will receive their Pro Rata share of any such excess Distributable Cash.

As set forth herein, because the Debtors believe it is unlikely all Allowed General Administrative Claims and Other Priority Claims will be paid in full in Cash, the Debtors further believe that it is unlikely that Holders of Allowed Crossover Unsecured Claims or Allowed Other Unsecured Claims will receive a Cash recovery under the Plan on account of such Claims. However, on the Effective Date any Avoidance Actions held by the Debtors or the Wind-Down Debtors against Holders of Allowed Crossover Unsecured Claims will be fully waived, released, and discharged, and Avoidance Actions held by the Debtors or the Wind-Down Debtors against Holders of Crossover Unsecured Claims shall not be Retained Claims or Causes of Action

**M. Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan proposes that the Debtors and the Wind-Down Debtors will release the Released Parties, that the Releasing Parties will release the Released Parties, and that the Exculpated Parties will be exculpated. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan (as reflected below) are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations between the Debtors and their key constituencies in obtaining their support for the Plan.

As defined in the Plan, "Released Parties" means each of and in each case solely in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) all Holders of Interests; (d) the Official Committee and each of its members; (e) each current and former affiliate of each Entity in clause (a) through (d); and (f) with respect to each of the foregoing parties in clauses (a) through (e), each of such party's current and former directors, officers, members, employees, partners, managers, general partners, limited partners, managing members, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, advisory board members, investment advisors or sub-advisors, and other professionals; *provided* that if any Holder of a Claim or Interest that would otherwise be a Released Party (x) validly opts out of the releases contained in the Plan, (y) files an objection to the releases contained in the Plan, or (z) votes to reject the Plan, such Holder of a Claim or Interest shall not be a Released Party.

As defined in the Plan, "Releasing Parties" means, each of and in each case solely in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) all Holders of Claims; (d) all Holders of Interests; (e) each current and former affiliate of each Entity in clause (a) through (d); and (f) with respect to each of the foregoing parties in clauses (a) through (e), each of such party's current and former directors, officers, members, employees, partners, managers, general partners, limited partners, managing members, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, advisory board members, investment advisors or sub-advisors, and other professionals; *provided* that, if any Holder of a Claim or Interest that would otherwise be a

Released Party (x) validly opts out of the releases contained in the Plan, (y) files an objection to the releases contained in the Plan, or (z) votes to reject the Plan, such Holder of a Claim or Interest shall not be a Released Party.

As defined in the Plan, "Exculpated Parties" means, collectively, (a) the Exculpated Fiduciaries and (b) the Section 1125(e) Parties.

As defined in the Plan, "Exculpated Fiduciaries" means, collectively, each of the following solely in their respective capacities as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Official Committee and each of its members; and (d) with respect to each of (a), (b), and (c) to the extent they were employed in such capacity on or after the Petition Date, such Entity's directors, officers, partners, managers, trustees, assigns, employees, agents, advisory board members, predecessors, successors, heirs, executors and assignees, attorneys, financial advisors, investment bankers, accountants, consultants and other professionals or representatives.

As defined in the Plan, the Section 1125(e) Parties means, collectively, each of the following solely in their respective capacities as such (a) Holders of the Existing Equity Interests, (b) the Debtors' principals, members, affiliates, parents, and subsidiaries, (c) the Official Committee, and (d) with respect to each of the Entities named in (a) through (c) above, such Entity's directors, officers, current and former shareholders (regardless of whether such interests are held directly or indirectly), partners, managers, trustees, assigns, principals, members, employees, agents, affiliates, advisory board members, parents, subsidiaries, predecessors, successors, heirs, executors and assignees, attorneys, financial advisors, investment bankers, accountants, consultants and other professionals or representatives.

The Debtors believe that all of the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. As set forth in Article IX of the Plan, the releases (as well as the definitions of Released Parties and Releasing Parties) are subject to approval by the Court at the Confirmation Hearing.

1.  **Discharge of Claims and Termination of Existing Equity Interests.**

PURSUANT TO AND TO THE FULLEST EXTENT PERMITTED BY SECTION 1141(D) OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, OR IN ANY CONTRACT, INSTRUMENT, OR OTHER AGREEMENT OR DOCUMENT CREATED PURSUANT TO THE PLAN, THE DISTRIBUTIONS, RIGHTS, AND TREATMENT THAT ARE PROVIDED IN THE PLAN SHALL BE IN FULL AND FINAL SATISFACTION, SETTLEMENT, RELEASE, AND DISCHARGE, EFFECTIVE AS OF THE EFFECTIVE DATE, OF ALL EQUITY INTERESTS, CLAIMS, AND CAUSES OF ACTION OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, WHETHER KNOWN OR UNKNOWN, AGAINST, LIABILITIES OF, LIENS ON, OBLIGATIONS OF, RIGHTS AGAINST, AND INTERESTS IN, THE DEBTORS, THE WIND-DOWN DEBTORS OR ANY OF THEIR ASSETS OR PROPERTIES, REGARDLESS OF WHETHER ANY PROPERTY SHALL HAVE BEEN DISTRIBUTED OR RETAINED PURSUANT TO THE PLAN ON ACCOUNT OF SUCH

CLAIMS AND INTERESTS, INCLUDING DEMANDS, LIABILITIES, AND CAUSES OF ACTION THAT AROSE BEFORE THE EFFECTIVE DATE, ANY LIABILITY TO THE EXTENT SUCH CLAIMS OR INTERESTS RELATE TO SERVICES PERFORMED BY CURRENT OR FORMER EMPLOYEES OF THE DEBTORS PRIOR TO THE EFFECTIVE DATE AND THAT ARISE FROM A TERMINATION OF EMPLOYMENT, ANY CONTINGENT OR NON-CONTINGENT LIABILITY ON ACCOUNT OF REPRESENTATIONS OR WARRANTIES ISSUED ON OR BEFORE THE EFFECTIVE DATE, AND ALL DEBTS OF THE KIND SPECIFIED IN SECTIONS 502(G), 502(H), OR 502(I) OF THE BANKRUPTCY CODE, IN EACH CASE WHETHER OR NOT: (1) A PROOF OF CLAIM OR EQUITY INTEREST IS FILED OR DEEMED FILED PURSUANT TO SECTION 501 OF THE BANKRUPTCY CODE; (2) A CLAIM OR EQUITY INTEREST IS ALLOWED PURSUANT TO SECTION 502 OF THE BANKRUPTCY CODE; OR (3) THE HOLDER OF SUCH CLAIM OR EQUITY INTEREST HAS ACCEPTED THE PLAN. EXCEPT AS OTHERWISE PROVIDED HEREIN, ANY DEFAULT OR "EVENT OF DEFAULT" BY THE DEBTORS OR THEIR AFFILIATES WITH RESPECT TO ANY CLAIM OR EQUITY INTEREST THAT EXISTED IMMEDIATELY PRIOR TO OR ON ACCOUNT OF THE FILING OF THE CHAPTER 11 CASES SHALL BE DEEMED CURED ON THE EFFECTIVE DATE. THE CONFIRMATION ORDER SHALL BE A JUDICIAL DETERMINATION OF THE DISCHARGE OF ALL CLAIMS AND INTERESTS SUBJECT TO THE EFFECTIVE DATE OCCURRING, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN. FOR THE AVOIDANCE OF DOUBT, NOTHING IN ARTICLE IX.A OF THE PLAN SHALL AFFECT THE RIGHTS OF HOLDERS OF CLAIMS AND INTERESTS TO SEEK TO ENFORCE THE PLAN, INCLUDING THE DISTRIBUTIONS TO WHICH HOLDERS OF ALLOWED CLAIMS AND INTERESTS ARE ENTITLED UNDER THE PLAN.

PURSUANT TO BANKRUPTCY RULE 9019 AND IN CONSIDERATION FOR THE DISTRIBUTIONS AND OTHER BENEFITS PROVIDED PURSUANT TO THE PLAN, THE PROVISIONS OF THE PLAN SHALL CONSTITUTE A GOOD FAITH COMPROMISE OF ALL CLAIMS, INTERESTS, AND CONTROVERSIES RELATING TO THE CONTRACTUAL, LEGAL, AND SUBORDINATION RIGHTS THAT A HOLDER OF A CLAIM OR INTEREST MAY HAVE WITH RESPECT TO ANY ALLOWED CLAIM OR INTEREST, OR ANY DISTRIBUTION TO BE MADE ON ACCOUNT OF SUCH ALLOWED CLAIM OR INTEREST. THE ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE COURT'S APPROVAL OF THE COMPROMISE OR SETTLEMENT (INCLUDING AS CONTEMPLATED BY THE SETTLEMENT AND INCLUDING THE TERMS CONTEMPLATED THEREIN) OF ALL SUCH CLAIMS, INTERESTS, AND CONTROVERSIES, AS WELL AS A FINDING BY THE COURT THAT SUCH COMPROMISE OR SETTLEMENT IS IN THE BEST INTERESTS OF THE DEBTORS, THEIR ESTATES, AND HOLDERS OF CLAIMS AND INTERESTS AND IS FAIR, EQUITABLE, AND REASONABLE. IN ACCORDANCE WITH THE PROVISIONS OF THE PLAN, PURSUANT TO BANKRUPTCY RULE 9019, WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE COURT, AFTER THE EFFECTIVE DATE, THE WIND-DOWN DEBTORS OR THE PLAN ADMINISTRATOR, AS APPLICABLE, MAY COMPROMISE AND SETTLE CLAIMS AGAINST THE DEBTORS AND THEIR ESTATES AND RETAINED CLAIMS OR CAUSES OF ACTION AGAINST OTHER ENTITIES.

2.      **Releases by the Debtors.**

PURSUANT TO SECTION 1123(B) AND ANY OTHER APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, ON AND AFTER THE EFFECTIVE DATE, EACH RELEASED PARTY AND ITS RESPECTIVE ASSETS AND PROPERTY ARE, AND ARE DEEMED TO BE, HEREBY CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASED AND DISCHARGED BY THE

DEBTORS, THE WIND-DOWN DEBTORS, AND THEIR ESTATES, FROM ANY AND ALL RETAINED CLAIMS OR CAUSES OF ACTION, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE, THAT THE DEBTORS, THE WIND-DOWN DEBTORS, OR THEIR ESTATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM AGAINST, OR INTEREST IN, A DEBTOR OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE DEBTORS' CAPITAL STRUCTURE, THE ASSERTION OR ENFORCEMENT OF RIGHTS AND REMEDIES AGAINST THE DEBTORS, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, THE SALE TRANSACTION, INTERCOMPANY TRANSACTIONS BETWEEN OR AMONG A COMPANY PARTY AND ANOTHER COMPANY PARTY, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE ASSET PURCHASE AGREEMENT, THE SETTLEMENT, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO BEFORE OR DURING THE CHAPTER 11 CASES, ANY PREFERENCE, FRAUDULENT TRANSFER, OR OTHER AVOIDANCE CLAIM ARISING PURSUANT TO CHAPTER 5 OF THE BANKRUPTCY CODE OR OTHER APPLICABLE LAW, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE RELATED OR RELATING TO ANY OF THE FOREGOING.  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN.

