## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
| FOREVER 21, INC., *et al.*,[1] | Case No. 19-12122 (MJW)<br>(Jointly Administered) |
| Debtors. | **Hearing Date: July 22, 2021, at 3:00 p.m.**<br>**Objection Deadline: July 12, 2021 at 4 p.m.**<br>**Extended for the U.S. Trustee**<br><br>**Ref: Docket Nos. 585, 1957, 1959, and 1960** |

## UNITED STATES TRUSTEE'S OBJECTION TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) APPROVING THE DISCLOSURE STATEMENT, (B) ESTABLISHING THE VOTING RECORD DATE, VOTING DEADLINE, AND OTHER DATES, (C) APPROVING PROCEDURES FOR SOLICITING, RECEIVING, AND TABULATING VOTES ON THE PLAN, AND (D) APPROVING THE MANNER AND FORMS OF NOTICE AND OTHER RELATED DOCUMENTS

Andrew R. Vara, the United States Trustee for Region 3 (the "U.S. Trustee"), through his counsel, files this Objection to Debtors' Motion for Entry of an Order (A) Approving the Disclosure Statement (B) Establishing The Voting Record Date, Voting Deadline, And Other Dates, (C) Approving Procedures For Soliciting, Receiving, And Tabulating Votes On The Plan, And (D) Approving The Manner And Forms Of Notice And Other Related Documents, which was filed at Dkt. No. 585, on December 18, 2019 (the "Motion"). The U.S. Trustee also submits this Objection to the revised Disclosure Statement filed on June 11, 2021 at Dkt. No.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Forever 21, Inc. (4795); Alameda Holdings, LLC (2379); Forever 21 International Holdings, Inc. (4904); Forever 21 Logistics, LLC (1956); Forever 21 Real Estate Holdings, LLC (4224); Forever 21 Retail, Inc. (7150); Innovative Brand Partners, LLC (7248); and Riley Rose, LLC (6928). The location of the Debtors' service address is: 3880 N. Mission Road, Los Angeles, California 90031.

1957 (the "Disclosure Statement"), as well as to the revised Solicitation Procedures,[2] and revised

proposed form of order, ballots, notices, letters and other documents included in Dkt. No. 1959.

In support of the Objection, the U.S. Trustee states as follows:

## **PRELIMINARY STATEMENT**

1.      The Debtors in these cases sold their business by way of a section 363 sale in

February of 2020.   They have been admittedly administratively solvent by at least $100 million

dollars since that time.   In the fall of last year, the Debtors commenced a process, with the

Court's approval, whereby they sent forms to all of their administrative creditors asking them to

opt-***in*** to the proposed treatment of their claims under the Plan, whereby they would receive a

distribution of at least 11% of their allowed administrative claims.

2.      The Debtors indicate, in their amended Disclosure Statement, that they have

received opt-***in*** forms from approximately 90% of their administrative creditors, but not from the

remaining 10%, even though representatives of the Debtors reached out more than five times on

average to each such creditor.   *See* Dkt. 1957, ecf pages 10 and 20 of 61. Counsel to the Debtors

indicate that the 10% accounts for approximately $11 million in administrative claims, although

that figure would be closer to $20 million if based on the amount of the administrative claims

listed in the Debtors' Liquidation Analysis and May 2021 Monthly Operating Report.   Even

assuming the $11 million figure is correct, there does not appear to be anything near sufficient

funds in the Debtors' estates to pay such claims in full, as required under section 1129(a)(9) of

---

[2]    Capitalized terms that are not defined herein have the definitions set forth in the Plan, or Disclosure Statement, as applicable.

the Code, unless the funds that have been set aside to pay professional fees are made available to pay non-professional administrative creditors.[3]

3.      The Debtors now seek Court approval for procedures whereby they would send to those administrative creditors who did not return an opt-*in* form regarding their treatment under the Plan, an opt-*out* form regarding their treatment under the Plan.   The Debtor also seek approval to send opt-*out* forms to all priority tax and other priority creditors.   Such procedures are in furtherance of a Plan that provides that if an administrative, priority tax or other priority creditors does not return an opt-*out* form, or file an objection to confirmation, such creditor shall be deemed to consent to receive under the Plan a small fraction of what they are mandated to be paid under § 1129(a)(9) of the Bankruptcy Code.   *See* Dkt. 1956, Art. II. A.1, and Art. III, B.2, quoted below in the Factual Background.

4.      The Debtors' request for approval to send opt-*out* forms to those administrative creditors who have not returned an opt-*in* form, and to all of their priority tax and other priority creditors, should be denied for two reasons.   First, the proposal procedure violates 11 U.S.C. §§ 1129(a)(9) because, in the absence of affirmative consent, the Debtors are statutorily required to pay the administrative expense claims and priority claims in full.

5.      There are only a small number of written opinions addressing whether the agreement of a creditor to receive less under a plan than that provided under section 1129(a)(9) can be implied by silence, or whether such agreement must be affirmative. The majority of such

---

[3]     Even if those funds were made available to pay non-professional administrative creditors who have *not* agreed to opt-*in* to the Plan's treatment, it is not clear whether those funds would be sufficient to pay such claims in full. The Disclosure Statement references there being $8.3 million remaining in the Carve-Out Account.  *See* Dkt. No. 1957, page 16 of 61.

opinions require affirmative agreement.   The one written opinion that allowed an opt-***out***

process for administrative creditors involved facts vastly different from those of the present case.

In addition, that case was described by this Court as based on a "questionable fiction."   *See In re*

*Molycorp*, *Inc.*, 562 B.R. 67, 78, n. 54. (Bankr. D. Del. 2017), discussing *Teligent*, 282 B.R. 765

(Bankr. S.D. New York. 2002).

6.      Requiring an affirmative agreement is also consistent with this Court's opinion in

*In re Washington Mutual, Inc.,* 442 B.R. 314, 355 (Bankr. D. Del. 2011), *Emerge Energy*

*Services LP*, 2019 Bankr. LEXIS 3717, Case No. 19-11563, at *54-55 (Bankr. D. Del, Dec. 5,

2019)(KBO), and other Delaware decisions that have required affirmative consent from creditors

or interest holders with respect to third party releases.

7.      The second reason the Debtors' request to use opt-***outs*** should be denied is

because those administrative creditors who did not return the opt- ***in*** forms (after being contacted

on average over 5 times by the Debtors), have made it clear that they do not agree to accept less

than what is provided under § 1129(a)(9).   The Debtors should not be allowed to pull a bait and

switch by now sending those same creditors an opt-***out*** form.   Such a reverse procedure is likely

to confuse such creditors, especially as the majority of them are foreign.   Such creditors may

well think the opt-***out*** is simply another copy of the opt-***in*** form, which did not require them to

take any action if they did not agree to accept the proposed payout under the Plan.

8.      More importantly, the Debtors should not be permitted to deem agreement from

administrative creditors to accept a reduced distribution when such creditors ***have already***

***communicated to the Debtors that they do not agree to such treatment*** by not returning the opt-

***in*** form.   To deem a creditor to implicitly agree to a proposal that it has already expressly

rejected defies logic and fairness, and does not comply with the requirements of section

1129(a)(9) of the Code.