3. **Releases by Holders of Claims and Existing Equity Interests.**

PURSUANT TO SECTION 1123(B) AND ANY OTHER APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THE PLAN OR THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE, IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, EACH RELEASED PARTY AND ITS RESPECTIVE ASSETS AND PROPERTY ARE, AND ARE DEEMED TO BE, HEREBY CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER, RELEASED AND DISCHARGED BY EACH RELEASING PARTY FROM ANY AND ALL CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, THE SALE TRANSACTION, INTERCOMPANY TRANSACTIONS BETWEEN OR AMONG A COMPANY PARTY AND ANOTHER COMPANY

PARTY, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE ASSET PURCHASE AGREEMENT, THE SETTLEMENT, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT RELATING TO ANY OF THE FOREGOING, CREATED OR ENTERED INTO BEFORE OR DURING THE CHAPTER 11 CASES, ANY PREFERENCE, FRAUDULENT TRANSFER, OR OTHER AVOIDANCE CLAIM ARISING PURSUANT TO CHAPTER 5 OF THE BANKRUPTCY CODE OR OTHER APPLICABLE LAW, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE RELATED OR RELATING TO ANY OF THE FOREGOING. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN, INCLUDING ANY CLAIM OR OBLIGATION ARISING UNDER THE PLAN. FOR THE AVOIDANCE OF DOUBT, NOTHING IN THE PLAN SHALL BE DEEMED TO BE, OR CONSTRUED AS, A RELEASE, WAIVER, OR DISCHARGE OF ANY OF THE COMPANY INDEMNIFICATION OBLIGATIONS.

4. **Exculpation.**

EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, NO EXCULPATED PARTY SHALL HAVE OR INCUR, AND EACH EXCULPATED PARTY IS RELEASED AND EXCULPATED FROM ANY CAUSE OF ACTION FOR ANY CLAIM RELATED TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF, THE CHAPTER 11 CASES, THE SALE TRANSACTION, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OR TERMINATION OF THE ASSET PURCHASE AGREEMENT, THE SETTLEMENT, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT RELATING TO THE FOREGOING CREATED OR ENTERED INTO BEFORE OR DURING THE CHAPTER 11 CASES, ANY PREFERENCE, FRAUDULENT TRANSFER, OR OTHER AVOIDANCE CLAIM ARISING PURSUANT TO CHAPTER 5 OF THE BANKRUPTCY CODE OR OTHER APPLICABLE LAW, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, EXCEPT FOR CLAIMS RELATED TO ANY ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER BY A COURT OF COMPETENT JURISDICTION TO HAVE CONSTITUTED BAD FAITH, GROSS NEGLIGENCE, ACTUAL FRAUD, OR WILLFUL MISCONDUCT, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE EXCULPATION SET FORTH ABOVE SHALL NOT OPERATE TO WAIVE OR RELEASE THE RIGHTS OF ANY ENTITY TO ENFORCE THE PLAN, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN, INCLUDING ANY CLAIM OR OBLIGATION ARISING UNDER THE

PLAN. THE EXCULPATED PARTIES HAVE, AND UPON COMPLETION OF THE PLAN SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE LAWS WITH REGARD TO THE SOLICITATION OF VOTES AND DISTRIBUTION OF CONSIDERATION PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN.

5. **Injunction.**

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES THAT: (A) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (B) HAVE BEEN RELEASED PURSUANT TO ARTICLE IX.B OF THE PLAN; (C) HAVE BEEN RELEASED PURSUANT TO ARTICLE IX.C OF THE PLAN, (D) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE IX.D OF THE PLAN (BUT ONLY TO THE EXTENT OF THE EXCULPATION PROVIDED IN ARTICLE IX.D OF THE PLAN), OR (E) ARE OTHERWISE DISCHARGED, SATISFIED, STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY ACTION OR OTHER PROCEEDING, INCLUDING ON ACCOUNT OF ANY CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES THAT HAVE BEEN COMPROMISED OR SETTLED AGAINST THE DEBTORS, THE WIND-DOWN DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY, DIRECTLY OR INDIRECTLY, SO RELEASED OR EXCULPATED) ON ACCOUNT OF, OR IN CONNECTION WITH OR WITH RESPECT TO, ANY DISCHARGED, RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES.

N. **What impact does a potential Claims Bar Date have on my Claim?**

On November 5, 2019, the Court entered the *Order (I) Settling Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Setting a Bar Date for the Filing of Proofs of Claim by Governmental Units, (III) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (IV) Approving the Form of and Manner for Filing Proofs of Claim, (V) Approving Notice of Bar Dates, and (VI) Granting Related Relief* [Docket No. 396] (the "General Bar Date Order"), which established bar dates by which each person or entity (with certain exceptions for, *inter alia*, any Debtor or non-Debtor subsidiary having a claim against another Debtor, any person or entity whose claim had previously been allowed by order of the Court, and claims for fees and expenses of professionals retained in these Chapter 11 Cases) that asserts a claim against the Debtors that arose before the Petition Date, including requests for payment under section 503(b)(9) of the Bankruptcy Code, Class 3A: Crossover Unsecured Claims, and Class 3B: Other Unsecured Claims, was required to file an original, written proof of claim (the "General Bar Date"). **Except in the cases of governmental units and certain other exceptions expressly set forth in the General Bar Date Order, all proofs of claims of any person or entity that is required to file a proof of claim under the General Bar Date Order must be filed so they were actually received on or before January 13, 2020, at 5:00 p.m. (prevailing Eastern Time). All governmental units holding claims that arose prior to the Petition Date and that are required to be filed pursuant to the General Bar Date Order must file proofs of claims so they were actually received on or before March 27, 2020, at 5:00 p.m. (prevailing Eastern Time).**

On March 26, 2020, the Court entered the *Amended Order (I) Setting a Bar Date for Filing Proofs of Administrative Claims, (II) Establishing Administrative Claims Procedures, (III) Approving the Form and Manner of Filing Proofs of Administrative Claims, (IV) Approving Notice of the Administrative Claim Bar Date, and (V) Granting Related Relief* [Docket No. 1094] (the "Administrative Claims Bar Date Order" and, along with the General Bar Date Order, the "Bar Date Order"), which established a bar date by which each entity (with certain exceptions for any Debtor having a claim against another Debtor, any current or former officer, director, or employee of any Debtor for claims based on indemnification, contribution, or reimbursement, and any governmental entity asserting a claim for taxes that arose postpetition) that asserts a claim against the Debtors that arose following the Petition Date was required to file an original, written Proof of Administrative Claim (the "Administrative Claims Bar Date"). **Except in the cases of certain exceptions explicitly set forth in the Administrative Claims Procedures Order, all Proofs of Administrative Claim for any Administrative Claim arising prior to March 5, 2020, at 11:59 p.m., prevailing Eastern Time, must be filed so that they were actually received by June 1, 2020, at 4:00 p.m., prevailing Eastern Time.**

In accordance with Bankruptcy Rule 3003(c)(2), if any person or entity that is required, but fails, to file a proof of claim on or before the applicable Bar Date: (a) such person or entity may be forever barred, estopped, and enjoined from asserting such Claim against the Debtors (or filing a proof of claim with respect thereto); (b) the Debtors and their property may be forever discharged from any and all indebtedness or liability with respect to or arising from such Claim; (c) such person or entity may not receive any distribution in these Chapter 11 Cases on account of that Claim; and (d) such person or entity may not be permitted to vote on any plan or plans of reorganization for the Debtors on account of these barred Claims or receive further notices regarding such Claim.

### O. What is the deadline to vote on the Plan?

The Voting Deadline is [●], 2021, at 4:00 p.m. (prevailing Eastern Time).

### P. How do I vote for or against the Plan?

Detailed instructions regarding how to vote on the Plan are contained on the Ballots distributed to Holders of Claims and Interests that are entitled to vote on the Plan. For your vote to be counted, your Ballot must be completed and signed so that it is *actually received* by [●], 2021, at 4:00 p.m. (prevailing Eastern Time) at the following address:

| |
|---|
| Forever 21, Inc. Ballot Processing |
| c/o Prime Clerk LLC |
| 60 East 42nd Street, Suite 1440 |
| New York, New York 10164-4575 |

For more detail on voting and solicitation procedures, *see* Article X of this Disclosure Statement.

**Q. Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Notice and Claims Agent, Prime Clerk LLC:

| By regular, hand delivery, or overnight mail at: | By electronic mail at: | By telephone at: |
|---|---|---|
| Forever 21, Inc., c/o Prime Clerk LLC 820 3rd Avenue, Suite 412 Brooklyn NY 11232 | forever21info@primerclerk.com | 877-510-9565 (US/Canada) 917-947-5437 (International) |

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Notice and Claims Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' notice, claims, and solicitation agent at http://www.cases.primeclerk.com/forever21 (free of charge) or the Court's website at www.deb.uscourts.gov (for a fee).

**R. Do the Debtors recommend voting in favor of the Plan?**

Yes. The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative. The Debtors believe the Plan is in the best interest of all Holders of Claims and Interests and that other alternatives fail to realize or recognize the value inherent under the Plan.

**S. What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are seeking to wind down their estates under chapter 11 of the Bankruptcy Code. Confirmation means that the Debtors will be able to undertake an orderly wind down of their businesses and provide certain distributions as provided in the Plan. Following Confirmation, the Plan will be consummated on the Effective Date, which is a date selected by the Debtors that is a Business Day on which: (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article VIII.A of the Plan have been satisfied or waived (in accordance with Article VIII.B of the Plan); and (c) the Plan is declared effective. On or after the Effective Date, and unless otherwise provided in the Plan, the Wind-Down Debtors may wind-down their businesses and, except as otherwise provided by the Plan, the Sale Order, and the Asset Purchase Agreement, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Additionally, upon the Effective Date, all actions contemplated by the Plan and the Restructuring Transactions will be deemed authorized and approved.