9.    There is another significant issue, namely the Debtors' inability to comply with

section 1129(a)(10) of the Code.   The sole voting classes proposed by the Debtors are two

classes of general unsecured claims.[4]   The Debtors admit, in the notice they seek to send to such

creditors, that they will receive no distribution under the Plan.   Such creditors therefore must be

deemed to reject the Plan under section 1126(g) of the Code, leaving no other possible class of

impaired creditors who could vote on the plan.

10.    These issues are ripe because the Debtors seek the Court's approval now of

solicitation procedures that would permit them (a) to send opt-*out* forms to those administrative

creditors who did not previously return *opt-in* forms, as well as to all priority tax creditors other

priority creditors, and (b) to send ballots to all general unsecured creditors to vote on the Plan,

even though such creditors must be deemed to reject the Plan.

11.    In addition, because these Debtors are severely administratively insolvent, they

should not be permitted to incur significant additional costs soliciting a plan that cannot be

confirmed.   As part of the relief requested by way of the proposed form of order, the Debtors

ask for authority to *prepay* their claims agent, Prime Clerk, for the cost of solicitation.   *See* Dkt.

No. 1959-1, ¶ 20.   Debtors' counsel has informed the U.S. Trustee's counsel that those costs are

estimated at two hundred-thousand dollars ($200,000). In addition, proceeding with solicitation

---

[4]   Class 3 A consists of general unsecured creditors who also hold administrative claims.   Class 3 B
consists of general unsecured creditors who do not also hold administrative claims.   It is unclear
what justification, if any, exists for dividing these similarly situated general unsecured creditors into
separate classes based on whether they also hold administrative claims.   The U.S. Trustee reserves all
rights to object to the same if the Plan is permitted to proceed to confirmation.

of an unconfirmable plan would presumably generate additional fees of the Debtors' counsel, and perhaps other professionals, without providing any benefit to these administratively insolvent estates.[5]

12.     The U.S. Trustee also objects to the Disclosure Statement including information that is inaccurate and inadequate.   The inaccurate information includes a greatly exaggerated estimate of what professional fees would be if the cases converted to chapter 7, which is addressed in the accompanying declaration of Alfred T. Giuliano (the "Giuliano Declaration"), annexed hereto as **Exhibit A**.   Accuracy in the Liquidation Analysis is important because, *inter alia*, that analysis is the basis for the Debtors' repeated assertions in the Disclosure Statement, letters, notices and forms they seek to send to administrative creditors that such creditors should agree to their treatment under the Plan because they would receive significantly less in chapter 7. It is also presumably the basis for the Debtors' assertion in the proposed ballots to those general unsecured creditors who also hold administrative claims (Class 3A) that they should vote in favor of the Plan.

13.     Another significant inaccurate statement in the Disclosure Statement (and in the Letter the Debtors propose to send to the Class 3A general unsecured creditors) is the assertion that, under the Plan, the Debtors are waiving all avoidance actions against general unsecured creditors.   That statement, which is being used as a carrot to induce general unsecured creditors to vote in favor of the plan, is a fallacy.   All avoidance actions, and all other causes of action

---

[5]     There are other provisions in the Plan that make it unconfirmable, such as the inclusion of a discharge provision in Art. IX.A of the Plan, even though the Plan is a liquidating plan.   See discussion in Point III of the Argument below.

held by the Debtors, were sold to the buyer of the Debtors' assets in February of 2020.   Other

inaccuracies are detailed in Point II.B of the Argument below.

14.    In addition to factual inaccuracies, the Disclosure Statement fails to disclose

certain important information, detailed in Point II.C of the Argument below.   These include, but

are not limited to, failing to disclose (a) what will be paid to administrative creditors, priority tax

creditors or other priority creditors who do return opt-*out* forms; (b) that professionals have

received, and potentially will continue to receive, a much higher distribution on their claims than

other administrative creditors;[6] and (d) the identity of the proposed Plan Administrator and their

fee structure.

15.    Finally, there is a significant procedures irregularity with the Debtors' Motion.

The Debtors have not filed a motion to approve their current Disclosure Statement regarding

their current Plan, which is one of *liquidation*.   Nor have they filed a motion to approve the

Solicitation Procedures they are currently requesting the Court to approve.   Rather, the only

motion the Debtors have filed seeking approval of a disclosure statement or solicitation

procedures was the Motion filed on December 18, 2019 at Dkt. No. 583.   That Motion was filed

before the Debtors sold their business in February of 2020, and it related to a plan of

*reorganization* that included provisions consistent with section 1129 (a)(9) of the Code relating

to the treatment of administrative claims, priority tax claims and other priority claims.   That plan

included no provision that deemed agreement by any creditors to treatment different than that

provided by section 1129 (a)(9) of the Code, and includes no mention of any opt-out or opt-in

---

[6]    Over $40 million in professional fees have been paid in these cases as of May 31, 2021.   *See*
Monthly Operating Report for May 2021, Dkt. No. 1972, ecf page 6 of 12.

procedure regarding the same.    Similarly, the solicitation procedures addressed in the Motion are significantly different from the current Solicitation Procedures.    The solicitation procedures that were the subject of the Motion do not include any opt-out (or opt-in) forms to be sent to any administrative or priority creditor regarding their treatment under the plan.    The current Solicitation Procedures also seek approval of a number of other forms and documents that were not included in the solicitation procedures filed in December of 2019, and are therefore not addressed by the Motion. A review of the redline included in Dkt. No. 1959, which compares the current solicitation procedures, proposed order, ballots, notices and related documents to those addressed in the Motion, reveal how much those procedures and documents have changed.

16.    For the reasons set forth herein, the Motion should be denied. [7]

## JURISDICTION

17.    Pursuant to (i) 28 U.S.C. § 1334; (ii) applicable order(s) of the United States District Court for the District of Delaware issued pursuant to 28 U.S.C. § 157(a); and (iii) 28 U.S.C. § 157(b)(2)(A), this Court has jurisdiction to hear and determine this Objection.

18.    Under 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of chapter 11 cases filed in this judicial district.    This duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the courts.    *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

---

[7]    The U.S. Trustee's counsel has provided other comments to counsel to the Debtors and the Committee regarding to the proposed form of order approving the Disclosure Statement, the Solicitation Procedures, and the form of ballots, notices, letters and other documents annexed to the proposed order.    The U.S. Trustee's counsel believes these comments will be able to be consensually resolved, but reserves the right to supplement this objection, or to assert additional objections at the hearing on the Motion, if such resolution is not reached.

19.     Under 11 U.S.C. § 307, the U.S. Trustee has standing to be heard on this

Objection. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.),*

33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under

11 U.S.C. § 307, which goes beyond mere pecuniary interest).

## FACTUAL BACKGROUND

### A.  General Case Background

20.     On September 29, 2019 (the "Petition Date"), the Debtors filed voluntary chapter

11 petitions in this Court. The Debtors continue to operate their business as debtors-in-

possession pursuant to 11 U.S.C. §§ 1107 and 1108.

21.     The U.S. Trustee appointed an official committee of unsecured creditors in these

cases on October 11, 2019.

22.     On December 18, 2019, the Debtors filed their initial proposed plan of

reorganization and related disclosure statement, as well as the Motion, which sought approval of

that disclosure statement and of related solicitation procedures.  *See* Dkt. Nos. 583, 584 and 585.

A hearing on such motion never took place.

23.     In late January 2020, the Debtors changed course, seeking to sell substantially all

of their assets.  By Order dated February 13, 2020, this Court approved the sale.  *See* Dkt. No.