**T. What will the corporate structure be upon Emergence?**

Except as otherwise provided in the Plan, each Debtor shall continue to exist as of the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation

documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be pursuant to the Plan and require no further action or approval. After the Effective Date, upon a certification to be filed with the Court by the Plan Administrator of all distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Wind-Down Debtors, including the filing of any documents with the secretary of state for the state in which the Wind-Down Debtors are formed or any other jurisdiction. The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Wind-Down Debtors in, and withdraw the Wind-Down Debtors from, applicable states.

## V. IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

### A. Additional Important Information.

The Confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article VIII of the Plan. There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Plan to go effective will be satisfied (or waived).

You are encouraged to read this Disclosure Statement in its entirety, including the section entitled "Risk Factors" and the Plan before submitting your ballot to vote on the Plan.

***The Court's approval of this Disclosure Statement does not constitute a guarantee by the Court of the accuracy or completeness of the information contained herein or an endorsement by the Court of the merits of the Plan.***

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan. The summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference are qualified in their entirety by reference to those documents. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and Confirmation of, the Plan and may not be relied on for any other purpose. In the event of any inconsistency between the Disclosure Statement and the Plan, the relevant provisions of the Plan will govern.

This Disclosure Statement has not been approved or disapproved by the SEC or any similar federal, state, local or foreign regulatory agency, nor has the SEC or any other agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement; however, the financial information contained in this Disclosure Statement or incorporated herein by reference has not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under federal securities laws. The Debtors consider all statements regarding anticipated or future

matters, to be forward-looking statements. Forward-looking statements may include statements about the Debtors':

- financial condition, revenues, cash flows, and expenses;

- levels of indebtedness, liquidity, and compliance with debt covenants;

- financial strategy, budget, projections, and operating results;

- general economic conditions;

- counterparty credit risk;

- the outcome of pending and future litigation; and

- plans, objectives, and expectations.

Statements concerning the foregoing and other matters are not guarantees of the Wind-Down Debtors' future performance. There are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be different from those they may project, and the Debtors undertake no obligation to update the projections made herein.

## VI.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.    The Debtors.

Headquartered in Los Angeles, California, as of the Petition Date, Forever 21 operated both nationwide and worldwide in brick-and-mortar retail stores, selling fast fashion women's and men's apparel and accessories. As of the Petition Date, the Debtors operated 549 stores across the United States, and 251 stores internationally by non-Debtor affiliates. Of the 251 international stores, 181 were owned and operated exclusively by the non-Debtor affiliates, 54 were franchises, and 16 were operated as joint ventures. The Debtors also maintained a substantial online presence, with their e-commerce platform accounting for approximately 16 percent of all sales.

### B.    Assets and Operations.

- *Forever 21 Brand*. With a loyal customer base consisting primarily of young women, Forever 21 offered trendy clothing and accessories at affordable prices. Forever 21 generated substantial brand awareness through an outsized social media presence with active accounts on Facebook, Twitter, Instagram, Pinterest, YouTube, and Snapchat. With more than 16 million Instagram followers, Forever 21 far outpaced the presence of its peers, including Urban Outfitters, GAP, J.Crew, and Abercrombie & Fitch, and had helped spur increased domestic internet sales.

- *Merchandise and Key Customer Base*. Historically and prior to implementation of some of the Debtors' prepetition turnaround initiatives, Forever 21 utilized 90 percent import-sourced merchandising, benefiting from ultra-low prices even when compared to similarly inexpensive peers (*e.g.*, H&M, Urban Outfitters, and American Eagle Outfitters). Forever 21 placed an emphasis on outfit solutions to provide its customers with complete outfits, including fashion accessories, jewelry, and handbags. This approach required offering a wide assortment of apparel pieces in regular and plus-sizes across various color varieties. Essential to the Forever 21 and Riley brands was the promise of a wide range of products

that were unique, innovative, and reflective of the latest trends. Forever 21's loyal customer base shopped regularly in its stores and proudly advocated for the brand.

- **Supply Chain**. Forever 21's core business was delivering trendy merchandize at inexpensive prices. Low pricing and the ability to adapt to an ever-changing market was thus an essential component of Forever 21's success, which the Debtors were able to achieve through strong relationships with their vendors and suppliers. Therefore, Forever 21's business depended on the uninterrupted flow of fresh merchandise through its worldwide supply chain. Generally, the Debtors contracted with various domestic vendors to design and source the merchandise from foreign manufacturers, located predominantly in the People's Republic of China, Korea, and Hong Kong.

- **Real Estate Footprint**. As of the Petition Date, Forever 21 operated 549 stores across the United States and Forever 21's non-Debtor affiliates operate 251 stores internationally. As detailed in the Store Closings Motion, and pursuant to the authority granted to the Debtors by the Store Closings Order the Debtors were authorized, but not directed, to close up to 178 stores in accordance with the terms of the store closing procedures attached thereto (the "Store Closings"). Since the entrance of the Store Closings Order, the Debtors filed several supplemental list of stores that they seek authorization to close under the Store Closings Motion [Docket Nos. 190, 359, 504, 702].

- **E-Commerce Platform**. Approximately 16 percent of Forever 21's total sales originated from its e-commerce platform. The Debtors operated nine e-commerce sites under the Forever 21 and Riley Rose brands and shipped their products globally. Online shoppers could purchase merchandise and seek out fashion advice, tips, trends, and styles. Compared to its peers, Forever 21's online sales as a proportion of its overall sales were low, leading to expansion opportunities, including by relying on social media.

### C. Prepetition Capital Structure.

As of the Petition Date, the Debtors' capital structure consisted of outstanding funded-debt obligations in the aggregate principal amount of approximately $227.7 million, including the Prepetition ABL Facility, the Term Loan Agreements, and the Praxton Agreement. The following table summarizes the Debtors' outstanding funded-debt obligations as of the Petition Date:

| Funded Debt | Maturity | Interest Rates | Principal Amount Outstanding |
|---|---|---|---|
| **ABL Facility** | March 2022 | LIBOR + 1.25–1.75% | $194.5 million |
| **Term Loan Agreements** | December 2019 | 2.00% | $20.0 million |
| **Praxton Note** | October 2020 | 2.75% | $13.2 million[27] |
| **TOTAL** | | | $227.7 million |

---

[27] PHP 686.1 million is approximately $13.2 million, calculated using PHP / USD exchange rate of 0.0192647 as of September 28, 2019.

1. **Prepetition ABL Facility.**

The Debtors are party to that certain Prepetition ABL Agreement by and among Forever 21, Inc., each of the other United States Borrowers from time to time party thereto, each of the Canadian Borrowers from time to time party thereto, the lenders party thereto, and JPMorgan Chase Bank, N.A., as Prepetition ABL Agent. The Prepetition ABL Agreement provides for a $375 million facility (subject to a borrowing base composed primarily of credit card receivables, franchise receivables, and inventory) with a maturity date of March 7, 2022.[28]

The obligations under the Prepetition ABL Facility (the "Prepetition ABL Obligations") are secured by substantially all of each Debtor's working capital assets, including, without limitation, by a first priority lien on the Debtors' accounts (including receivables), inventory, deposit accounts, security accounts, cash, and cash equivalents, but excluding the Debtors' intellectual properties and certain of the Debtors' real estate assets. Each non-borrower Debtor has guaranteed all obligations under the Prepetition ABL Facility. Due to the Debtors' ongoing liquidity constraints, the aggregate availability under the Prepetition ABL Facility was constrained for many months preceding the Petition Date. As of the Petition Date, there was effectively no availability under the Prepetition ABL Facility.

Additionally, Forever 21 has entered into certain deposit account control agreements in favor of the Prepetition ABL Agent with respect to its bank accounts. Thus, as of the Petition Date, substantially all of the Debtors' cash was subject to a perfected security interest in favor of the Prepetition ABL Agent. Under the Prepetition ABL Facility, if aggregate availability was less than the greater of (a) 12.5 percent of the then-applicable borrowing base (or, if less, the total commitments) and (b) $25 million, for at least five consecutive business days, the Debtors were required to remit all cash receipts on a daily basis to a non-Debtor account maintained by the Prepetition ABL Agent.

Pursuant to the Final DIP Order, postpetition cash receipts of the Debtors were used to convert Allowed Prepetition ABL Facility Claims to Allowed DIP ABL Facility Claims on a dollar-for-dollar basis. As of the date hereof, there are no outstanding Prepetition ABL Facility Claims, other than contingent claims.

2. **The Related Party Loans.**

Forever 21 is party to that certain Loan Agreement, dated as of January 21, 2015 (as amended, restated, amended and restated, modified, or supplemented from time to time, the "Term Loan A Agreement"), with Do Won Chang, an individual, as lender thereunder. Under the Term Loan A Agreement, Do Won Chang provided Forever 21 with a $10 million loan, the balance of which is due at its maturity.

Forever 21 is also party to that certain Loan Agreement, dated as of January 21, 2015 (as amended, restated, amended and restated, modified, or supplemented from time to time, the "Term Loan B Agreement"), with the Linda Inhee Chang 2012 Trust as lender thereunder. Under the Term Loan B Agreement, the Linda Inhee Chang 2012 Trust provided the Debtors with a $5 million loan, the balance of which is due at its maturity.

---

[28] The Prepetition ABL Facility provides for LIBO Rate and Prime Rate loans. The LIBO Rate loans bear interest at the LIBO Rate plus an applicable margin of (a) 3.75 percent if the Average Aggregate Availability (as defined in the Prepetition ABL Agreement) is equal to or exceeds 50 percent or (b) 4.00 percent if the Average Aggregate Availability is less than 50 percent. The Prime Rate loans bear interest at a Prime Rate, plus an applicable margin of (x) 2.75 percent if the Average Aggregate Availability is equal to or exceeds 50 percent or (y) 3.00 percent if the Average Aggregate Availability is less than 50 percent.

Forever 21 is also party to that certain Loan Agreement, dated as of January 21, 2015 (as amended, restated, amended and restated, modified, or supplemented from time to time, the "Term Loan C Agreement"), with the Esther Duk-Hee Chang 2012 Trust as lender thereunder. Under the Term Loan C Agreement, the Esther Duk-Hee Chang 2012 Trust provided the Debtors with a $5 million loan, the balance of which is due at its maturity.