927.  At that time, the Debtors admitted they were administratively insolvent by approximately

$100 million.  *See* Transcript of hearing of February 11, 2020, Dkt. No. 935, Tr. 38:25 – 39:14;

and Tr. 42:5-13.

24.     By Order of July 17, 2020, the Court prohibited the Debtors from paying any fees

to estate professionals until further order of the Court.  *See* Dkt. No. 1444.  An exception to that

prohibition was later made by the Court for Deloitte, in connection with their services to assist the Debtors in seeking tax refunds.   *See* Dkt. No. 1505.

25.    On August 19, 2020, the U.S. Trustee filed a motion under § 1112(b) of the Bankruptcy Code to convert the Debtors' chapter 11 cases to cases under chapter 7 of the Code (the "Motion to Convert").

26.    At the September 16, 2020 hearing on the Motion to Convert, the Court made an oral ruling granting the motion.   As part of the ruling, the Court stated, "[b]ased on my prior rulings, counsel for the debtor can tell I'm highly skeptical about whether a creditor can be deemed to have consented to a different treatment unless it fails to opt out -- excuse me -- unless it opts out. Failure to opt out is not consent to an agreement, as I held in Washington Mutual." *See* Transcript of September 16, 2020, Tr. 77:15-20.[8]   The Court further directed that conversion of the cases be delayed until it was known whether the Debtors' tax refund requests would be granted.   *Id.*, Tr., 79:10-12, and 80:4-9.

27.    On September 25, 2020, before the Court entered an order on the Motion to Convert, the Debtors filed a Motion to Reconsider Ruling Granting U.S. Trustee's Motion to Convert.   Dkt. No. 590.   In their reply on that motion, the Debtors asserted that they "intend to solicit consent of administrative creditors ahead of plan confirmation through a motion and procedures under Bankruptcy Rule 9019."   *See* Dkt No. 1603, p. 2.   The Debtors attached the

---

[8]    A copy of that transcript is Exhibit B to the Debtors' Motion to Reconsider Ruling Granting U.S. Trustee's Motion to Convert, Dkt. No. 590.

form of Notice of Administrative Claim Settlement, which was an opt-*in* form.    *See* Dkt No.

1603, Ex. A.

28.    By Order dated October 26, 2020, the Court granted the Debtors' motion for

reconsideration, for the reasons set forth on the record at the hearing on October 21, 2020, and

denied the U.S. Trustee's Motion to Convert, without prejudice.    *See* Dkt. No. 1632.

### B. The Motion To Approve Settlement Procedures Relating to Administrative Claims

29.    In November of 2020, the Debtor filed a motion, seeking approval of procedures

to settle the claims of administrative claimants for a small fraction of the approved amounts of

such claims (the "Settlement Procedures Motion").    *See* Dkt. No. 1654.    The Settlement

Procedures Motion sought approval of a process by which the Debtors would send opt-*in* forms

to all administrative claimants regarding the proposed treatment of their claims under the plan.

30.    The U.S. Trustee objected to the motion, primarily because the plan that was filed

concurrently with the motion (Dkt. No. 1649) provided for an opt-*out* process for administrative

creditors regarding their treatment under the plan, rather than an opt-*in* process.    The Court

overruled that objection, stating as follows:

> The first objection, as I understand it, is the fact that there is an opt-in now to the
> settlement while the plan has an opt-out. I will overrule that objection at this time. I
> don't have to decide today if there is going to be an opt-out provision in the plan of
> reorganization [or] whether that would be appropriate under the circumstances.

*See* Transcript of Hearing of December 16, 2020, Dkt. No. 1714, Tr. 28: 14-19.

31.    The Court entered the Order granting the Settlement Procedure Motion on

December 22, 2020.    That Order included the following provision: "For the avoidance of doubt,

11

only those creditors that affirmatively return a signed copy of the Opt-In Form shall be bound by

the terms thereof and parties that fail to return a signed copy of the Opt-In Form shall not be

bound by the terms thereof."   *See* Dkt. No. 1724, ¶ 3 (c).

**C.  The Current Plan and Disclosure Statement**

32.     The current Plan is the Third Amended Plan.   It was filed, along with an

amended Disclosure Statement, on June 11, 2021.   *See* Dkt. Nos. 1956 and 1957.   Also filed at

that time was a revised form of proposed order, solicitation procedures, ballots, notices, letters

and various forms, redlined against what was filed on December 18, 2019.   *See* Dkt. No. 1959.

The Debtors also filed at that time a Notice of Disclosure Statement hearing, with an objection

deadline.   *See* Dkt. No. 1960.   As noted above, the Third Amended Plan, the related Disclosure

Statement and the current Solicitation Procedures are substantively different from those that were

addressed in the Motion, which was filed approximately 18 months ago.   The Debtors have not

filed any amended motion.

33.     The Plan's treatment of holders of Allowed General Administrative Claims is as

follows:

> Subject to the provisions of sections 328, 330(a), and 331 of the Bankruptcy Code,
> except to the extent that a Holder of an Allowed General Administrative Claim and
> the applicable Debtor(s) agree to less favorable treatment with respect to such
> Allowed General Administrative Claim, each Holder of an Allowed General
> Administrative Claim shall receive, in full and final satisfaction, compromise,
> settlement, and release of an in exchange for its Claim, its Pro Rata share of the
> Administrative and Priority Claims Recovery.   All known Holders of General
> Administrative Claims, other than Administrative Settlement Claimants, have been
> sent an Administrative/Priority Claim Consent Form pursuant to which the Debtors
> are seeking the agreement of such Holder to the treatment afforded to such Holder
> hereunder.   ***The failure to return the Administrative/Priority Claim Consent Form***
> ***or to object to Confirmation by a Holder of an Allowed General Administrative***
> ***Claim shall be deemed to be such Holder's consent to receive treatment for such***

12

***Claim that is different from that set forth in section 1129(a)(9) of the Bankruptcy Code.***   Administrative Settlement Claims against the Debtors shall be Allowed and paid solely in accordance with the terms of the Settlement, which is incorporated herein by reference as if fully set forth herein.

Plan, Dkt. 1956, Art. II. A.1 (emphasis added).

34.     The Plan defines "General Administrative Claim" to include Priority Tax Claims.

*See id.* Art. 1.A.48.   Therefore, the provision regarding treatment of Allowed General

Administrative Claims also applies to Priority Tax Claims.

35.     The Plan's treatment of holders of Other Priority Claims is as follows:

*Treatment*:   All known Holders of Other Priority Claims have been sent an Administrative/Priority Claim Consent Form pursuant to which the Debtors are seeking the agreement of such party to the treatment afforded to such Holder hereunder.   The treatment afforded to Holders of Other Priority Claims hereunder is only available if each such Holder agrees to such treatment.   ***The failure to return the Administrative/Priority Claim Consent Form or to object to the Plan shall be deemed to be such Holder's consent to accept less than full payment of its Claim as required by section 1129(a)(9)*** and as contemplated under sections 1124 and 1123(a)(4) of the Bankruptcy Code, and in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive its Pro Rata share of the Administrative and Priority Claims Recovery on the Effective Date, or as soon as reasonably practicable thereafter.

Plan, Dkt. 1956, Art. III. B.2 (emphasis added).