### 3. The Praxton Note.

Forever 21 is party to certain loan agreement, dated as of October 9, 2015, by and among Forever 21 and Praxton Commercial Corp., with Praxton Commercial Corp, a company organized and existing under the laws of the Philippines, as lender thereunder. The Praxton Note provides the Debtors with a PHP 950 million (approximately $18.3 million)[29] facility maturing October 9, 2020. The loans borrowed under the Praxton Note accrue interest monthly at a rate of 2.75 percent. Interest is paid annually on October 9, and the outstanding principal is amortized over the final 36 months of the term of the loan. The obligations of Forever 21 under the Praxton Note are not secured. Pursuant to that certain Subordination Agreement, dated as of March 10, 2017, by and among Praxton Commercial Corp., the Prepetition ABL Agent and Forever 21, the indebtedness of Forever 21 owing to Praxton Commercial Corp. under the Praxton Note is subordinated in right of payment to the Prepetition ABL Obligations. As of the Petition Date, there was approximately $13.2 million outstanding on account of the Praxton Note.[30]

## VII. EVENTS LEADING TO THE CHAPTER 11 FILINGS

A number of factors, both macro and micro contributed to the need to commence these Chapter 11 Cases. Most significantly is the decrease in mall traffic. Many Forever 21 storefronts are located in malls. As its neighbors have closed, the number of customers walking past Forever 21 has declined. This has led to a decrease in sales through what has traditionally been Forever 21's predominant retail channel, its brick and mortar stores. Despite Forever 21's continued efforts to adjust its sales strategy to one capitalizing on its online store, it remains saddled with excessive floor space from leases entered almost a decade ago or more in unprofitable markets. Over time, Forever 21's liquidity has become strained and its vendor relations have been tested. Despite continued vendor and landlord support, the following factors culminated with dwindling cash flows and the inability to access incremental liquidity under its prepetition debt facilities.

### A. Challenging Operating Environment and Operational Right Sizing.

Forever 21, along with many other apparel and retail companies, has faced a challenging commercial environment over the past several years brought on by increased competition and the shift away from shopping at brick-and-mortar stores. Given its substantial brick-and-mortar presence in the United States, and the expenses associated therewith, Forever 21's domestic business has been heavily dependent on physical consumer traffic, and resulting sales conversion, to meet sales and profitability targets. The combination of the above factors, and others plaguing the retail industry as a whole, contributed to Forever 21 falling short of its sales targets and depressed profitability performance domestically. Depressed domestic profitability was exacerbated by the burden created by its international footprint.

---

[29] The initial principal of the Praxton Agreement was PHP 950 million (approximately $18.3 million), calculated using PHP / USD exchange rate of 0.0192647 as of September 28, 2019.

[30] As of the Petition Date, there is approximately PHP 686.1 million outstanding on account of the Praxton Note. PHP 686.1 million is approximately $13.2 million, calculated using PHP / USD exchange rate of 0.0192647 as of September 28, 2019.

Additionally, Forever 21 suffered from recent merchandising miscalculations that have contributed to the decline in EBITDA.  Historically, merchandising decisions largely were in reaction to the previous year's performance, resulting in a "pendulum" phenomenon whereby Forever 21 underspent one year and overspent the next.  Specifically, Forever 21 materially under purchased inventory in 2017 due to excess 2016 inventory levels.  Following this under purchase, Forever 21 materially over purchased in 2018.  Additionally, the in-house product design team was structured around styles (e.g., work, weekend, night), leading to duplicative stock keeping units within a given category (i.e., tops, bottoms dresses).  For example, if the teams assigned to design "work clothing" designed a striped top, it is possible that the team assigned to design "casual clothing" may design a similar striped top, unaware that their work was duplicative.  As part of the "Back-to-Basics" plan, design teams will now be centered around categories such as "tops" or "bottoms."  This will reduce duplicative design and help produce the trendy fashion upon which its brand was built.

**B.      Management Changes.**

In an effort to improve Forever 21's corporate governance and to implement the turnaround initiatives, the Debtors hired experienced executives and Disinterested Directors to bolster the existing management team and refine its corporate governance structure.  More specifically, the Debtors added three directors to Forever 21's Board (for a total of six members on the Board), all of whom have extensive experience in the retail space (and in the distressed retail space).  This includes Russell Belinsky, Lisa Gavales, and Lawrence Meyer.  Additionally, in the last six months, Forever 21 added four new members to its management team:  (i) in March 2019, Brad Sell was appointed as Chief Financial Officer; (ii) in August 2019, Lawrence Meyer was hired as Chief Strategy Officer, in light of his prior experience with Forever 21 and his experience with distressed retailers; and (iii) Matthew Katz and Jonathan Goulding were appointed as Interim Chief Operations Officer and Chief Restructuring Officer, respectively, in light of their nearly forty collective years of experience in the distressed retail space.  These additions to the management team will work with the existing leaders to chart a path for Forever 21's future sustained success.

**C.      Burdensome International Portfolio.**

**1.      Rapid International Overexpansion.**

In 2008, Forever 21 began expanding into international markets.  The initial strategy was to create a hub within a city, with a flagship store surrounded by more affordable rent locations spread throughout a metro area.  Forever 21, however, was generally unable to accumulate sufficient storefronts in lower-rent areas and were left with several high-rent locations without the necessary surrounding support.  Therefore, Forever 21 entered lease agreements for store footprints, which were too large and required more products to fill the available space.

Compounding the risk of high-rent locations, Forever 21's focus on rapid expansion left Forever 21 without the operational capabilities to scale effectively.  By 2015, there were 262 international stores.  The majority of the international stores were unprofitable due to variances in local fashion trends and elevated labor costs.  As a result, Forever 21 was unable to account for geographical differences in taste and climate, ultimately leading to operational scaling inefficiencies.

**2.      International Underperformance.**

Despite relatively strong domestic sales, international sales have remained depressed and have counter-balanced the strong performance of the stateside stores.  Global sales dropped from $4.1 billion in 2014 to $3.1 billion in the latest twelve months as of July 31, 2019.  Specifically, Forever 21's storefronts in Canada, Europe, and Asia has been losing approximately $10 million per month on average over the past

12 months. These losses from international operations, compounded with the foregoing factors, have rendered Forever 21 unable to service its outstanding debt.

### D. Prepetition Borrowing Base Challenges.

Consistent with industry practice, inventory levels of the Debtors formed a substantial portion of the Prepetition ABL Facility borrowing base. As new inventory failed to resonate with customers, the Prepetition ABL Facility made it difficult to clear inventory at lower margin rates because this would depress the borrowing base and, therefore, liquidity available under the Prepetition ABL Facility. As a result, Forever 21 continued to carry aged inventory which crowded out new product. Additionally, low liquidity made it challenging to procure new product. Forever 21 had continued to sell through older inventory rather than bringing in new product. The lack of fresh inventory had a negative impact on sales which tightened liquidity (including by reducing the borrowing base under the Prepetition ABL Facility), which created a negative feedback loop. Without the flow of fresh inventory, Forever 21's business would have effectively starved.

### E. Prepetition Efforts to Access Additional Liquidity.

#### 1. Efforts to Access Liquidity under ABL Facility.

In addition to implementing the turnaround initiatives, Forever 21 attempted to ameliorate its liquidity issues through an amendment of its Prepetition ABL Facility that would allow them to borrow additional funds against its assets and accounts. On July 30, 2019, Forever 21 entered into the Third Amendment to Credit Agreement (the "Third Prepetition ABL Amendment"). Although unsuccessful in securing additional capital under an amended Prepetition ABL Agreement, through the Third ABL Amendment, Forever 21 was able to negotiate a forbearance of its audit requirements for the months of July and August. The audit amendment was necessary to avoid a premature default under the Prepetition ABL Facility's covenants. On September 5, 2019, Forever 21 entered into the Fourth Amendment to Credit Agreement (the "Fourth ABL Amendment"). The Fourth ABL Amendment further extended the ability of Forever 21 to continue to operate its business without defaulting under the Prepetition ABL Facility.

#### 2. Efforts to Obtain the FILO Loan to Purchase Holiday Inventory.

Beginning in July 2019, the Debtors, with the assistance of Lazard, evaluated potential funding alternatives necessary to obtain liquidity needed for purchasing inventory and implementing the Debtors' go forward business plan reflecting the Debtors' turnaround initiatives. The Debtors contacted 25 parties regarding potential financing, including an out-of-court first-in-last-out term loan (a "FILO Loan"). Of the 25 contacted parties, 22 parties signed non-disclosure agreements ("NDAs") and were granted data room access (two of them had existing NDAs with the Debtors). As a result of these efforts, the Debtors received four financing offers. After further review of the ongoing turnaround initiative efforts, however, the Debtors decided that a FILO Loan would not put the Debtors' on a value-maximizing long-term path for success without the tools made available in connection with a chapter 11 process (including, most significantly, the ability to reject burdensome domestic and international leases). Therefore, the Debtors focused on preparing for a potential chapter 11 filing, including finding postpetition financing.

### F. DIP Marketing Process.

In conjunction with implementing turnaround initiatives, obtaining key covenant relief, and operationally right-sizing their operations, the Debtors and their advisors commenced a marketing process to obtain DIP financing to fund these Chapter 11 Cases.

Specifically, the Debtors prioritized two potential DIP financing facilities: (i) a senior, asset based ABL facility with a similar borrowing base structure to the Prepetition ABL Facility, combined with (ii) a junior facility to provide incremental liquidity to the Debtors during the Chapter 11 Cases and structured similarly to the FILO Loan. With this in mind, in late August, Lazard (at the direction of the Debtors) began reaching out to parties with the requisite experience and sophistication to participate in such facilities. To avoid disruptive news coverage, Lazard initially limited its outreach to only 13 potential lenders to solicit proposals for DIP financing (including the Prepetition ABL Agent). Several of those parties were already under an NDA in connection with the request for proposals regarding the potential FILO Loan. Further, several of those parties were already familiar with the Debtors' business as they had performed diligence and, in many instances, provided proposals for financing. Approximately one week after the initial DIP financing outreach, with the risk of disruptive news coverage becoming moot, Lazard expanded its outreach and solicited proposals from 18 additional parties. Many of those parties were already familiar with the Debtors and the collateral available to secure a DIP facility, and had largely indicated an interest to participate in a potential DIP Facility.