36.     The only classes of claims under the Plan that are permitted to vote are two

classes of General Unsecured Claims.   However, in their proposed Confirmation Hearing

Notice, the Debtors make the following representation:

Holders of unsecured Claims will not receive any cash recovery on account of such Claims <u>unless</u> Holders of Allowed General Administrative Claims and Allowed Other Priority Claims are paid in full in cash. However, the Debtors believe that Allowed General Administrative Claims and Allowed Other Priority Claims will <u>not</u> be paid in full in cash.

13

As such, ***the Debtors anticipate that Holders of unsecured Claims will not receive any cash recovery under the Plan on account of such Claims.***

*See* the proposed Confirmation Hearing Notice, which is Exhibit 8 to the proposed form of Disclosure Statement Order, Dkt. No. 1959-1, ecf page 78 of 103 (bolded, italicized language added).   The same language is included in the letter the Debtors propose to send to creditors in voting classes, which is in Exhibit 7 to the proposed form of Disclosure Statement Order, Dkt. No. 1959-1, ecf page 73 of 103.

### D.  The Debtors' Administrative Claims

37.    After the sale of their assets closed, the Debtors' sought, and had approved, an administrative bar date of June 1, 2020, covering administrative claims arising through March 5, 2020.

38.    In their monthly operating report for October 2020, the Debtors reported that approximately 1,500 administrative claims had been filed by the administrative claims bar date, totaling approximately $337.5 million.   At that time the Debtors further reported that, based on the Debtors' books and records, their best estimate of allowed administrative claims was $248.6 million.   *See* October Monthly Operating Report, Dkt. No. 1679, ecf p. 10 of 12.

39.    The Debtors' most recently filed Monthly Operating Report, for May of 2021, lists Administrative Claims of approximately $229 million.   *See* Dkt. No. 1972, ecf page 8 of 12.   This $229 million is consistent with the figure for administrative and priority claims set forth in the Liquidation Analysis attached to the current Disclosure Statement, which shows a range of such claims to be between $220 million and $240 million.   *See* Dkt. No. 1957, ecf page 61 of 61.

40.     The Debtors indicate, in the Disclosure Statement, that they have received opt-*in*

forms from approximately 90% of their administrative creditors, but not from the remaining

10%, even though representatives of the Debtors reached out more than five times on average to

each such creditor.   *See* Dkt. 1957, ecf pages 10 and 20 of 61.

41.     Debtors' counsel recently informed counsel to the U.S. Trustee that they believe

the administrative claims ultimately will be reduced to approximately $129 million, and of that

amount they have received opt-*in* forms from administrative creditors holding an aggregate of

approximately $118 million, and have not received opt- *in* forms from administrative creditors

holding an aggregate of approximately $11 million.

## ARGUMENT

**I.      The Debtors' Proposed Solicitation Procedures Should Not Be Approved.**

**A.  The Debtors' Request to Send Opt-*Out* Forms to those
Administrative Creditors Who Have Declined to Return Opt-*In* Forms,
and to Priority Tax and Other Priority Creditors, Should be Denied**

42.     Section 1129(a) of the Code provides that the Court shall confirm a plan only if

certain requirements are met.   These requirements include the following, set forth in §

1129(a)(9):

> ***Except to the extent that the holder of a particular claim has agreed to a
> different treatment of such claim,*** the plan provides that—
>
> (A) with respect to a claim of a kind specified in section 507(a)(2) or
> 507(a)(3) of this title, on the effective date of the plan, the holder of such
> claim will receive on account of such claim cash equal to the allowed amount
> of such claim;
>
> (B) with respect to a class of claims of a kind specified in section 507(a)(1),
> 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of this title, each holder of a
> claim of such class will receive—

(i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim;

(C) with respect to a claim of a kind specified in section 507(a)(8) of this title, the holder of such claim will receive on account of such claim regular installment payments in cash—

(i) of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;

(ii) over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and

(iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b)); and

(D) with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8), but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in subparagraph (C).

11 U.S.C. § 1129(a)(9) (emphasis added).

43.     The Debtors' Plan does not propose to pay administrative creditors, priority tax and other priority creditors as required under § 1129(a)(9).   Instead, the Plan proposes that those administrative creditors who already returned opt-*in* forms shall be paid in accordance with the terms of the Settlement.   *See* Plan, Dkt. No. 1956, Art. II.A.1.   The terms of that Settlement guarantee an 11% payout.   *See* opt-*in* form approved by the Court, Dkt. No. 1724-1, p. 6 of 7 ("You will only be bound by the Administrative Claims Settlement to the extent the confirmed Plan provides for a recovery of 11% or greater on account of your administrative claim.").

44.     In contrast, administrative creditors that did not return opt-*in* forms and also do not return opt-*out* forms, together with all priority tax and other priority creditors who do not return opt-*out* forms, shall receive their "Pro Rata share of the Administrative and Priority

16

Claims Recovery," in an unspecified amount.   *See* Plan, Dkt. No. 1956, Art. II.A.1 and Art. III. B.2.   The Plan is silent as to what distribution will be made to those administrative and priority creditors who *do* return an opt-**out** form.

45.    The Solicitation Procedures for which the Debtors now seek Court approval include authority to send an opt-**out** forms to all administrative creditors that did not return an opt-**in** form, as well as to all priority tax and other priority creditors.[9]   That request should be denied.

46.    Allowing the Debtors to now send opt-**out** forms to those same administrative creditors who did not return the **opt-in** forms would effectively negate the creditors' wishes, expressed through their decision not to return an **opt-in** form, to reject the proposed treatment of their claim under the Debtors' Plan.   A creditor cannot be deemed to implicitly agree to a proposal that it has already expressly rejected.

47.    While there are only a handful of written opinions from courts that have addressed the issue of what constitutes an agreement to alternative treatment under section § 1129(a)(9) of the Code, the majority of them have held that each affected creditor must *affirmatively* agree to such treatment.   Silence, through failure to return an opt-**out** form or failure to file an objection, is not sufficient.   *See In re Digital Impact, Inc.,* 223 B.R. 1 (Bankr. N.D. Okla. 1998); *In re Jankins*, 184 B.R. 488 (Bankr. E.D. Va. 1995); *In re Real Wilson*

---

9   As part of the Solicitation Procedures, the Debtors appear to seek authority to be exempted from having to serve the Plan and Disclosure Statement on their administrative, priority tax and other priority creditors, while simultaneously seeking to send such creditors a form asking them to determine whether they agree to the proposed treatment of their claims under the Plan.   *See* proposed order, Dkt. No. 1959-1, ¶¶ 16 (c) and 18. This raises obvious notice issues, and also is inconsistent with Bankruptcy Rule 3017(d), which permits the Court to exempt debtors from serving a plan and disclosure statement on *unimpaired* classes, but not on impaired classes, as the administrative, priority tax and other priority creditors are in these cases.

*Entertainment*, No. 11-15697-B-11, 2013 WL 5352697 (Bankr. E.D. Cal. Sept. 23, 2013); *see also In re St. Louis Freight Lines, Inc.*, 45 B.R. 546, 552, n. 9 (Bankr. E.D. Mich. 1984) (IRS was bound by the plan's treatment, even though less favorable than it was entitled to as a priority administrative tax claimant, because it had "expressly 'approved' the order confirming the plan.").