In total, more than 30 parties were contacted and more than 30 NDAs were executed. All parties subject to NDAs were granted access to a virtual data room containing detailed information regarding the Debtors and received access to non-public information. As a result of these efforts, several parties engaged in negotiations with the Debtors and their advisors and discussed the terms of potential DIP financing. Ultimately, the Debtors received one proposal for an ABL facility and eight proposals for a junior term loan facility. No party was willing to provide financing to the Debtors on an unsecured or administrative priority basis. Additionally, the Debtors solicited interest for a "unitranche" DIP facility to ensure competitive tension with the potential lender for the DIP ABL facility; interest in such a facility, however, was very limited.

For nearly three weeks, the Debtors and their advisors engaged in round-the-clock negotiations with several parties who provided term sheets in order to obtain the best possible financing for the Debtors. Specifically, the Debtors exchanged drafts of commitment papers and long-form term sheets with several parties. These documents were heavily negotiated over the course of the past three weeks. Furthermore, to ensure the Debtors received the best terms, several potential financing parties met with members of the management team to enhance their understanding of the Debtors and their operations. As negotiations went on, the Debtors actively sought out a deal that would offer the most liquidity to fund these Chapter 11 Cases while simultaneously providing flexibility to implement the terms of their restructuring, especially with respect to the case milestones required by such counterparties.

As a result, in the weeks leading up to the Petition Date, it became clear to the Debtors that their best path to financing their chapter 11 cases was through a financing from both the Prepetition ABL Secured Parties and the DIP Term Loan Lenders. Accordingly, and as noted in the Debtors' motion seeking authorization to enter into the DIP Facilities on an interim and final basis [Docket No. 24] (the "DIP Motion") and accompanying declarations, the Debtors efforts ultimately culminated in the DIP ABL Facility and the DIP Term Loan Facility. Because the Prepetition ABL Facility was being "rolled up" into the DIP ABL Facility and the DIP ABL Facility is senior in priority to the DIP Term Loan Facility (with respect to the collateral securing the DIP ABL Facility), the DIP Facilities did not effectuate any priming of the Prepetition ABL Secured Parties' liens on their collateral under the Prepetition ABL Facility. Accordingly, the Debtors avoided the need to engage in a priming fight at the outset of these Chapter 11 Cases. The Prepetition ABL Secured Parties also consented to the Debtors' use of their Cash Collateral in connection with the DIP Facilities. In short, despite the Debtors' robust marketing efforts, the best—and only actionable—proposals to preserve the Debtors' long-term sustainability were the DIP Facilities.

## VIII.   EVENTS OF THE CHAPTER 11 CASES

### A.   First Day Relief.

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (the "First Day Motions") requesting various types of relief which were approved by the Court.  The relief granted enabled the Debtors to preserve value and efficiently administer the Chapter 11 Cases, including, among other things:  (a) an order authorizing the Debtors to obtain postpetition financing and use cash collateral during the Chapter 11 Cases, and granting certain adequate protection to certain secured parties; (b) an order authorizing the Debtors to continue using their existing cash management system, honor certain prepetition obligations related thereto, maintain existing business forms, and continue to perform intercompany transactions; (c) an order authorizing the Debtors to pay certain prepetition taxes and fees; (d) an order authorizing the Debtors to pay their obligations under insurance policies entered into prepetition, continue paying brokerage fees, honor the terms of their premium financing agreement and pay premiums thereunder, enter into new premium financing agreements in the ordinary course of business, and renew, supplement, modify, and purchase insurance coverage in the ordinary course of business; (e) an order granting authority to pay employees' wage Claims and related obligations in the ordinary course of business and continue certain employee benefit programs; (f) an order authorizing the Debtors to make payment on account of prepetition Claims of certain critical vendors, foreign vendors, and 503(b)(9) claimants; (g) an order authorizing the Debtors to make payment on account of prepetition Claims of certain Lien Claimants and import Claimants; and (h) an order approving procedures for, among other things, determining adequate assurance for utility providers, prohibiting utility providers from altering, refusing, or discontinuing services, and determining that the Debtors are not required to provide additional adequate assurance.

A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Jonathan Goulding, Chief Restructuring Officer of Forever 21, Inc., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 23], filed on the Petition Date.  The First Day Motions, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at www.cases.primeclerk.com/forever21.

To assist the Debtors in carrying out their duties as debtors-in-possession and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Debtors filed motions requesting that the Court authorize the Debtors to retain and employ the following advisors:  (a) Prime Clerk LLC, as Notice and Solicitation Agent to the Debtors; (b) Kirkland & Ellis LLP as counsel to the Debtors; (c) Pachulski Stang Ziehl & Jones LLP as co-counsel to the Debtors; (d) Lazard Freres & Co. LLC, Inc. as investment banker to the Debtors; (e) Alvarez & Marsal North America, LLC to provide the Debtors a Chief Restructuring Officer and certain additional personnel; (f) RCS Real Estate Advisors as real estate advisor to the Debtors; (g) Six Sigma Academy International, LLC as operational advisor to the Debtors; (h) KPMG LLP as auditor, tax compliance service provider, and tax consultant to the Debtors; (i) Montgomery McCracken Walker & Rhoads LLP as special counsel to the Debtors, and (j) Deloitte Tax LLP as tax services providers to the Debtors.  The Court entered orders approving the aforementioned retentions [Docket Nos. 385, 386, 387, 388, 395, 486, 490, 519, 528, 962].  Further, the Debtors filed a motion seeking approval of procedures for the interim compensation and reimbursement of expenses of retained Professionals in the Chapter 11 Cases, which the Court approved on October 28, 2019 [Docket No. 339].

### B.   Approval of the DIP Facilities.

Based on the Debtors' need for debtor-in-possession financing and their conclusion that the DIP Facilities represents the best terms available, on September 30, 2019, the Debtors filed the DIP Motion seeking authorization to enter into the DIP Facilities on an interim and final basis.  On October 2, 2019 the

Court approved the DIP Motion on an interim basis. On November 5, 2019, the Court approved the DIP Motion on a final basis.

### C.  International Wind-Downs.

To correct the Debtors international footprint, the Debtors, with the assistance of their international non-Debtor subsidiaries, have taken significant steps to wind down operations in nearly all of their international locations. Non-Debtor subsidiaries in the following countries either have filed for formal insolvency proceedings, anticipate filing for insolvency in the near term, or will effectuate a solvent wind-down process in the near term: France, Austria, Germany, Netherlands, United Kingdom, Teren (the Teren entities include entities purchased by the Debtors located in Bulgaria, Greece, Poland, Czech Republic, Slovakia, Spain, Portugal, and Romania), Japan, South Korea, Hong Kong, China, and Canada. The Debtors, however, intend to continue operations in Brazil and Mexico.

### D.  Treatment of Executory Contracts and Unexpired Leases.

Assumption and rejection of executory contracts and unexpired leases shall be governed by the terms of the Asset Purchase Agreement and Sale Order, pursuant to which the Debtors transferred rights as to assumption and assignment or rejection decisions to the Buyer.

### E.  Substantive Consolidation.

In connection with Confirmation of the Plan, the Debtors reserve the right to assert that the Plan substantively consolidates the Estates of all of the Debtors into a single consolidated estate for all purposes associated with Confirmation and consummation of the Plan.

Sections 105(a) and 1123(a)(5) of the Bankruptcy Code empower a bankruptcy court to authorize substantive consolidation pursuant to a chapter 11 plan over the objections of creditors. *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005). The Third Circuit in *Owens Corning* discussed at length substantive consolidation in bankruptcy proceedings, as well as its genesis and the impact it has on a debtors' creditors and their rights and recoveries. The Court provided the following baseline standards for approval of non-consensual substantive consolidation, while leaving the trial court with discretion to assess what facts are necessary to meet these standards:

- prepetition [the debtors] disregarded separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one legal entity, or

- postpetition their assets and liabilities are so scrambled that separate them is prohibitive and hurts all creditors. *Id*. at 211.

Following Owens Corning, Courts in this District have clarified that substantive consolidation is also appropriate where the parties consent to it. *See Schroeder v. New Century Liquidating Trust (In re New Century TRS Holdings, Inc.)*, 407 B.R. 576, 591 (D. Del. 2009).

In the event the Debtors assert that the Plan substantively consolidates the Estates, the entry of the Confirmation Order would constitute approval by the Court of the substantive consolidation of the Debtors and their respective Estates for all purposes relating to the Plan, including for purposes of voting, Confirmation, and distributions. If the Plan substantively consolidates the Estates, then for all purposes associated with the Confirmation and consummation of the Plan, all assets and liabilities of the Debtors would be treated as though they were merged into a single economic unit, and all guarantees by any Debtor of the obligations of any other Debtor, to the extent such exist, would be considered eliminated so that any Claim and any guarantee thereof by any other Debtor, as well as any joint and several liability of any Debtor

with respect to any other Debtor, would be treated as one collective obligation of the Debtors. Moreover, (a) no distribution would be made under the Plan on account of any Intercompany Interest held by any one of the Debtors in any of the other Debtors except to the extent necessary to effectuate the substantive consolidation provided for in the Plan, (b) all guaranties of any one of the Debtors of the obligations of any of the other Debtors, to the extent such exist, would be eliminated so that any Claim against any one of the Debtors, and any guaranty thereof executed by any of the other Debtors, would be one obligation of the consolidated Debtors' Estates, and (c) every Claim that is timely filed or to be filed in the Chapter 11 Cases of any of the Debtors would be deemed filed against the consolidated Estates and would be one Claim against, and one obligation of, the Estates.

Additionally, any Holder of multiple Allowed Claims against more than one Debtor that arise from the contractual, joint, joint and several, or several liability of such Debtors, the guaranty by one Debtor of another Debtor's obligation or other similar circumstances, would be entitled to one Allowed Claim that, in the aggregate, does not exceed the amount of the underlying Claim giving rise to such multiple Claims. Claims against more than one of the Debtors arising from the same injury, damage, cause of action, or common facts would be Allowed only once as if such Claim were against a single Debtor.

Any alleged defaults under any applicable agreement with the Debtors arising from substantive consolidation of the Estates would be deemed cured as of the Effective Date without prejudice to any other cure claims unrelated to substantive consolidation.