48.     In *Digital Impact,* the plan proponent proposed a plan that impaired administrative claimants and placed them in a voting class.   223 B.R. at 6.   No objections to such treatment were filed, but the court *sua sponte* found that the plan "fails to comply with Section § 1129(a)(9) on its face," because the plan proposed the payment of only 50% of administrative claims.   *Id.*   The debtor had argued that since the administrative claim classes had voted in sufficient numbers for those classes to have accepted the plan, all members of those classes had agreed to the different treatment in the plan.   The court disagreed, ruling that § 1129 (a)(9) "specifically requires ***each holder of each 'particular claim'*** to enter into an agreement with the plan proponent to waive the right to payment of administrative expenses in full."   *Id.* at 7 (emphasis added).   The court further indicated that it, "does not consider a 'deemed' acceptance by inaction equivalent to the affirmative consent required to override the clear mandate of Section § 1129(a)(9)."   *Id.* at 8, n.1.

49.     The court in *Digital Impact* explained that its reasoning was supported by Section 1123(a)(1) of the Code, which provides for classification of claims, but specifically excepts from classification priority administrative claims under Section 507(a)(1).   "Because these post-petition creditors are entitled to be paid in full, 'there is no reason to create a class or classes for such claims in light of the fact that a majority of such classes cannot bind a minority to less

favorable payment terms than those provided under section § 1129(a)(9).'" *Id.*, *quoting* 7 COLLIER ON BANKRUPTCY ¶ 1129.03 [9][a].   Similarly, the Debtors here should not be permitted to have 90% of the administrative creditors who chose to opt-***in*** to the Plan's treatment bind the remaining 10% who did not.

50.     *In re Jankins*, 184 B.R. 488 (Bankr. E.D. Va. 1995), an individual Chapter 11 debtor defaulted on priority IRS tax claim.   The United States moved to dismiss pursuant to § 1112(b).   A dispute arose as to how much the debtor had to pay to the IRS, with the IRS arguing that it was entitled to post-confirmation interest on its claim.   The debtor argued that the confirmed plan did not provide for the payment of interest, and the IRS had "agreed" to its treatment under the plan by its failure to object.   The court ruled that it "construes the term 'has agreed' in Section 1129(a)(9) as requiring the affected creditor's ***affirmative concurrence*** and not mere failure to object . . ." *Id.* at 492, n. 8 (emphasis added).   The court found the pertinent section of the plan to be ambiguous, but interpreted it as to comport with the Bankruptcy Code and therefore ruled that the debtor had to pay the IRS post-confirmation interest.   *Id.* at 492.

51.     Another decision addressing what the term "agreed" means in the context of § 1129(a)(9) is *In re Real Wilson Entertainment*, No. 11-15697-B-11, 2013 WL 5352697 (Bankr. E.D. Cal. Sept. 23, 2013).   While this is a written opinion, it is stated as being "not for publication."   The decision was, however, cited by the Court in *In re Molycorp, Inc.*, 562 B.R. 67 (Bankr. D. Del. 2017),[10] as an example of a case that required a creditors' affirmative consent to treatment different than that provided under § 1129(a)(9).

---

[10]   *Molycorp* addressed an objection by a secured creditor to a fee application of the committee's counsel on the grounds, *inter alia*, that it was barred by the cap on fees set forth in the cash collateral order. In overruling the objection, the Court discussed the split of authority on what constitutes an agreement by an administrative creditor to receive less than provided under section § 1129(a)(9) of

19

52.     The above referenced decisions are also consistent with this Court's ruling regarding what constitutes "consent" in the context of third party releases in *In re Washington Mutual, Inc.,* 442 B.R. 314 (Bankr. D. Del. 2011).   In *Washington Mutual,* this Court held that "any third party release is effective only with respect to those who *affirmatively consent* to it by voting in favor of the Plan and not opting out of the third party releases."   *Id.* at 355 (emphasis added).   This Court clarified that merely having an opt out mechanism is not enough, holding that an "opt out mechanism is not sufficient to support the third party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place). *Failing to return a ballot is not a sufficient manifestation of consent* to a third party release." *Id.* (emphasis added), *citing In re Zenith Electronics Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999); *accord Emerge Energy Services LP*, 2019 Bankr. LEXIS 3717, Case No. 19-11563, at \*54-55 (Bankr. D. Del, Dec. 5, 2019)(KBO)(in the context of a third party release provision in a plan, the Court held that "a waiver cannot be discerned through a party's silence or inaction unless specific circumstances are present," and, "[a] party's receipt of a notice imposing an artificial opt-out requirement, the recipient's possible understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as such circumstances).

53.     There is one published opinion that reaches the opposite result of the cases discussed above regarding what constitutes agreement to treatment that is different than what is provided by § 1129(a)(9).   *See Teligent*, 282 B.R. 765 (Bankr. S.D. New York. 2002).   The Court in *Teligent* held that the term ''agree,'' as used in section § 1129(a)(9), does not require a

---

the Code. *See Molycorp,* 562 B.R. at 78, and n. 54. The *Molycorp* Court also cited to *In re Cummins Util., L.P.*, 279 B.R. 195 (Bankr. N.D. Tex. 2003) as holding that section § 1129(a)(9)(A) requires express consent to a different treatment. However, the *Cummins* decision does not appear to address that section of the Code.

creditor's consent to treatment different than that provided under that section of the Code to be affirmative consent, and that administrative claimants could be deemed by their silence to have consented to treatment proposed by the debtors under their plan.  *Id.* at 770-73.

54.     The approach in *Teligent* was described by this Court in *Molycorp* as "novel," and based on a "questionable fiction" that a creditor's non-response was an acceptance to a different treatment than that provided by § 1129(a)(9).   562 B.R. at 78, n. 54.   A "questionable fiction" should not be sufficient to override the clear mandate of Section § 1129(a)(9) of the Code.   In addition, certain aspects of the *Teligent* ruling make it inapplicable to the present case.   The plan in *Teligent* was one of reorganization, which appeared to play a significant role in the Court's decision.   In its opinion, the Court stressed that, "one's general right to remain silent in the face of an offer should be subject to question and reconsideration where passivity will threaten the fundamental goals of bankruptcy – *rehabilitation, saving jobs and equality of distribution*.   *Id*. at 772 (emphasis added), citing *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984).   In Forever 21, there are no jobs to save, as the Debtors no longer have any employees,[11] and there is no possibility of rehabilitation under any scenario.   As to equality of distribution, that would be much more likely under a chapter 7 liquidation than under the Debtors' Plan, which appears to provide for the possibility of a higher payout for those administrative creditors who opted-***in*** (a guaranteed 11% distribution) as compared to those that did not ***opt-in*** but also do not opt-***out*** (percentage distribution unclear).   And even if the Debtors are permitted to use the op-***out*** mechanism, a much higher percentage distribution (100%) would

---

[11]   The absence of employees can be seen by the lack of any payroll disbursements in the Debtors' Monthly Operating Reports. *See, e.g.,* May 2021 Monthly Operating Reports, Dkt No. 1972, ecf p. 3 of 12.

have to be paid to those administrative and priority creditors who do not return an opt-*out* form if the Plan is to be confirmable under section § 1129(a)(9).

55.     Another significant difference between the facts of *Teligent* and Forever 21 is that in *Teligent* approximately 75% of the administrative creditors fell into a convenience class of $3,000 or less, who were to be paid *in full*.   Of the remainder, about half opted into the convenience class.   *See Teligent*, 282 B.R. at 770.   There is no convenience class in the Forever 21 plan, and it appears from the claims register that a good number of the administrative claims are in the hundreds of thousands of dollars, and some in the millions.