If the Debtors seek and receive approval of substantive consolidation, the Wind-Down Debtors or the Plan Administrator will be authorized to submit an order to the Court under certification of counsel that is in form and substance reasonably acceptable to the United States. Trustee and the Official Committee that closes each of the Chapter 11 Cases except Forever 21, Inc.'s Chapter 11 Case. The Debtors' consolidated estate would thereafter be administered through Forever 21, Inc.'s Chapter 11 Case. Once the Plan has been fully administered, the Wind-Down Debtors or the Plan Administrator would thereafter file a final report and a motion seeking a final decree in accordance with Local Rule 3022-1.

### F. Sale of the Debtors' Assets and Debtors' Wind-Down Efforts

In late January, 2020, the Debtors and a consortium led by Simon Property Group and Authentic Brands Group, through the F21 OpCo LLC entity (the "Buyer"), undertook extraordinary efforts to negotiate and implement a going-concern sale transaction on an expedited basis. On February 2, 2020, the Debtors and the Buyer entered into an Asset Purchase Agreement (such agreement together with all schedules and exhibits attached thereto and related agreements, the "Asset Purchase Agreement").

On February 13, 2020, the Court approved the sale of substantially all the assets to the Buyer and entered the *Order (I) Authorizing (A) Entry into and Performance Under the Asset Purchase Agreement, (B) the Sale of the Debtors' Assets to the Buyer, and (C) the Buyer to Conduct Store Closings and Going Out of Business Sales, and (II) Granting Related Relief* [Docket No. 927] (the "Sale Order"). The Sale Order authorized the sale of substantially all of the Debtors' assets to the Buyer, including all inventory, pursuant to the terms of conditions of the Asset Purchase Agreement.

On February 19, 2020, the Debtors and Buyer closed the Sale Transaction and the Debtors filed a *Notice of Occurrence of Closing of Sale of Substantially All of the Debtors' Assets to F21 OpCo, LLC* [Docket No. 960].

Since the closing of the Sale Transaction, the Debtors endeavored to wind-down their estates and complete certain workstreams that are expected to bring additional value to the estate for distribution to the Debtors' administrative creditors. More specifically, the Debtors have focused on two primary workstreams: (a) closing the Warehouse Sale, which the Court approved via separate order on

February 19, 2020 [Docket No. 956], and (b) securing meaningful tax refunds. The Warehouse Sale closed on September 4, 2020, resulting in the Debtors receiving $17.0 million of net value. Under the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), the Debtors received certain additional tax refunds in the amount of approximately $22.4 million. Further, the Debtors received approximately $1.9 million in certain other tax refunds and anticipate receiving certain additional state tax refunds in the amount of approximately $500,000, proceeds of a certain Court-approved settlement of intercompany claims between the Debtors and Forever 21 Korea Retail, LLC in the amount of approximately $205,000, and proceeds of a certain duty drawback claim.[31]

### G.   Appointment and Investigation of the Official Committee.

On October 11, 2019, the United .States Trustee filed the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 197] notifying parties in interest that the United States Trustee had appointed a statutory committee of unsecured creditors (the "Official Committee") in the Chapter 11 Cases. The Official Committee was composed of the following members: KNF International Co. LTD, Intec, Ltd, Eroglu Giyim Sanayi Ticaret, A.S., Simon Property Group, Inc., Brookfield Property REIT, Inc., The Macerich Company, and AT&T Services, Inc. The Official Committee had retained Kramer Levin Naftalis & Frankel LLP and Saul Ewing Arnstein & Lehr LLP as its legal counsel, AlixPartners, LLP as its financial advisor, and Malfitano Advisors, LLC as its asset disposition consultant. The Official Committee had established a website (www.Forever21Committee.com) that contains certain information for general unsecured creditors.

The Official Committee, pursuant to section 1103 of the Bankruptcy Code, was separately conducting a parallel investigation into potential claims and causes of action belonging to the Debtors' estates (the "Committee Investigation"). At the end of its investigation, the Official Committee did not oppose the sale of such potential claims and causes of action to the Buyer under the Asset Purchase Agreement.

### H.   The Administrative Claims Settlement.

On November 5, 2020, the Debtors filed the 9019 Motion. On December 22, 2020, the Court entered an order granting the 9019 Motion [Docket No. 1724]. The 9019 Motion sought approval of certain Settlement Procedures (as defined in the 9019 Motion) that provided Holders of General Administrative Claims the ability to opt in to the Settlement. As set forth in greater detail in the Settlement Procedures, under the Settlement Holders of General Administrative Claims were asked to affirmatively agree to receive less than full payment of their Claims as required by Section 1129(a)(9). To the extent that Holders of General Administrative Claims did not opt in to the Settlement, the Debtors and their advisors reached out to such Holders to ensure such Holders were aware of their options with respect to opting in to the Settlement, choosing to forego opting in to the Settlement, the consequences related thereto, and the alternatives to the Settlement. As of the date hereof, the Debtors and their advisors conducted some 6,800 individual outreach efforts to such Holders of General Administrative Claims to ensure such Holders were given every opportunity to engage on the Settlement and terms of the Plan. As a result of such process, as of the date hereof, the Debtors estimate that holders of approximately 90% by dollar amount of known, timely filed, non-duplicative General Administrative Claims have opted-in to the Settlement. In light of the multiple communication attempts by Debtors and their advisors, the Debtors intend to rely on deemed consent to treatment under the Plan for those Holders of General Administrative Claims that have not opted

---

[31]   The amount of such duty drawback claim remains speculative as of the date hereof, and the receipt of the proceeds thereof, if any, are anticipated to be received no earlier than twelve months after the filing hereof.

in to the Settlement. A further discussion of deemed consent is included in Article IV.E of this Disclosure Statement.

## IX.    RISK FACTORS

Holders of Claims and Interests should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.

### A.    Bankruptcy Law Considerations.

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims and Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims and Interests in such Impaired Classes.

#### 1.    Parties in Interest May Object to the Plan's Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Court will reach the same conclusion.

#### 2.    The Conditions Precedent to the Effective Date of the Plan May Not Occur.

As more fully set forth in Article VIII of the Plan, the Effective Date is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Effective Date will not take place.

#### 3.    The Debtors May Fail to Satisfy Vote Requirements.

If votes are received in number and amount sufficient to enable the Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan of reorganization. There can be no assurance that the terms of any such alternative chapter 11 plan of reorganization would be similar or as favorable to the Holders of Allowed Claims and Interests as those proposed in the Plan.

#### 4.    The Debtors May Not Be Able to Secure Confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the

value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Court will confirm the Plan. A non-accepting Holder of an Allowed Claim or Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Court, it is unclear what, if anything, Holders of Allowed Claims and Interests against them would ultimately receive on account of such Allowed Claims and Interests.

The effectiveness of the Plan is also subject to certain conditions as described in Article VIII of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims and Interests will receive on account of such Allowed Claims and Interests.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.

5. **Nonconsensual Confirmation.**

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

6. **The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code.**

If the Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling in a controlled manner affecting the business as a going concern, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, and (d) the absence of a consensual resolution among the various creditor constituencies as set forth in the Settlement.

7. **The Debtors May Object to the Amount or Classification of a Claim.**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim or Interest where such Claim or Interest is subject to an objection. Any Holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

8. **Risk of Non-Occurrence of the Effective Date.**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

9. **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.**

The distributions available to Holders of Allowed Claims and Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Court orders certain Allowed Claims or Interests to be subordinated to other Allowed Claims or Interests. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims, Interests, and creditor recoveries that will be forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims and Interests may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims or Interests may vary from the estimated Claims and Interests contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims and Interests under the Plan.

10. **Releases, Injunctions, and Exculpations Provisions May Not Be Approved.**

Article IX of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Wind-Down Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations (including, for the avoidance of doubt, the definitions of Released Parties, Releasing Parties, and Exculpated Parties) provided in the Plan are subject to consent by parties in interest and may not be approved. If the releases are not approved, certain parties may not be considered Released Parties, Releasing Parties, or Exculpated Parties, and certain Released Parties may withdraw their support for the Plan.

11. **The Total Amount of Allowed Administrative and Priority Claims May Exceed the Amount of Distributable Cash and/or Be Higher Than Anticipated.**

The amount of Cash the Debtors ultimately receive prior to and following the Effective Date may be lower than anticipated. Additionally, Allowed General Administrative Claims and Allowed Other Priority Claims may likely exceed the total amount of Distributable Cash and/or be higher than anticipated. Accordingly, it is anticipated that the Debtors will not be able to pay in full in cash all General Administrative Claims and Other Priority Claims on the Effective Date and that the Debtors may not be

able to confirm the Plan absent consent from Holders thereof to accept less than full payment of their Claims as required by section 1129(a)(9) of the Bankruptcy Code.

12.  **The Court May Not Approve Holders of Administrative Claims', Priority Tax Claims', and Other Priority Claims' Deemed Consent to Treatment that Is Different from that Set Forth in the Bankruptcy Code.**

The Court may not approve the deemed consent mechanism provided for in the Plan. Requiring Holders of Administrative Claims, Priority Tax Claims, and Other Priority Claims to affirmatively agree to receive treatment for such Claim that is different from that set forth in 11 U.S.C. § 1129(a)(9) could threaten the Debtors' ability to confirm the Plan and the orderly distribution of the estates' remaining value, to the detriment of such claimants and others.

**B.    Risks Related to Recoveries under the Plan.**

1.    **Risks Related to the Settlement.**

As described above, the Settlement Parties entered into the Settlement to resolve certain Administrative Settlement Claims. Although the Debtors believe that all the Settlement Parties are working diligently to ensure that the Settlement Agreement is consummated, the Debtors are aware that there are certain risks associated with this process. Specifically, if there are insufficient opt ins to the Settlement by Holders of General Administrative Claims, the Debtors may be unable to confirm a Plan.

2.    **The Recovery for Holders of Allowed Crossover Unsecured Claims and Other Unsecured Claims is Uncertain.**

The ultimate Cash distributions to Holders of Crossover Unsecured Claims and Other Unsecured Claims is dependent on several factors and cannot be determined at this time. Such distributions are also subject to the application of certain bankruptcy and nonbankruptcy law and may be required to comply with certain tax and securities laws restrictions and may subject the Wind-Down Debtors to obligations under applicable securities law.

**X.    SOLICITATION AND VOTING PROCEDURES**

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims and Interests in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order.