56.     Finally, it does not appear that the debtors in *Teligent* served opt-*out* forms on administrative creditors regarding their treatment under the plan *after* such administrative creditors had already declined to return opt-*in* forms, as the Forever 21 Debtors seek to do here.

57.     *Teligent* is the only reported opinion that supports the use of opt-*outs* to deem agreement to treatment different than that mandated by § 1129(a)(9).   In the legal argument appearing in the Debtors' Disclosure Statement, the Debtors also cite to confirmation orders, other court orders, the wording of plans, and hearing transcripts in other cases, in support of their request for authority to send opt-*out* forms to administrative and priority creditors.   All but one of these cases are from outside of the Third Circuit.[12]   Because there are no written opinions in these cases, it is difficult to address their outcome.   The U.S. Trustee is cognizant of this Court's general directive regarding citations to orders, hearing transcripts and court filings in cases in

---

[12]  The one case within the Third Circuit is *Trans World Airlines, Inc.*, No. 01–0056 (Bankr. D. Del. 2002)(Walsh, J.).

which there is not a reported decision, and therefore will not address those types of documents

on which the Debtors rely, unless requested to by the Court.

58.     The Debtors' request for approval of procedures to allow them to send opt-***out***

forms to administrative creditors who previously declined to execute opt-***in*** forms, and to send

the same to all holders of priority tax and other priority claims, should be denied.

### B.  The Debtors' Request for Approval to Solicit the Vote of General Unsecured Creditors Should be Denied

59.     By their solicitation procedures, the Debtors seek approval to solicit the vote of

two classes of general unsecured creditors, Class 3A and 3B, which are the only voting classes.

Such approval should be denied because the general unsecured creditors, whether placed in Class

3A or Class 3B, are to receive nothing under the Plan, and therefore must be deemed to reject it.

60.     The distribution chart in the Disclosure Statement indicates the possibility of

general unsecured creditors receiving a less than one percent distribution under the Plan.

However, the Disclosure Statement makes clear that will occur only if all administrative and

priority creditors are paid in full, which the Debtors concede in their papers will not happen. As

noted in the Factual Background above, both the proposed Confirmation Hearing Notice and the

letter the Debtors propose to send to creditors in voting classes, state that, "the Debtors anticipate

that ***Holders of unsecured Claims will not receive any cash recovery*** under the Plan on account

of such Claims."  *See* Dkt. No. 1959-1, ecf pages 73 and 78 of 103 (emphasis added).


61.     Section 1126(g) of the Code provides:

> Notwithstanding any other provision of this section, a class is deemed not to
> have accepted a plan if such plan provides that the claims or interests of such
> class do not entitle the holders of such claims or interests to receive or retain
> any property under the plan on account of such claims or interests.

23

11 U.S.C. § 1126(g).

62.     Based on the Debtors' own admission, the two classes of unsecured creditors will

receive nothing, and therefore, under § 1126(g), must be deemed to reject the Plan.   *See In re*

*Fur Creations by Varriale, Ltd.*, 188 B.R. 754, 763, n.4 (Bankr. S.D.N.Y. 1995) ("a class is

deemed to reject a plan if the class does not receive a distribution under the plan."), *citing* 11

U.S.C. § 1126(g).

63.     Because the two classes of general unsecured creditors must be deemed to reject

the Plan under section 1126(g) of the Code, the Debtors should not be permitted to pre-pay

Prime Clerk an estimated $200,000 to soliciting votes from such creditors.

**II.     The Disclosure Statement Should Not be Approved
        Because it Contains Inaccurate and Inadequate Information**

64.     The Motion also should be denied because the disclosure included in the

Disclosure Statement is inadequate and inaccurate.   Section 1125 of the Bankruptcy Code

provides that a disclosure statement must contain "adequate information" describing a

confirmable plan.   *See In re Quigley Co., Inc.*, 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007).

65.     "Adequate information" is defined in § 1125 as being:

> information of a kind, and in sufficient detail, as far as is reasonably
> practicable in light of the nature and history of the debtor and the condition
> of debtor's books and records, that would enable a reasonable hypothetical
> investor typical of holders of claims or interests of the relevant class to make
> an informed judgment about the plan, but adequate information need not
> include such information about any other possible or proposed plan.

11 U.S.C. § 1125(a)(1).

66.     Adequate information is "determined by the facts and circumstances of each

case."   *Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.)*,

24

848 F.2d 414, 417 (3d Cir. 1988) (*citing* H.R. Rep. No. 595, 97th Cong., 2d Sess. 266 (1977))).

The "adequate information" requirement is intended to help creditors in their negotiations with a

debtor over a plan.   *See Century Glove, Inc. v. First American Bank of New York*, 860 F.2d 94,

100 (3d Cir. 1988).

67.     The disclosure statement requirement of Section 1125 is "crucial to the effective

functioning of the federal bankruptcy system.   Because creditors and the bankruptcy court rely

heavily on the debtor's disclosure statement in determining whether to approve a proposed

reorganization plan, the importance of full and honest disclosure cannot be overstated."   *Ryan*

*Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) (*citing*

*Oneida*, 848 F.2d at 417-18).

68.     The Disclosure Statement does not contain adequate information for a number of

reasons, detailed below.

### A.  The Liquidation Analysis Includes Inaccurate Assertions as to the Difference in Recoveries Under a Chapter 7 Liquation and Under the Debtors' Plan

69.     The Disclosure Statement's Liquidation Analysis is not accurate.   For a plan to

be confirmable, Section 1129(a)(7) of the Bankruptcy Code requires that a plan provide creditors

in impaired classes with at least what they would receive under a chapter 7 liquidation.   "To

measure value, the Court must contrive a hypothetical chapter 7 liquidation conducted on the

effective date of the plan."   *In re Lason, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003).   "The

court must independently determine the value of the distributions under the plan in order to

ascertain whether this requirement is satisfied, utilizing information that the proponent must

provide."   *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 610 (Bankr. D. Del. 2001)

(citations omitted).   "Disclosure statements are required to contain liquidation analyses that

enable creditors to make their own judgment as to whether a plan is in their best interests and to vote and object to a plan if they so desire." *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300-301 (Bankr. S.D.N.Y. 1990).   The plan proponent has the burden of demonstrating that the best interest test has been satisfied.   *See Genesis Health*, 266 B.R. at 610.

70.    While the Debtors have included a Liquidation Analysis, it is factually inaccurate, most significantly with respect to the amount of professional fees that a chapter 7 trustee would incur if the case were to convert.   *See* Dkt No. 1957, ecf page 61 of 61.   The Debtors estimate these fees to be a whopping $ 4.5 to $5.7 million.   In contrast, the Debtors estimates fees of the Plan Administrator at only $1.5 million.   It is not disclosed whether the $1.5 million is just for the Plan Administrator's fee, or the Plan Administrator's professionals, or both.   For a proper comparison with the costs in a chapter 7, the liquidation analysis should include both the Plan Administrator's fees and his or her professionals' fees.