*The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan.*

---

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY.**
PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

---

**A.    Holders of Claims and Interests Entitled to Vote on the Plan.**

Under the provisions of the Bankruptcy Code, not all holders of claims against a debtor are entitled to vote on a chapter 11 plan. The table in Article IV.A of this Disclosure Statement provides a summary

of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Classes 3A and 3B (collectively, the "Voting Classes"). Holders of Claims and Interests in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims and Interests in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes from Holders of Claims and Interests in Classes 1, 2, 4, 5, 6, and 7. Additionally, the Disclosure Statement Order provides that certain Holders of Claims and Interests in the Voting Classes, such as those Holders whose Claims and Interests have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

B.      **Voting Record Date.**

**The Voting Record Date is [●]**. The Voting Record Date is the date on which it will be determined which Holders of Claims and Interests in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims and Interests have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim or Interest.

C.      **Voting on the Plan.**

**The Voting Deadline is [●], 2021, at 4:00 p.m.** prevailing Eastern Time. In order to be counted as votes to accept or reject the Plan, all Ballots must be properly executed, completed, and delivered (either by using the return envelope provided, by first class mail, overnight courier, or personal delivery) so that the Ballots are **actually received** by the Notice and Claims Agent on or before the Voting Deadline at the following address:

<div style="border:1px solid black; text-align:center">

**DELIVERY OF BALLOTS**

**FOREVER 21, INC. BALLOTS PROCESSING**
**C/O PRIME CLERK LLC**
**60 EAST 42ND STREET, SUITE 1440**
**NEW YORK NY 10164-4575**

</div>

D.      **Ballots Not Counted.**

**No ballot will be counted toward Confirmation if, among other things**: (i) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (ii) it was transmitted by facsimile or other electronic means (other than the E-Ballot Portal); (iii) it was cast by an entity that is not entitled to vote on the Plan; (iv) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated or disputed for which the applicable Claims Bar Date has passed and no Proof of Claim was timely filed; (v) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order and the Solicitation Procedures); (vi) it was sent to the Debtors, the Debtors' agents/representatives (other than the Notice and Claims Agent), an administrative agent (except as otherwise permitted by the Disclosure Statement Order), or the Debtors' financial or legal advisors instead of the Notice and Claims Agent; (vii) it is unsigned; or (viii) it is not clearly marked to either accept or reject the Plan or it is marked both to accept

and reject the Plan. ***Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.***

<div style="border: 1px solid black; text-align: center;">

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE NOTICE AND CLAIMS AGENT AT 877-510-9565 OR 917-947-5437 (INTERNATIONAL). ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL <u>NOT</u> BE COUNTED.**

</div>

### E. Confirmation Hearing.

The Court has scheduled the Confirmation Hearing for [●], 2021 (prevailing Eastern Time). The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than [●], 2021, at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order, incorporated herein by reference.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in the *Wall Street Journal*, National Edition, to provide notification to those persons who may not receive notice by mail. The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

## XI. CONFIRMATION OF THE PLAN

### A. Requirements for Confirmation of the Plan.

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims and Interests.

At the Confirmation Hearing, the Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11; and (3) the Plan has been proposed in good faith.

### B. Best Interests of Creditors/Liquidation Analysis.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Pursuant to the Sale, the Debtors already sold substantially all of their assets. As a result, a chapter 7 proceeding will do nothing more than create additional costs associated with converting to a

chapter 7 liquidation. These additional costs include a percentage fee based on disbursements, as well as additional professional fees associated with a chapter 7 trustee selecting advisors.

While information regarding the additional costs are speculative, the costs are clearly higher and more burdensome for the Debtors' estates than the current proposed Plan (which do not have such incremental costs).

With respect to conversion from chapter 11 to chapter 7 and the related increased costs, delays, and lower recoveries, one bankruptcy judge in the District of Delaware and one bankruptcy judge in the Southern District of New York observed:

- "Conversion to chapter 7 would not increase the asset recoveries, but would add substantial costs and delays to the process before unsecured creditors would receive any distribution." *In re New Century TRS Holdings, Inc.*, 390 B.R. 140, 166 (Bankr. D. Del. 2008).

- "[G]iven the loss in value no new fiduciary could be expected to come up to speed in this case . . . without a destructive delay . . . unless he or she were to immediately hire the people that are implementing the wind down, which would be a difficult task without doing any analysis on his or her part, the resulting delay would seriously affect the sale value and greatly diminish the likelihood of there being a recovery here for at least the administrative claimants in full." *In re Hostess Brands, Inc*., No. 12-22052 (Bankr. S.D.N.Y. Nov. 21, 2012), Hr'g Tr. at 148:17-149:6.

Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

A liquidation analysis is attached hereto as **Exhibit B**.

### C. Feasibility.

The Bankruptcy Code requires that a chapter 11 plan provide for payment in full of all administrative and priority claims unless holders of such claim consent to other treatment. The Plan provides for the payment of Priority and Administrative obligations from Distributable Cash. It is likely there will not be sufficient Distributable Cash to satisfy all Administrative and Priority claims in full upon the Effective Date. The Debtors will be required to obtain consent from any such claim holder that is not otherwise paid in full in Cash. The Debtors believe that the Plan is feasible on these alternative bases.

### D. Acceptance by Impaired Classes.

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[32]

---

[32] A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the Holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the Holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the Holder of such claim or equity interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in a dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

### E. Confirmation Without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

#### 1. No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class

#### 2. Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## XII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction.

The following discussion is a summary of certain United States federal income tax consequences of the consummation of the Plan to the Debtors, the Wind-Down Debtors, and to certain Holders of Claims. The following summary does not address the United States federal income tax consequences to Holders of Claims not entitled to vote to accept or reject the Plan.  This summary is based on the United States Internal Revenue Code of 1986, as amended ("IRC"), the United States Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the United States Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained and neither the Debtors nor the Wind-Down Debtors intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below.  The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of United States federal income taxation that may be relevant to the Debtors, the Wind-Down Debtors, or to certain Holders of Claims in light of their individual circumstances.  This discussion does not address tax issues with respect to such Holders of Claims subject to special treatment under the United States federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, small business investment companies, foreign taxpayers, Persons who are related to the Debtors within the meaning of the IRC, Persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, and regulated investment companies and those holding, or who will hold, consideration received pursuant to the Plan as part of a hedge, straddle, conversion, or other integrated transaction).  No aspect of state, local, estate, gift, or non-United States taxation is addressed.  Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds Claims as "capital assets" (within the meaning of Section 1221 of the IRC).  This discussion does not address special considerations that may apply to persons who are both Holders of Claims and Holders of Interests. This summary also assumes that the various debt and other arrangements to which the Debtors are a party will be respected for United States federal income tax purposes in accordance with their form and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of Section 897 of the IRC. This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below.  This summary does not address the United States federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, or (b) that are deemed to accept or reject the Plan.

For purposes of this discussion, a "United States Holder" is a Holder that for United States federal income tax purposes is:  (i) an individual citizen or resident of the United States; (ii) a corporation created or organized under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate the income of which is subject to United States federal income taxation regardless of the source of such income; or (iv) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the

trust's administration and one or more "United States persons" (within the meaning of Section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a "United States person" (within the meaning of Section 7701(a)(30) of the IRC). For purposes of this discussion, a "Non-United States Holder" is any Holder that is not a United States Holder or a partnership (or other entity treated as a partnership or other pass-through entity for United States federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for United States federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the partnership or pass-through entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders are urged to consult their respective tax advisors regarding the United States federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-UNITED STATES TAX CONSEQUENCES OF THE PLAN.**

       **B.**      **Certain United States Federal Income Tax Consequences of the Plan to the Debtors and the Wind-Down Debtors.**

The Debtors engaged in various assets sales, and as a result of, or in connection with, such asset sales, the Debtors recognized certain gains and/or losses (including in an amount equal to the difference between the fair market value of the assets sold and the Debtors' tax basis in such assets). Any available Debtor attributes may be available to offset, in whole or in part, any gains that were recognized as a result of, or in connection with, such asset sales. To the extent that any gains could not be entirely offset with available tax attributes, a cash tax liability could arise as a result of, or in connection with, such asset sales. The Debtors and the Wind-Down Debtors do not currently anticipate that a cash tax liability is likely to arise in connection with the Restructuring Transactions.

       **C.**      **Certain United States Federal Income Tax Consequences of the Plan to United States Holders of Allowed Claims Entitled to Vote.**

The following discussion assumes that the Wind-Down Debtors will undertake the Restructuring Transactions currently contemplated by the Plan. United States Holders are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

       1.      **Consequences to Holders of Allowed Class 3A and 3B Claims**

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release, and discharge of, and in exchange for their Claims, each United States Holder of an Allowed Class 3A Crossover Unsecured Claim and Allowed Class 3B Other Unsecured Claim shall receive its Pro Rata share of any Distributable Cash.

Each such Holder will be treated as exchanging such Claim in a taxable exchange under Section 1001 of the IRC for any such Distributable Cash. Accordingly, subject to the rules regarding accrued but untaxed interest, each Holder of such Claim should recognize gain or loss equal to the difference between

(i) the amount of any Distributable Cash received in exchange for such Claim, and (ii) such Holder's adjusted basis, if any, in such Claim.

The character of such gain or loss as capital or ordinary will be determined by a number of factors including the tax status of the United States Holder, whether the Claim constitutes a capital asset in the hands of the United States Holder, whether and to what extent the United States Holder had previously claimed a bad-debt deduction with respect to its Claim, and the potential application of the accrued interest and market discount rules discussed below. If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the United States Holder held its Claim for more than one year at the time of the exchange.

2.      **Accrued Interest**

To the extent that any amount received by a United States Holder of an Allowed Class 3A or Class 3B Claim under the Plan is attributable to accrued but untaxed interest on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the United States Holder as ordinary interest income (to the extent not already taken into income by the United States Holder). Conversely, a United States Holder of an Allowed Class 3A or Class 3B Claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the United States Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the Distributable Cash received by a United States Holder of an Allowed Class 3A or Class 3B Claim is not sufficient to fully satisfy all principal and interest on an Allowed Claim, the extent to which such Distributable Cash will be attributable to accrued interest is unclear. Under the Plan, the Distributable Cash distributed to United States Holders of Allowed of a Class 3A or Class 3B Claims will be allocated first to the principal amount such Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for United States federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated to principal, rather than interest. Certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that any Distributable Cash received by the United States Holder should be allocated in some way other than as provided in the Plan. United States Holders of Allowed Class 3A or Class 3B Claims should consult their own tax advisors regarding the proper allocation of the Distributable Cash received by them under the Plan.