71.    There would appear to be no justification for chapter 7 professional fees to be in the range of $4.5 to $5.7 million.   There are no assets left for a chapter 7 trustee to collect, other than waiting for payment of state tax refunds (for which, upon information and belief, the Debtors have already submitted applications), together with "duty drawback claims and other claims," that total, in the aggregate with the state tax refunds, of between a $500,000 and $ 1 million.   *Id.*   The Debtors state they are "not aware of any other claims or causes of action available to creditors in the Chapter 7 scenario."   *Id.*   All avoidance claims and all other causes of action of the Debtors were sold to the buyer of the Debtors' assets.[13]   Yet the Debtors attempt

---

[13]    *See* Notice of Filing of Final Asset Purchase Agreement, Dkt. No. 922-1, § 1.1(v) (definition of "Acquired Assets"), and § 2.1 ("Purchase and Sale of Assets"), ecf pp. 9-10 and 31 of 83.

to justify the figure of $4.5 to $5.7 million in trustee professional fees in Note C of the Liquidation Analysis by stating that such fees include "evaluating (sic) pursuing causes of action." *Id.*

72.     Given that causes of action were sold, and there are virtually no assets to collect, the only work for a chapter 7 trustee would be administrative claims resolution, some of which has been done by the Debtors by way of claims objections, and disbursing funds.   *See* Giuliano Declaration, Ex. A hereto, ¶ 11.   The chapter 7 trustee's professional fees associated with this work should not be any greater than those that would be incurred by the Plan Administrator. *See id.*, ¶ 9.

73.     There are also costs that should have been included under the "Plan Scenario" portion of the Liquidation Analysis that do not appear, such as professional fees for the Debtors and the Committee.   The Debtors asserted in their Settlement Procedures Motion that their professionals "have agreed to run the Administrative Claims Settlement process without receiving any payment for the work necessary to facility such process."   Dkt. No. 1654, ¶ 5. However, the Debtors did not assert that all professionals have agreed not to seek payment for any services or out of pocket expenses relating to the plan and disclosure statement process, or subsequent services, such as filing and prosecuting additional administrative claims objections. Nor did the Debtors include in the "Plan Scenario" the $200,000 they are seeking Court authority to prepay to Prime Clerk to undertake solicitation of the Plan.

74.     If the Disclosure Statement is to be approved, the inaccuracies in the Liquation Analysis must be corrected, so as to allow administrative creditors to get a true picture of what difference, if any, there would be in the amount of distribution on their claims in chapter 7, as

27

compared with a liquidation under the Plan.   Because an evidentiary predicate is necessary on this issue, the U.S. Trustee reserves argument until the record at the disclosure statement hearing is closed.

**B.  Other Inaccuracies Included in the Disclosure Statement**

75.   The Disclosure Statement includes numerous inaccurate or misleading statements, including the following:

> a.   The Disclosure Statement includes the representation that the Plan waives all avoidance actions against general unsecured creditors, and uses that as a carrot to induce such creditors to vote in favor of the Plan.   *See, e.g.*, chart of "Summary of Expected Recoveries" on pages 8-9 of the Disclosure Statement, indicating that part of the projected recovery under the Plan for unsecured creditors is the "value of Avoidance Action waiver;" and reference to waiver of Avoidance Actions on page 3 of the Disclosure Statement.   *See* Dkt. No. 1957, ecf page 9 of 61 (first and second bullet points on page) and pages 14 and 15 of 61.   This supposed waiver is a fallacy, because the Debtors sold all avoidance claims and all other causes of action to the buyer of the Debtors' assets in February of 2020.   *See* Notice of Filing of Final Asset Purchase Agreement, Dkt. No. 922-1, § 1.1(v) (definition of "Acquired Assets"), and § 2.1 ("Purchase and Sale of Assets"), ecf pp. 9-10 and 31 of 83.   The Debtors therefore have no right or ability to waive any avoidance actions against their creditors.

> b.   The Debtors assert in the Disclosure Statement that one of the reasons creditors will be better off under the Plan than under a chapter 7 liquidation is that, if the cases convert, "important employees with institutional knowledge would be gone for good."   *See* Dkt. No. 1957, ecf page 9 of 61.   The Debtors no longer have any employees.

28

c.  The Disclosure Statement asserts that "the Confirmation Order will discharge the Debtors from any debt arising before the Effective Date." *See id.,* ecf page 8 of 61.   The Debtors are not entitled to a discharge under the Code because they are liquidating.

d.  The Disclosure Statement wrongly asserts that parties in voting classes who "abstain" from voting on the Plan and do not opt-out of or object to third party releases will be deemed to consent to such releases. *See id.,* ecf page 11 of 61. This is not consistent with the definition of "Releasing Parties" set forth in the Plan.   *See* Dkt. No. 1956, ecf page 10 of 39 (the definition does not include claimants in voting classes who do not return a ballot).

e.  The Disclosure Statement indicates that the sale of a warehouse "brought approximately $16.0 million of net available proceeds for distribution." *See* Dkt. No. 1957, ecf pages 7-8.   This gives the impression that such $16 million remains available for distribution to creditors, when a large portion of that sum was immediately paid to the DIP lender, and only $6.7 million currently remains.

f.  There are a number of places in the Disclosure Statement that give the misleading impressing that the Debtors are continuing their business and are going to reorganize.   The Preliminary Statement begins with the statement, "The goal of these Chapter 11 Cases has been clear since the Petition Date: emerge with a viable and feasible standalone business."   *See* Dkt. No. 1957, ecf page 7 of 61.   Perhaps that had been the goal prior to the Debtors selling their business, but such goal is no longer achievable. Similarly, in discussing "Operational Right Sizing" of the Debtors business, they assert that "design teams will *now* be centered around categories such as 'tops' or 'bottoms.'" *See id.,* ecf page 35 of 61 (emphasis added).   That statement is followed by a list of employees that were supposedly hired "in the last six months," but were in fact hired in 2019.   *See id.*

**C.  Necessary Disclosures that are Missing from the Disclosure Statement**

76.    In addition to including inaccurate information, the Disclosure Statement also
fails to disclose certain relevant information, including the following:

    a.  As noted above, the Disclosure Statement does not disclose what distribution will
be made to an administrative or priority creditor who opt-*out* of the treatment
proposed under the plan, or who files an objection to the same.   The Debtors
imply they may not be able to proceed to confirmation if that occurs, but do not
disclose if that would be true if even one administrative creditor or priority
creditor returned an opt-*out* form, or whether the Debtors could pay some amount
of administrative and priority claims in full, and therefore still could proceed to
confirmation provided that holders of not more than a certain dollar amount of
such claims do not opt-*out* of their proposed treatment under the Plan.

    b.  The Disclosure Statement does not disclose the percentage of their allowed claims
that administrative creditors, priority tax or other priority creditors will receive
under the Plan.   Those administrative creditors who returned opt-*in* forms were
guaranteed at least 11% of their allowed claims, although that is not disclosed in
the Disclosure Statement.   The Disclosure Statement does not disclose what
happens if the Debtors cannot pay them the full 11%, either because (a) the
allowed administrative claims are in excess of what the Debtors are anticipating
they will be, or (b) they receive more opt-*out* forms than they currently expect.

    c.  The Disclosure Statement fails to disclose what percentage distribution the
Debtors anticipate will be paid to those administrative creditors who hold
professional fee claims, as compared with other general administrative creditors.

    d.  The Disclosure Statement does not disclose what would happen to the $8.3
million in Carve-Out Reserves if the cases converted to chapter 7, and whether
any of those funds would be available to pay administrative claimants who were
not professionals.

e.  The Disclosure Statement does not disclose that this Court entered an order
prohibiting the Debtors from paying any fees to estate professionals, with the
exception of Deloitte, until further order of the Court.   *See* Dkt. Nos. 1444 and
1505.

f.  The Disclosure Statement and the Plan use the term "General Administrative
Claim" to also cover Priority Tax Claims, and do not have a separate section that
addresses the treatment of Priority Tax Claims.   This could obscure the fact that
priority tax Claims will not be paid as required under section 1129(a)(9)(C) and
(D) of the Code.

g.  The Disclosure Statement does not disclose who will be the Plan Administrator,
or what their fee structure will be, which is important for purposes of comparison
to the fees of a chapter 7 trustee.   It also is not clear from the Liquidation
Analysis whether the $1.5 million in Plan Administrator costs includes
professional fees of such administrator.

h.  The Disclosure Statement does not disclose that, unlike the process in chapter 7,
there will be no Court oversight of the professional fees of a Plan Administrator.