3.      **Market Discount**

Although not necessarily free from doubt, the "market discount" provisions of the IRC are arguably inapplicable to the kind of trade and ordinary course Claims that constitute the Claims in Class 3A and Class 3B. United States Holders should consult with their own tax advisors regarding the potential application of the "market discount" rules to their Claims.

4.      **Limitations on Use of Capital Losses**

A United States Holder of a Class 3A or Class 3B Claim who recognizes capital losses will be subject to limits on their use of capital losses. For a non-corporate United States Holder, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (i) $3,000 ($1,500 for married individuals filing separate returns) or (ii) the excess of the capital losses over the capital gains. A non-corporate United States Holder may carry over unused capital losses

and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate United States Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. A corporate United States Holder who has more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. Corporate United States Holders may only carry over unused capital losses for the five years following the capital loss year but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

### 5. Medicare Tax

Certain United States Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, gains from the sale or other disposition of capital assets. United States Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

### D. Certain United States Federal Income Tax Consequences of the Plan to Non-United States Holders of Allowed Class 3A and 3B Claims.

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain United States federal income tax consequences of the Plan to Non-United States Holders. This discussion does not include any non-United States tax considerations. The rules governing the United States federal income tax consequences to Non-United States Holders are complex. Each Non-United States Holder is urged to consult its own tax advisor regarding the United States federal, state, local, non-United States, and non-income tax consequences of the consummation of the Plan to such Non-United States Holder.

### 1. Gain Recognition

Any gain realized by a Non-United States Holder on the exchange of its Allowed Class 3A or Class 3B Claim generally will not be subject to United States federal income taxation unless (a) the Non-United States Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-United States Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-United States Holder in the United States).

If the first exception applies, the Non-United States Holder generally will be subject to United States federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-United States Holder's capital gains allocable to United States sources exceed capital losses allocable to United States sources during the taxable year of the exchange. If the second exception applies, the Non-United States Holder generally will be subject to United States federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-United States Holder's conduct of a trade or business in the United States in the same manner as a United States Holder (except that the Medicare tax would generally not apply). In order to claim an exemption from withholding tax, such Non-United States Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-United States Holder is a corporation, it may be subject to a "branch profits tax" at a 30 percent rate (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

2. **Payments of Interest (Including Interest Attributable to Accrued but Untaxed Interest)**

Subject to the discussion of backup withholding and FATCA below, interest income (which, for purposes of this discussion of Non-United States Holders, includes original issue discount and accrued but untaxed interest, including in each case any such amounts paid to a Non-United States Holder under the Plan) of a Non-United States Holder that is not effectively connected with a United States trade or business carried on by the Non-United States Holder will qualify for the so-called "portfolio interest exemption" and, therefore, will not be subject to United States federal income tax or withholding, provided that:

- the Non-United States Holder does not own, actually or constructively, a 10 percent or greater interest in Forever 21 in the case of interest received pursuant to the Plan, within the meaning of Section 871(h)(3) of the IRC and Treasury Regulations thereunder;

- the Non-United States Holder is not a controlled foreign corporation related to Forever 21, in the case of interest received pursuant to the Plan, actually or constructively through the ownership rules under Section 864(d)(4) of the IRC;

- the Non-United States Holder is not a bank that is receiving the interest on an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business; and

- the beneficial owner gives Forever 21 (or Forever 21's paying agent or other withholding agent) an appropriate IRS Form W-8 (or suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed establishing its status as a Non-United States Holder.

A Non-United States Holder that does not qualify for the exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income will generally be subject to United States federal income tax and withholding at a 30 percent rate unless an applicable income tax treaty reduces or eliminates such withholding and the Non-United States Holder claims the benefit of that treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed. As described above in more detail under the heading "Accrued Interest," the aggregate consideration to be distributed to holders of Allowed Class 3A Claims and Allowed Class 3B Claims will be allocated first to the principal amount of such Allowed Class 3A Claims and Allowed Class 3B Claims, respectively, with any excess allocated to unpaid interest that accrued on these Claims, if any.

To claim an exemption from withholding, such Non-United States Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe). If a Non-United States Holder is eligible for the benefits of any income tax treaty between the United States and its country of residence, any interest income that is ECI will be subject to United States federal income tax in the manner specified by the treaty if the Non-United States Holder claims the benefit of the treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed. In addition, a corporate Non-United States Holder may, under certain circumstances, be subject to an additional "branch profits tax" at a 30 percent rate (or such lower rate provided by an applicable income tax treaty) on its effectively connected earnings and profits attributable to such interest (subject to adjustments).

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest. Non-United States Holders that do not timely provide the applicable withholding

agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS. Non-United States Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

### 3. FATCA

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their United States account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally United States-source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type that can produce United States-source interest or dividends. FATCA withholding will apply even if the applicable payment would not otherwise be subject to United States federal nonresident withholding.

FATCA withholding rules were previously scheduled to take effect on January 1, 2019, that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce United States-source interest or dividends. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Non-United States Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-United States Holder.

### 4. Information Reporting and Back-Up Withholding

The Debtors and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest in connection with distributions under the Plan and will comply with all applicable information reporting requirements. The IRS may make the information returns reporting such interest and withholding available to the tax authorities in the country in which a Non-United States Holder is resident. In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a United States Holder, and, for a Non-United States Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-United States Holder's eligibility for an exemption). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its United States federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-UNITED STATES TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XIII.   RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  April 19, 2021

Respectfully submitted,

Forever 21, Inc.,
on behalf of itself and each of the other Debtors

By:       */s/ Jonathan Goulding*
Name:    Jonathan Goulding
Title:    Chief Restructuring Officer

## EXHIBIT A

**Plan**

**<u>EXHIBIT B</u>**

**Liquidation Analysis**

# LIQUIDATION ANALYSIS

## General Assumptions

Hypothetical Chapter 7 recoveries set forth in this analysis (this "**Liquidation Analysis**") were determined through multiple steps, as set forth below.  The basis of the Liquidation Analysis is the Debtors' cash balance and assets as of April 9, 2021 (the "**Conversion Date**").  The Liquidation Analysis assumes that the Debtors would commence a Chapter 7 liquidation on or about the Conversion Date under the supervision of a court-appointed Chapter 7 Trustee.  The Liquidation Analysis reflects the wind down and liquidation of substantially all of the Debtors' remaining assets and the distribution of available proceeds to the claim holders during the period after the Conversion Date.

THE DEBTORS BELIEVE THAT ANY ANALYSIS OF A HYPOTHETICAL LIQUIDATION IS NECESSARILY SPECULATIVE.  THERE ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS UNDERLYING THE LIQUIDATION ANALYSIS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS OR A CHAPTER 7 TRUSTEE.  NEITHER THE ANALYSIS, NOR THE FINANCIAL INFORMATION ON WHICH IT IS BASED, HAS BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS.  THERE CAN BE NO ASSURANCE THAT ACTUAL RESULTS WOULD NOT VARY MATERIALLY FROM THE HYPOTHETICAL RESULTS PRESENTED IN THE LIQUIDATION ANALYSIS.

## Summary Notes to Liquidation Analysis

1.  *Dependence on assumptions*.  The Liquidation Analysis depends on a number of estimates and assumptions.  Although developed and considered reasonable by the management and the advisors of the Debtors, the assumptions are inherently subject to uncertainties and contingencies beyond the control of the Debtors or their management.  The Liquidation Analysis is also based on the Debtors' best judgment of how numerous decisions in the liquidation process would be resolved.  Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation and actual results would vary materially and adversely from those contained herein.

2.  *Dependence on forecasted financials*.  This Liquidation Analysis contains numerous estimates that are still under review and it remains subject to further legal and accounting analysis.

3.  *Chapter 7 liquidation process*.  This liquidation of the Debtors' assets is assumed to be completed over a four- to six-month period.  During this time, the Chapter 7 Trustee would hold a 341 creditors meeting, investigate the Debtors' assets, and would also be working on administrative activities, such as final creditor distributions needed to complete the wind down of the Estates.

4.   *Claim Estimates.* In preparing this Liquidation Analysis, the Debtors have preliminarily estimated an amount of claims based upon a review of the Debtors' estimated balance sheet and claims filed to date. The estimate of the amount of claims set forth in this Liquidation Analysis should not be relied upon for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of claims under the Plan. The actual amount of claims could be materially different from the amount of claims estimated in the Liquidation Analysis.

| Forever 21, Inc. - Liquidation Analysis | | | | | |
|---|---|---|---|---|---|
| *($ in millions)* | | | | | |
| | | Plan Scenario | | Chapter 7 Scenario | |
| | Notes | Low | High | Low | High |
| **Assets** | | | | | |
| Cash in Estate Accounts | A | $ 31.2 | $ 31.2 | $ 31.2 | $ 31.2 |
| Other Receivables | B | 0.5 | 1.0 | 0.5 | 1.0 |
| **Total** | C | **$ 31.7** | **$ 32.2** | **$ 31.7** | **$ 32.2** |
| | | | | | |
| **Chapter 7 Related Costs** | | | | | |
| Chapter 7 Trustee Costs | D | $ - | $ - | $ (1.0) | $ (1.0) |
| Chapter 7 Professional Fee Costs | E | - | - | (5.2) | (4.0) |
| **Total Chapter 7 Related Costs** | | **$ -** | **$ -** | **$ (6.2)** | **$ (5.0)** |
| | | | | | |
| **Total Proceeds Available for Distribution** | | **$ 31.7** | **$ 32.2** | **$ 25.6** | **$ 27.3** |
| | | | | | |
| **Total Administrative and Priority Claims** | F | **$ 260.0** | **$ 240.0** | **$ 260.0** | **$ 240.0** |
| ***Total Recovery for Administrative Claims*** | | *12.2%* | *13.4%* | *9.8%* | *11.4%* |

**Notes:**

A.  Cash balances are as of 4/9/21.

B.  Estimate of potential state tax refunds, duty drawback claims, F21 Korea settlement, and other claims.

C.  The Debtor is not aware of any other claims or causes of action available to creditors in the Chapter 7 scenario.

D.  These amounts represent a Chapter 7 Trustee Fee of 3% of assets.

E.  Chapter 7 professional fees include estimates of fees and expenses for four to six months required during the Wind-Down period, including those responsible for evaluating pursuing causes of action.

F.  The Administrative and Priority claims are based on preliminary estimates and have not been fully reconciled. Total amount of claims will be the same across scenarios once claims are fully reconciled.