77.     In light of the inaccuracies and inadequacies of the Disclosure Statement, it
should not be approved by the Court.

## III.    The Disclosure Statement Should Not be Approved
Because the Plan is Not Confirmable

78.     A disclosure statement should not be approved if the plan it describes is
unconfirmable on its face, because approving the disclosure statement and proceeding to a
confirmation hearing would be a fruitless exercise.   *In re Dow Corning Corp.*, 237 B.R. 380
(Bankr. E.D. Mich. 1999); *In re H.K. Porter Co.*, 156 B.R. 16 (W.D. Pa. 1993); *In re Monroe
Well Service*, 80 B.R. 324 (Bankr. E.D. Pa. 1987); *John Hancock Mutual Life Insurance
Company v. Route 37 Business Park Associates*, 987 F. 2d 154 (Cir. 3 1993).   A disclosure

statement should not be approved if the plan attempts to rewrite the Bankruptcy Code. *See In re Beyond.com*, 289 Bankr. 138 (Bankr. N.D. CA. 2003).

79.    The Debtors' Disclosure Statement should not be approved, and the Debtors should not be authorized to solicit votes on their Plan, because the Plan does not satisfy several of the confirmation requirements in Section 1129.   The Court may address confirmation issues at the disclosure statement phase "where it is obvious . . . that a later confirmation hearing would be futile because the plan described by the disclosure statement is patently unconfirmable.   A plan is patently unconfirmable where (1) confirmation 'defects [cannot] be overcome by creditor voting results' and (2) those defects 'concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing.'"   *In re American Capital Equipment, LLC*, 688 F.3d 145, 154-55 (3d Cir. 2012) (citation omitted).   "The debtor has the burden of proving that a disclosure statement is adequate, including showing that the plan is confirmable or that defects might be cured or involve material facts in dispute."   *Id.* at 155. The Plan does not appear capable on its face of satisfying Sections 1129(a)(9) or 1129(a)(10). The Motion therefore should be denied.

80.    The Plan is not confirmable under section 1129(a)(9) of the Code because it fails to pay administrative claimants, priority tax claimants, or other priority claimants in full without obtaining their affirmative agreement to such lesser treatment, for the reasons set forth in Point I.A. above.

81.    In addition, the Debtors' Plan does not even provide for payment in full to those administrative and priority claimants who *do* return an opt-***out*** form.   Rather, the Plan provides that each Holder of an Allowed General Administrative Claim (which is defined to include

32

Priority Tax Claims), shall receive its "Pro Rata share of the Administrative and Priority Tax

Claims Recovery." The only exception is for those Holders of such claims who "agree to *less*

favorable treatment." *See* Plan, Dkt. 1956, Art. II.A.1 (emphasis added). Even under the

Debtors' view that an agreement to different treatment under § 1129(a)(9) can be inferred by

silence, the Plan must provide to pay in full the claim of any administrative or priority claims

who *do* return opt-***out*** forms. Because the Plan fails to do so, it is not confirmable.

82.     Plan is not also confirmable because there is no scenario in which it can comply

with 1129(a)(10). That section of the Code provides, "If a class of claims is impaired under the

plan, at least one class of claims that is impaired under the plan has accepted the plan,

determined without including any acceptance of the plan by any insider." 11 U.S.C. §

1129(a)(10).

83.     The Plan does have classes of impaired claims, and therefore § 1129(a)(10)

applies and the Plan cannot be confirmed unless at least one class of impaired claims votes to

accept the Plan. But there are no impaired classes of claims that are eligible to vote on the Plan

because all classes either are deemed to reject, or must be deemed to reject under section

1126(g). As addressed above, the two classes of general unsecured creditors that are designated

as voting classes will not receive any distribution under the Plan, which the Debtors admit.

They therefore must be deemed to reject under § 1126(g).

84.     The Debtors should not be allowed to create artificial voting classes in order to

meet the requirements of § 1129(a)(10). *See, e.g.*, *Windsor on the River Assocs. v. Balcor Real*

*Estate Fin. (In re Windsor on the River Assocs., Ltd.)*, 7 F.3d 127, 132-33 (8th Cir. 1993)

(rejecting manufacture of an impaired class for sole purpose of ensuring plan approval by at least

one impaired class); *In re Washington Assoc.*, 147 B.R. 827, 831 (E.D.N.Y. 1992); *In re Dunes Hotel Assocs..*, 188 B.R. 174, 184 (Bankr. D.S.C. 1995).   Because there is no class of impaired creditors who can vote to accept the Plan, the Plan is not confirmable.

85.    The Plan is also not confirmable because it includes a discharge provision in Article IX.A.   *See* Dkt. No. 1956, ecf page 28 of 39.   Although the Plan is not called a plan of liquidation, the Plan provides for the liquidation of all the property of the estate.   The Plan provides that, after consummation of the Plan, "the Plan Administrator shall have the power and authority to take any action necessary to Wind-Down and dissolve the Debtors' Estates," and that "[f]rom and after the Effective Date the Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, . . ."   *See* Dkt. No. 1956, Art. IV.F, ecf page 20 of 39; *see also* Art. IV.I (titled "Dissolution of the Wind-Down Debtors"), on the same page.   In light of these provisions, the Debtors are not entitled to a discharge under § 1141(d)(3) of the Code, and therefore the Plan's discharge provision renders it unconfirmable.[14]

## **RESERVATION OF RIGHTS**

86.    The U.S. Trustee reserves all rights, remedies, and obligations to, *inter alia*, complement, supplement, augment, alter, or modify this Objection, file any appropriate Motion, conduct any discovery as may be deemed necessary or as may be required, and assert such other

---

[14]    There are other provisions of the Plan that would prevent confirmation, but given the significance of the points addressed above, the U.S. Trustee will not detail those provisions here.   The U.S. Trustee reserves the right to raise such issues in connection with confirmation, if the Court allows the Plan to proceed to confirmation.

grounds as may subsequently become apparent. The U.S. Trustee also reserves all objections to

confirmation of the Plan, or any other plan that may be filed.

WHEREFORE, the U.S. Trustee respectfully requests that this Court enter an order

denying the Motion and granting such other relief as the Court deems appropriate.

Respectfully submitted,

ANDREW R. VARA
UNITED STATES TRUSTEE
REGIONS 3 AND 9

Dated: July 13, 2021                    By:  /s/ Juliet Sarkessian
                                        Juliet Sarkessian
                                        Trial Attorney
                                        Office of the United States Trustee
                                        J. Caleb Boggs Federal Building
                                        844 King Street, Suite 2207, Lockbox 35
                                        Wilmington, DE 19801
                                        (302) 573-6491
                                        Email: Juliet.M.Sarkessian@usdoj.gov